## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **NO. 1:16-CR-82** |
| | ) | |
| **v.** | ) | **(Judge Yvette Kane)** |
| | ) | |
| **WILLIAM CHANDLER AUGUSTA,** | ) | |
| **aka "Guy Johnson"** | ) | |
| | ) | **(Electronically Filed)** |
| **Defendant.** | ) | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

Child pornography is devoid of any trace of social value and it inflicts serious and reprehensible harm upon the children exploited in its production. Defendant Augusta has a deviant interest in the sexual abuse of children and sharing that abuse with other like-minded pedophiles for their mutual sexual gratification. The collection of child pornography he produced and distributed included images and videos of children being sexually abused, including prepubescent minors performing sex acts, and children as young as toddlers being raped, bound and penetrated by adults. The United States requests the Court impose a sentencing that reflects the seriousness of the defendant's conduct. The United States respectfully requests a sentence of life in prison.

### A. Procedural History

On March 30, 2016, a grand jury sitting in Harrisburg, Pennsylvania returned a sealed 17 count Indictment against William Augusta and 13 other

defendants.   The initial Indictment charged William Augusta as John Doe 1, aka

"Guy Johnson" in twelve counts of child exploitation offenses.   On May 11, 2016,

the grand jury returned an 18 count Superseding indictment against Augusta and

14 other defendants.   The Superseding Indictment charges Augusta in Counts 1-13

with Production of Child Pornography, in violation of 18 U.S.C. § 2251(a)(Counts

1,3,5,6,7,8,9), Conspiracy to Produce Child Pornography, in violation of 18 U.S.C.

§ 2251(e)(Counts 2, 10), Selling of Children, in violation of 18 U.S.C. §

2251A(a)(Count 4), Conspiracy to Receive and Distribute Child Pornography in

violation of 18 U.S.C. § 2252A(a)(2)(Counts 11, 12) and Conspiracy to Publish a

Notice or Advertisement Seeking Child Pornography, in violation of 18 U.S.C. §

2251(d)(Count 13).

On October 28, 2016, Augusta pleaded guilty without any written plea

agreement to all counts that name him in the Superseding Indictment, including

counts 1-13.  Sentencing is currently scheduled for October 31, 2017.

The United States Probation Office prepared a Pre-Sentence Investigation

Report and determined Augusta has a Criminal History Category I and a total

offense level of 43.  PSR ¶136.  Therefore, the advisory guidelines call for a

sentence of life in prison.  PSR ¶136.  In his Sentencing Memorandum, the

defendant requests a variance below life in prison to some term of years in order to

provide this defendant with "hope."  *See* Def's Sent. Memo. at 3.  The United

States respectfully requests a life sentence for this defendant.

### B. Factual Background

This case started in July 2015 when an undercover police officer in Toronto,

Canada observed the live sexual abuse of Victim-1 in "Application A."

"Application A,"[1] is designed for video conferencing on multiple device formats.

To use this application, a user downloads the application to a computer, mobile

phone or other mobile device (*e.g*., tablet) via direct download from the company's

website.  Once downloaded and installed, the user is prompted to create an

account.  "Application A" users can invite others to an online meeting "room."  In

each instance, both "Application A" and the targets are referring to the 10-digit

number that specifically identifies an online location where each user can see and

interact with the other users in the same room.

When a user chooses to enter a specific meeting room, the user enters the

10-digit number and enters the username that he wants to use on that specific

occasion, which does not have to be the same as the account username.

---

[1] The actual name of "Application A" is known to law enforcement and the defendants.  This application remains active and disclosure of the name of the application would potentially alert its users to the fact that law enforcement action is being taken against users of the application, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence.  Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the application will be identified herein as "Application A."

"Application A" does not require a certain number of characters for a particular username.  Consequently, a user can create a name with a single special character, such as "#" or a single letter, such as "a."

During a meeting, users can show a live image or video of themselves to other users through the webcam feature.  Users may also display the contents of their own computer desktops to the other users in the room.  The ability to display their own computer desktops allows users to show videos and photos to other users in the room.  "Application A" also allows users to send text messages visible to all of the users in the room, or private messages that are similar to instant messages sent between two users.

"Application A" permits users to conduct online video conferences for free for a limited number of minutes.  Paid subscribers can conduct online video conferences for an unlimited amount of time.  Some "Application A" users with a paid account permit their rooms to be accessed without a password such that anyone who knows the room number can enter and leave the room at any time.

On July 22, 2015, Toronto law enforcement began monitoring an "Application A" room that Toronto law enforcement became aware of on July 10, 2015 as a room that showed child pornography. The Toronto UC observed a German user streaming a video from the "Tara" series, which depicts an adult male wearing a mask while he vaginally and orally rapes the prepubescent girl. During

the stream of that video, Defendant William Augusta was logged into the room. The Toronto UC successfully recorded the stream of that video.

At approximately 18:37 EDT, Defendant Augusta (utilizing user name "Guy Johnson") posted "Pennsylvania with a . . . toy if you can visit." Immediately thereafter, at 18:38 EDT, the German user who had been streaming the "Tara" series, began streaming a prerecorded video called "boy1.mp4" that depicted Augusta orally raping a prepubescent black child (hereafter Victim-1). The Toronto UC successfully recorded the stream of that video. While the video was streaming, Augusta commented, "mmmmmmmm now THIS is porn." Additionally, during the stream of that video, other users in the room commented on the video. For example, Defendant Sewell, a.k.a. "SexEducation8-13" commented, "rape the nigger baby!!!." After the video completed, Augusta posted, "if you liked that last hardcore vid that was recorded live, me and my fucktoy [age redacted] yr old [Victim-1's real first name]." Another user suggested to Augusta, "nice you should bring out your fucktoy."

The Toronto UC attempted to message Augusta via "Application A," but was unsuccessful. Between approximately 18:50 and 19:16 EDT, the Toronto UC was away from the computer and it was not recording, but the "Application A" room was still active and the UC was logged into that room. Upon returning to the computer, at approximately 19:17 EDT, the UC observed Augusta streaming the

live sexual abuse of Victim-1. Specifically, Augusta orally raped Victim-1 and also digitally penetrated Victim-1's anus. The live abuse stream continued until approximately 19:22 EDT when another user took over the screensharing function in Application A, which made that user's screen the dominate screen, and Augusta's screen was minimized for everyone. A few seconds later, Augusta's screen turned off. The Toronto UC was able to record the activity from approximately 19:17 EDT until the end of the stream.

On that same day, July 22, 2015, the Toronto UC contacted a Homeland Security Special Agent located in Phoenix, Arizona and advised that agent about the live-abuse activity just witnessed in "Application A." On that same day, July 22, 2015, the HSI agent served a summons on "Application A" for IP logs associated with the room in which Toronto UC had observed the live abuse. "Application A" quickly responded and provided the IP address, which geolocated to the Carlisle, Pennsylvania area and was registered to Comcast Communications. The HSI agent then served an "exigent circumstances" request on Comcast, which verbally provided the subscriber name, address and telephone number. Additional open-source checks confirmed that the subscriber residence was a multi-generational household that included a prepubescent child that matched the description and depiction of the child who had been viewed in "Application A."

On July 23, 2015, a Pennsylvania state search warrant was executed at the residence in Carlisle, PA. Victim-1 was rescued and subsequently confirmed that he had been repeatedly sexually abused by Augusta. Augusta was arrested, but refused to make a statement. Subsequent review of chat logs revealed that Augusta has told other like-minded pedophiles that he has been sexually abusing Victim-1 since Victim-1 was one-year-old.

The following is a relevant timeline of events that occurred in the "Application A" room before and during the live transmission. First, a user in Germany streamed a previously recorded video of Augusta sexually abusing Victim-1. During that stream, Defendants Augusta, Sewell, and Fensler commented on it. A few minutes later, Augusta brought Victim-1 in front of the camera and proceeded to sexually abuse him, including oral rape and digital penetration, for the next 22 minutes. During the live-stream, other defendants, and unindicted co-conspirators, commented on the sexual abuse in a way that encouraged the abuse to continue. While the Toronto UC did not start recording the video content until later, the UC was able to recover the chat log that began well before the UC started recording what she saw on her screen. Consequently, we have the following chat log that starts before the UC recording and continues after.

**<u>Previously Recorded Video of August Abusing Victim-1</u>**

| | |
|---|---|
| 18:38:16 | From SEXeducation8-13 : rape the nigger baby!!!! (David Sewell) |
| 18:38:33 | From YngCanPigPerv : sorry guys (Non-U.S. target) |
| 18:38:35 | From YngCanPigPerv : lol (Non-U.S. target) |
| 18:38:38 | From YngCanPigPerv : its on now (Non-U.S. target) |
| 18:38:48 | From dirtypervy : rape that lil nigger |
| **18:39:39** | **From Guy Johnson : mmmmmmmmmmmmmmm now THIS is porn (Augusta)** |
| 18:40:29 | From babyRaperSnuffer : nice vid (Matthew Fensler) |
| **18:41:52** | **From Guy Johnson : if you liked that last hardcore vid that was recorded live, me and my fucktoy 6 yr old [Victim-1's real first name] (Augusta)** |
| 18:42:08 | From SEXeducation8-13 : hot:) (David Sewell) |
| 18:42:15 | From micheal : mmmmmmmmmmmmmm |
| 18:42:16 | From SEXeducation8-13 : you are my idol (David Sewell) |
| 18:42:19 | From babyRaperSnuffer : nice you should bring out your fucktoy (Matthew Fensler) |
| 18:44:24 | From . : hey guys if the vid has sound please rember to MUTE ur MIC (Bruce Edgecombe) |
| 18:44:37 | From perv : any lil puss vids? (Non-U.S. target) |
| 18:45:21 | From . : luv anything BALD b/g brutal or consentual (Bruce Edgecombe) |
| 18:46:18 | From xxx to gl(privately) : hey man (Non-U.S. target) |
| 18:46:37 | From pervpred : nepi guys? |
| 18:46:42 | From d to gl(privately) : hot (Non-U.S. target) |
| 18:46:51 | From babyRaperSnuffer : luv nepi (Matthew Fensler) |
| 18:47:08 | From . : luvr it  storment c (Bruce Edgecombe) |
| 18:48:32 | From . : as u all can see i like a littl pan with my PEDOS (Bruce Edgecombe) |
| 18:48:43 | From h. loroc : any young teen vids? (Ed Westbury) |
| 18:48:59 | From SS Lorenz : Do (Non-U.S. target) |
| 18:51:24 | From YngCanPigPerv : I think my cam is working now? (Non-U.S. target) |
| 18:51:25 | From pervpred : ne1 else with wife or gf in the house |
| 18:52:29 | From nyc perv : 31 nyc perv here (Scott Lane) |
| 18:52:38 | From Big Dawg : Georgia? |
| **18:54:06** | **From Guy Johnson : srry back if u messaged me (Augusta)** |
| **18:54:49** | **From Guy Johnson : did u guys like that video? (Augusta)** |
| 18:55:17 | From dirtypervy : love some good boi rapping |

18:55:22     From . :  GUy hot HOTTTTTTTTTTTTTTT (Bruce Edgecombe)
18:55:59     From babyRaperSnuffer : fuck yea hot vid earlier (Matthew Fensler)
18:56:03     From Sla,NPerv : london? (Non-U.S. target)
18:56:38     From . : us mid wwst (Bruce Edgecombe)
18:58:05     From nyc perv : nyc anyone? (Scott Lane)
18:59:23     From nyc perv : anyone showing vids? (Scott Lane)
18:59:36     From New 'Phone : or live? (Non-U.S. target)
18:59:44     From Daniel Sotherland : so appreciate if someone showed vids—need to bust before work (Dylan Heatherly)
18:59:47     From nyc perv : i can do live tomorrow (Scott Lane)
18:59:56     From New 'Phone : with what? (Non-U.S. target)
19:00:15     From . : ask GUY if [Victim-1] is home (Bruce Edgecombe)

## Live Event Begins Here

19:00:25     From New 'Phone : [Victim-1] is home (Non-U.S. target)
19:01:00     From New 'Phone : we all watching guy johnson (Non-U.S. target)
19:01:05     From babyRaperSnuffer : turn off the video wtf? (Matthew Fensler)
19:01:06     From nyc perv : who is [Victim-1]? (Scott Lane)
19:01:25     From New 'Phone : Stop screensharing (Non-U.S. target)
19:01:41     From New 'Phone : guy has his [relative] [Victim-1] (Non-U.S. target)
19:01:42     From h. loroc : keep it (Ed Westbury)
19:02:34     From dirtypervy : thanks man
19:02:37     From dirtypervy : made me shoot haha
19:02:46     From Daniel Sotherland : so close here (Dylan Heatherly)
19:03:19     From letsdothisnowtoo1 : Look at that throbbing (Moises Marquez)
19:09:32     From jay : spread his ass cheeks (Non-U.S. target)
19:09:59     From babyRaperSnuffer : you should smack him around a couple of times (Matthew Fensler)
19:10:20     From nyc perv : let us hear the audio (Scott Lane)
19:11:03     From Andy : guy put the sound on (Non-U.S. target)
19:11:35     From nyc perv : make out with him (Scott Lane)
19:13:10     From lovefurrymen : there's one perv here (Non-U.S. target)
19:13:17     From nyc perv : show more face (Scott Lane)
19:13:27     From lovefurrymen : guy Johnston (Non-U.S. target)
19:13:46     From lovefurrymen : no child here! (Non-U.S. target)
19:13:56     From SS Lorenz : Sado (Non-U.S. target)
19:14:08     From cumslut perv : cams on please (Casey O'Dell)
19:14:58     From Pp : Spit in his face (Non-U.S. target)
19:15:44     From nyc perv : fuck him (Scott Lane)

19:15:53      From Andy : guu he needs to be fucked (Non-U.S. target)
19:17:58      From Andy : rape him (Non-U.S. target)
19:18:51      From b b_lv : how old is the boy (Non-U.S. target)
19:21:12      From nyc perv : 31 nyc perv here. fuck nephew. (Scott Lane)
19:21:49      From Irish pd : Age is nephew? (Non-U.S. target)
19:21:54      From Andy : guy some guys think this is a vid do something to prove
              it's live (Non-U.S. target)
19:21:58      From Andy : smack him (Non-U.S. target)
19:22:50      From . : [Victim-1] has his shirt on again (Bruce Edgecombe)

## Live Event Ends Here

19:23:47      From Andy : get him to say hi andy (Non-U.S. target)
19:24:28      From nyc perv : lets see some fucking (Scott Lane)
19:25:52      From Dad Bear : hi guys
19:27:15      From nyc perv : anyone have vids? (Scott Lane)
19:27:44      From FlyingPerv : cunts? (Non-U.S. target)
**19:27:50      From gl to Guy Johnson (privately) : was that a vid or live?
              (Toronto UC)**
19:27:51      From FlyingPerv : u like? (Non-U.S. target)
19:28:15      From nyc perv : oh yeah (Scott Lane)
19:29:12      From YngCanPigPerv : SMOKE TIME? (Non-U.S. target)

Augusta disconnected from that "Application A" room at approximately 19:39, and

reconnected about an hour later at 20:33. He stayed in the room for another 48

minutes until about 21:22 EDT.

A forensic analysis of Defendant Augusta's multiple electronic devices

revealed that he had been sexually abusing Victim-1, as well as other child victims

ranging in age from a 13-month-old infant to two adolescents. The visual

depictions recovered from Defendant Augusta's devices date back to as early as

March 2013 and continue until July 22, 2015 when the live event occurred in

"Application A."

### C. Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant

Augusta claims his "history helps explain his participation in such an offense." Defendant's Sentencing Memorandum at *5. It is difficult to overstate the egregious nature of Augusta's conduct, it simply shocks the conscience. To mentally, emotionally, and physically manipulate a 6 year old boy bespeaks of true cruelty, particularly when considering Augusta's claims of how his own abuse affected him. As a matter of common sense, evils committed upon a person as a child should give that person greater empathy for the effects of such evil. To assume that the challenges faced by the defendant in his life are somehow an explanation or justification for his crimes is offensive. Every individual faces challenges in their life, some more severe, some less severe – but no challenge provides any explanation, justification or mitigation for the types of vile offenses committed by Augusta. The victim of his crimes – the child depicted during the worst moments of his life – is the one who experiences challenges beyond imagination.

To the extent Defendant suggests there is a correlation between being a victim of child molestation and his later engaging in serial, sexually exploitative conduct on children, the United States initially questions that correlation, but also notes that correlation is not causation. Indeed, while this "correlation" may appear attractive as an explanation for inexplicable conduct, reality does not bear it out.

That is, if being sexually abused makes one more likely to offend in a like manner, perhaps Defendant can explain why girls, who make up a disproportionately large percentage of child exploitation victims do not also make up an equally large percentage of child exploitation offenders. In other words, if abuse begets abuse, then the large volume of female victims would result in a statistically larger volume of female offenders. Defendant simply cannot produce such statistics to support his claim.  Thus, his argument fails at the outset.

Regardless of the patent fallacy in his argument, research in this area further illustrates that Defendant's argument - being abused caused him to abuse - is scientifically unsupported. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation." Lambie, Ian, et al.*, Resiliency in the victim-offender cycle in male sexual abuse*, SEX ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 14(1), 43 (2002) *see also* Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*,THE BRITISH JOURNAL OF PSYCHIATRY 179, 488 (2001) (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, CHILD ABUSE & NEGLECT

20(3), 230 (1996) (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations.").

Moreover, with respect to studies which have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy." Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, THE BRITISH JOURNAL OF PSYCHIATRY 179, 488 (2001). *See also* Hall, R.C.W., *A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,* MAYO CLINIC PROCEEDINGS 82(4),  464 (2007) ("There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves.  These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., *Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents,* CHILD ABUSE & NEGLECT 20(12) 1234, (1996) ("Studies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child.  Variability in

prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); and Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, CHILD ABUSE & NEGLECT 20(3), 232 (1996) ("Perpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers).").

Indeed, "when verified by polygraph…the percentage of offenders who experienced sexual victimization in their own lives drops significantly."  Hindman, Jan et al., *Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy* THE SEXUAL PREDATOR (vol. IV), 20-5 (2010).  *See also* Hindman, Jan et al., *Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders*, FEDERAL PROBATION 65(3), 8 (2001).

Despite the many limitations on Augusta's argument that abuse begets abuse, including the dearth of female offenders and the self-reporting of abuse by perpetrators, no amount of bullying or physical or verbal abuse justifies what Augusta did to Victim-1 in this case – the repeated sexual assaults, the anal rapes

by an adult penis, the anal rape with a hammer, the oral rapes forcing this child to perform oral sex on adults, the sexual assaults at knife point, the sexual assaults while the child was bound, the "sharing" of Victim-1 with other adult males for the purpose of allowing that HIV positive predator to provide the child with drugs and then anally rape the victim – and all of these dehumanizing, degrading and demoralizing acts captured on video, preserved for eternity.  Nothing the defendant has presented can explain, justify or mitigate even a portion of what Victim-1 has endured in his very short life on this planet.  Therefore, no downward variance is warranted in this case.

While most child pornography offenses do not involve direct contact with the children in the images, Augusta's direct victimization requires increased punishment to reflect the seriousness of his offenses.  His crimes were not isolated incidents, but rather a pattern of abuse.  The nature and circumstances of these offenses – namely depraved conduct that occurred over a period of time when he was a custodian or caregiver to Victim-1 – requires a substantial sentence, the sentence of life in prison, to reflect the seriousness of the offense, serve the ends of justice and protect the community.

### D. Seriousness of the offense, Promoting respect for the law

Pursuant to 18 U.S.C. § 3553, this Honorable Court, in determining an appropriate sentence, should consider the seriousness of the offense, promote

respect for the law, and provide just punishment to a defendant. This factor is

known as the "just desserts" concept, answering the need for retribution so that the

punishment fits the crime and the defendant is punished justly. *See United States v.*

*Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report

regarding this provision:

> This purpose--essentially the "just desserts" concept--should be
> reflected clearly in all sentences; it is another way of saying that the
> sentence should reflect the gravity of the defendant's conduct. From
> the public's standpoint, the sentence should be of a type and length
> that will adequately reflect, among other things, the harm done or
> threatened by the offense, and the public interest in preventing a
> recurrence of the offense. (quoting S. Rep. No. 98-225, at 75-76, 1984
> U.S.C.C.A.N. 3258-59).

*Id.* Because the "punishment should fit the crime, the more serious the criminal

conduct is, the greater the need for retribution and the longer the sentence should

be. The seriousness of the crime varies directly with the harm it causes or

threatens. It follows that the greater the harm the more serious the crime, and the

longer the sentence should be for the punishment to fit the crime." *Id.*

This concept is especially applicable in the instant case, because "child sex

crimes are among the most egregious and despicable of societal and criminal

offenses." *Id.; see also United States v. Foss*, 501 F.2d 522, 527 (1st Cir.

1974) (cited with approval in the legislative history of Section 3553(a)) ("[T]he

view that punishment should fit the offender has never yet been held to eliminate

general deterrence as a factor to be considered along with others .... This is so even

though general deterrence concerns itself not with the individual offender but with the sentence's impact on others.").

The Third Circuit, in *United States v. Goff*, 501 F.3d 250, 258 (3d Cir. 2007) reversed a sentence that was too lenient in a child pornography case, explaining that the children's "injuries and the taking of their innocence are all too real" in such cases. Indeed, Defendant Augusta's allowing dozens of people around the world to watch and record while he sexually abused Victim-1 means that abuse is perpetuated forever. *See id*. at 259 (citing *New York v. Ferber,* 458 U.S. 747, 759 (1982)) ("The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."); *see also Osborne v. Ohio,* 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come."). The *Goff* court further observed that when Congress passed the Child Pornography Prevention Act of 1996, it found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." *Goff*, 501 F.3d at 259 (citing Child Pornography Prevention Act of 1996 ("CPPA"), Pub.L. 104–208, sec. 121, 110 Stat. 3009–26, reprinted in 18 U.S.C. § 2251 note at 611).

Here, Defendant should be sentenced to the maximum because his criminal conduct has a high likelihood of resulting in the premature death of Victim-1. While this statement sounds like an assertion borne of speculation and bordering on hyperbole, there is strong scientific support demonstrating that due to the sexual abuse this boy suffered at the hands of Defendant, he is at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18, such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995-1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs

died nearly 20 years earlier on average than those without ACEs." David W.

Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*,

37 American Journal of Preventive Medicine 389-96 (2009). In other words, if a

person in the control group lived to 79.1 years old, that same person will only live

to age 60.6 years old if he experienced six or more ACEs before the age of 18.

This statistic is shocking.

While it is certainly alarming to know that serious negative experiences in

childhood could be correlated with such a precipitous drop in life expectancy, the

ACE Study expressly observed that "[t]here are several reasons to believe that

these estimates of the relationship between ACEs and premature death are

*conservative*." *Id*. at 394 (emphasis added). Indeed, when the initial survey was

conducted in 1995-1997, approximately 60% of the survey respondents were

already 50 years or older. Given that fact, "it is reasonable to postulate that people

who are exposed to ACEs (particularly multiple ACEs) are more likely (compared

to those who are unexposed) to be aborted; to die during childhood or young

adulthood; to be institutionalized; or to be otherwise lost prior to the initiation of

the ACE Study." *Id*. at 394-95. In addition, the survey respondents were of a

population who were enrolled in a major health plan at that time, i.e.,

"predominantly white, middle-class adults." *Id*. at 394. Due to these facts about the

survey population, "the association between ACEs and premature all-cause

mortality would be biased downward." *Id*. at 395. In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show, especially if the victim is already of a minority group, such as Victim-1.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering "yes" to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult men who were sexually abused in the form of intercourse as a child, were **240% more** likely to attempt suicide than men who had never been sexually abused as a child. *See id*. at 432, Table 4. Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused. Sadly, this data set

does not (because it cannot) include *actual* suicides, which undoubtedly would increase the odds described in the study. In addition to suicide risk, intercourse male child sexual abuse victims were **<u>80% more</u>** likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. *See id.*

The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse.  Victim-1, who was exposed to repeated sexual abuse by Augusta, now has a significantly increased risk of attempting suicide, using illicit drugs, and developing alcohol problems.  Finally, there is an increased chance that he will die 20 years early.  All because Defendant repeatedly chose to use him as a sexual object for his own base gratification and the gratification of countless other men viewing the abuse live on video stream over the internet. In short, Defendant has forever impacted this boy's life in ways that have significant long-term health consequences, and thus his abuse of Victim-1 will redound to the boy's detriment in profound ways. Therefore, a sentence of Life would be both reasonable and appropriate—"just punishment" in § 3553(a) language—given the lifelong consequences Victim-1 will likely experience due to Defendant's repeated and reprehensible acts.

Notably, Defendant Augusta's expert, Dr. Krueger, references the ACE study, but only as it relates to Augusta's own personal experience. Specifically, Dr. Krueger states that Defendant Augusta's score on the ACE scale is "the worst I have encountered in my experience, documenting significant childhood adversity." See Def's Sent. Memo., Exhibit B, Krueger Report at *12, ¶ 15.) Nowhere in Dr. Krueger's report does he discuss the ACE scale as it relates to Augusta's *victims*, particularly Victim-1 for which we have visual, incontrovertible proof that Victim-1 has well over six adverse childhood experiences at the hands of Augusta alone. By contrast, Dr. Krueger emphasizes Augusta's "extremely elevated score" based exclusively on the self-report by Augusta, which has absolutely no corroboration. Regardless, it pales in comparison to the ACEs Augusta inflicted on Victim-1.

The seriousness of this offense cannot be overstated. The defendant has irrevocably harmed this boy. Augusta violated Victim-1 both mentally and physically, violating his familial trust as well as his body. The Guidelines actually provide a basis for upward departure when the defendant's conduct is "unusually heinous, cruel, brutal, or degrading to the victim." *See* U.S.S.G. § 5K2.8. An upward departure is unnecessary in this case because the Guidelines recommendation is a Life sentence, and the statutory maximum on Count 4 is life. But it is certainly worth noting that if Defendant's Guidelines were less than Life, the facts of this case would fall squarely within § 5K2.8 given the "unusually

22

heinous, cruel, brutal [*and*] degrading" conduct that Defendant committed against Victim-1. *See United States v. Prawdzik*, 484 F. App'x 717, 722–23 (3d Cir. 2012) (affirming upward departure for "extreme conduct" within the meaning of § 5K2.8).

For more than two years of this boy's life, he knew nothing but sexual, physical and psychological abuse at the hands of his primary caregiver, Defendant Augusta. Victim-1 was completely incapable of stopping the abuse by the physically imposing (6-feet tall and 300 pounds at the time of his arrest) and effectively omnipotent Defendant.  Screaming and crying for mercy accomplished nothing because the sadistic nature of Defendant's psychosis was merely fueled by such pleadings by the boy.  A sentence of Life will show Victim-1 that Defendant cannot escape justice.   Augusta's crimes spanned 1/3 of the boy's entire life without consequence.  The harm caused by the proliferation of these child sexual abuse images is untold.  For these reasons, only a sentence of Life promotes respect for the law and provides just punishment given the serious nature of the Augusta's criminal offenses. *See* 18 U.S.C. § 3553(a)(2)(A).

## E. The Need for the Sentence Imposed to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See Rita v. United States*, 551 U.S. 338, 349 (2007).  In fact, courts have

placed a high importance on the need for deterrence in cases of hands-on sexual abuse of children due to the "heightened concern in sex offense cases with an offender's potential for recidivism." *United States v. Armendariz*, 451 F.3d 352 (5th Cir. 2006). In *Armendariz*, the Court of Appeals vacated and remanded for sentencing a district court's sentence of five years imprisonment with no supervised release because the sentence did not sufficiently consider the need for the sentence to deter the defendant and to protect the public.  Specifically, the Court noted that, "[e]specially in the case of a sex crime – and particularly for one involving a child – the need for deterrence, protecting the public, and providing the offender with necessary correctional treatment are highly relevant factors that should have been effectuated in the sentence that the district court imposed." *See id.* at 362;  *see also United States v. Jones*, 289 Fed. App'x 798 (5th Cir. 2008); *United States v. Planck*, 493 F.3d 501, 506 (5th Cir. 2007).  Similarly, in *United States v. Gonzalez*, the Fifth Circuit approvingly quoted the sentencing judge's rationale for a Guidelines departure:

> The court's experience with these sorts of folks is that they never get better. Sex offenders have the lowest rate of recovery and the highest rate of recidivism of any criminal defendant. This is an addiction that is almost impossible to overcome. And I think for the benefit of society and for the benefit of the protection of those who are victimized by these sorts of crimes to prevent this individual being a proven consumer of this creating a lifeline, as it were, to this kind of insidious industry requires a lifetime of supervision.

*United States v. Gonzalez*, 445 F.3d 815, 819-20 (5th Cir. 2006) (quoting sentencing court).

To the extent the defense argues for a sentence that lets Defendant Augusta walk out of prison at some point, either in middle age or advanced age, there is ample evidence that even old men commit horrible crimes against children. This Court only has to walk upstairs to discuss that very issue in a case that recently came before the Honorable John E. Jones, III this very week in this courthouse. *See United States v. Berwager*, No. 1: 16-CR-177. A man with no prior criminal history, a man with a distinguished military record and a supportive family, sexually assaulted, molested, raped, produced and distributed child pornography involving his own very young family members while he was in his 70s. Judge Jones sentenced Berwager to 240 months at the urging of the family.[2] *See also United States v. Seljan*, 547 F.3d 993, 997–98 (9th Cir. 2008) (en banc) (87–year–old defendant sentenced to 20 years for sexually abusing children); *see also United States v. Zastrow*, 534 F.3d 854, 855 (8th Cir. 2008) (73–year–old man sentenced to 20 years for enticing or coercing an 8–year–old girl into sexually explicit conduct which he photographed). Indeed, even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children,

_____

[2] The statutorily authorized maximum on the production of child pornography was 360 months.

scholarly research in this area demonstrates that sexual predators like Defendant

will simply change their *modus operandus*.

> Generally, older sex offenders engage in more passive sexual activity
> as compared to their younger counterparts. For example, fondling by
> elderly offenders is more prevalent than intercourse. Research has
> shown that elder offenders are more likely to commit 'nonviolent'
> sexual offenses such as pedophilia or exhibitionism as opposed to
> 'violent' offenses such as forcible rape. Specific examples of these
> 'nonviolent' offenses include improperly touching an acquaintance,
> statutory rape, exposing of the genitals (usually to a minor), and other
> acts of exhibitionism.

Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 Law &

Psychol. Rev. 153 (2008).  It is beyond peradventure that Defendant's multi-year

sexual victimization of every member of his household is enough to demonstrate

that he has a deviancy that has and will continue to put the community at risk

regardless of his age.  Accordingly, a sentence of Life is imperative to adequately

protect the community from Defendant.

## F.  The Need to Avoid Unwarranted Sentencing Disparities

The recommended Guidelines sentence of Life is not an unreasonable

sentence, and certainly would not be anomalous in the context of production of

child pornography offenses in federal court. Many defendants who engaged in

conduct similar to (and far less egregious than) Augusta have received comparable

sentences. Indeed, as the table below demonstrates, from Fiscal Year 2008 through

Fiscal Year 2017 (the most recent date of available data), federal judges across the

26

country have sentenced 118 defendants convicted of production of child pornography offenses to terms of imprisonment of 1020 months (85 years) or more. Approximately 47 of those defendants received an actual Life sentence, whereas others received an effective life sentence.

| | District | Defendant's Name | Court Number | Sentence Date (Yr-Mo-Day) | Prison Time (Months) |
|---|---|---|---|---|---|
| 1 | FLM | MATTHEWS, SAMUEL | 8:07-CR-247-T | 71030 | LIFE |
| 2 | ILC | Rosenbohm, Justin | 07-10117 | 80627 | LIFE |
| 3 | KYW | Moore, James T. | 3:06CR-98-S | 80304 | LIFE |
| 4 | MN | Paton, Lyle Robert | CR06-298PJS/SRN | 71022 | LIFE |
| 5 | MT | Gallenardo, William | CR 07-04-BU-DWM | 71026 | LIFE |
| 6 | TNE | Becker, David Aaron | 3:07-CR-22 | 71026 | LIFE |
| 7 | ARW | White, Arthur | 3:09CR30001 | 90624 | LIFE |
| 8 | CAE | Harrod, Allen | 03-CR-00384-S | 90427 | LIFE |
| 9 | CAE | LaBrecque, Michael | 03-CR-00384-S | 90427 | LIFE |
| 10 | FLM | MATTHEWS, SAMUEL | 8:07-CR-247-T | 71030 | LIFE |
| 11 | FLN | Freeman, James Andrew | 08-CR-00022-03-LAC | 90505 | LIFE |
| 12 | FLN | Mumpower, Warren K. | 08-CR-00022-03-LAC | 90722 | LIFE |
| 13 | FLN | Lakey, Gary Wayne | 08-CR-00022-03-LAC | 90420 | LIFE |
| 14 | FLN | McGarity, Neville R. | 08-CR-00022-03-LAC | 90420 | LIFE |
| 15 | FLN | Lambert, Marvin Laverne | 08-CR-00022-03-LAC | 90420 | LIFE |
| 16 | FLN | Castleman, Daniel Scott | 08-CR-00022-03-LAC | 90420 | LIFE |
| 17 | ILS | Courtright, Carl | 07-CR-30179-DRH | 90724 | LIFE |
| 18 | ILS | Masulla, Louise | 08-CR-30234-GPM-DGW | 90731 | LIFE |
| 19 | ILS | Robinson, Tabitha D. | 08-CR-30234-GPM-DGW | 90813 | LIFE |
| 20 | ILS | Milligan, William | 08-CR-30234-GPM-DGW | 90731 | LIFE |
| 21 | LAW | Daranda, Ben | 07-CR-10022-01 | 81125 | LIFE |
| 22 | NV | Latham, Robert Myron | 06-CR-00379-LDG(GWF) | 90304 | LIFE |
| 23 | NYN | Sacco, Dean | 08-CR-00077 | 90303 | LIFE |
| 24 | PAE | Marz, Robert Paul | 07-CR-00199 | 90914 | LIFE |
| 25 | TXW | Carmony, Charles Wayne | SA08CR036 | 90224 | LIFE |
| 26 | ALM | Smith, Ricky Randall Rex | 07-CR-00183-WKW | 100402 | LIFE |
| 27 | ALN | Simons, John Lawson | 08-CR-00408-CLS-TMP-5 | 100818 | LIFE |
| 28 | INS | Rarey, Rickie | 1:09-CR-130-M/F | 100224 | LIFE |
| 29 | MIE | Frazee, James | 10-CR-20082 | 100909 | LIFE |
| 30 | ALS | McGee, Bernard | 10-CR-00162-CG | 110303 | LIFE |
| 31 | ARW | Wilson, James H. | 2:09CR20063 | 101021 | LIFE |
| 32 | FLS | Rios, Jesus | 09-CR-60054-JIC | 101227 | LIFE |
| 33 | MD | Davison, Jesse Aaron | 10-CR-00632 | 110830 | LIFE |

| 34 | MIE | Demink, Steven | 10-CR-20676 | 110926 | LIFE |
| 35 | DE | Pavulak, Paul E. | 09-CR-00043-SLR | 111014 | LIFE |
| 36 | FLS | Mozie, James | 11-CR-60121-WPD | 120625 | LIFE |
| 37 | NYN | Rood, Flay | 10-CR-00149 | 111007 | LIFE |
| 38 | MOE | GRAVENMIER, JACK E. | 12-CR-00464 JAR | 130429 | LIFE |
| 39 | MOW | Smith, Todd C. | 11-CR-05044-01 | 121221 | LIFE |
| 40 | VAE | Sebolt, Philip Michael | 12-CR-00033-3 | 130128 | LIFE |
| 41 | GAN | HUTCHINSON, TREMAIN | 12-CR-00409-1 | 140106 | LIFE |
| 42 | ILC | Hendricks, Jerry L. | 12-CR-20025 | 140630 | LIFE |
| 43 | VT | Jacques, Michael S. | 08-CR-00117-WKS | 140521 | LIFE |
| 44 | VAE | Scott, Robert Harold, Jr. | 13-CR-00164-2 | 141123 | LIFE |
| 45 | IAS | Faler, James Everett | 14-CR-00021 | 151124 | LIFE |
| 46 | NCW | Muslim, Shahid Hassan | 13-CR-00307:3 | 160518 | LIFE |
| 47 | NJ | WARES, CLIFFORD | 15-CR-00570 | 160708 | LIFE |
| 48 | ALN | Ayers, Patricia Allana | 14-CR-00117-LSC-SGC-5 | 141219 | 19080 |
| 49 | ALN | Falgout III, Pierre Ernest | 6:07-CR-00157-RDP-RRA | 80620 | 11520 |
| 50 | ALN | Ayers, Matthew David | 14-CR-00117-LSC-SGC-5 | 141219 | 9000 |
| 51 | NYN | Howells, II, Stephen M. | 14-CR-00340 | 151228 | 6960 |
| 52 | ALN | Hulsey, James Shawn | 08-CR-00313-IPJ-RRA-2 | 91007 | 5760 |
| 53 | TXW | Simmons, Gemase Lee | 12-CR-00108-S | 130812 | 5760 |
| 54 | ALN | McKim, Christine Staggs | 08-CR-00313-IPJ-RRA-2 | 91007 | 5400 |
| 55 | INS | McGrath, Andrew | 1:09-CR-0169-L/F | 100517 | 4440 |
| 56 | FLM | TATRO, JOSHUA ADAM | 15-CR-00176-ORL | 161212 | 4200 |
| 57 | ALN | Vasiloff, Gary Steven | 4:07-CR-00337-VEH-PWG | 80204 | 3900 |
| 58 | ALN | Hayes, Gordon Elton | 4:07-CR-00062-IPJ-TMP | 70824 | 3720 |
| 59 | MOE | BEASLEY, LELAND | 10-CR-00119 CEJ | 110712 | 3480 |
| 60 | KS | Grigsby, Philip | 12-CR-10174-JTM | 130605 | 3120 |
| 61 | INS | Bostic, David Ryan | 1:11-CR-027-JMS-KPF | 120113 | 3060 |
| 62 | OHS | Napier, James O. | 13-CR-00016-1 | 140520 | 2880 |
| 63 | INN | Eckstrom, Daniel T. | 13-CR-00084-02 | 160330 | 2880 |
| 64 | MIW | COX, JEFFREY | 14-CR-00198 | 161004 | 2880 |
| 65 | INS | Metzger, David | 09-CR-00188-LJM/KPF1 | 100525 | 2820 |
| 66 | FLM | GRAZIOTTI, MATTHEW C. | 14-CR-00175-ORL | 150128 | 2520 |
| 67 | TXN | Rinehart, Timothy | 13-CR-00091-B-DL | 150416 | 2160 |
| 68 | TNW | Milam, Terrence | 15-CR-20091 | 170815 | 2040 |
| 69 | MOE | DEVLIN, MICHAEL | 4:07CR143 JCH | 71226 | 2010 |
| 70 | NH | Wright, John Allen | 11-CR-00146-SM | 130225 | 1920 |
| 71 | MSS | Spear, Philip Joseph | 17-CR-00017-LGRHW1 | 170707 | 1920 |
| 72 | FLN | Olmeda, Keith | 09-CR-00030-01-SPM | 100209 | 1800 |
| 73 | NYN | Hamilton, Wayne | 11-CR-00555 | 121113 | 1800 |
| 74 | NCE | Davis, John Thomas | 09-CR-00018-BO | 90505 | 1680 |
| 75 | FLM | COWAN, ROBERT ALLAN | 09-CR-00387-J | 111208 | 1680 |
| 76 | LAM | Miller, Paul W. | 10-CR-00102-JJB-DLD | 120520 | 1680 |

| 77 | ALN | Nelson, Jeremy Joseph | 14-CR-00372-MHH-JEO-5 | 150813 | 1680 |
|----|-----|------------------------|------------------------|--------|------|
| 78 | FLS | Killen, Patrick,Jr | 15-CR-20106-KMM | 151202 | 1668 |
| 79 | FLS | Castillo, Edgar Geovani Esquivel | 10-CR-20120-DMM | 100928 | 1560 |
| 80 | ID | Wilkinson, William Roger | 14-CR-00168-S-BLW | 160404 | 1560 |
| 81 | MIW | HINOJOSA, MICHAEL JAMES | 1:06-CR-93 | 80319 | 1440 |
| 82 | NYS | DAVIS, WILLIAM | 07 CR 0468 | 90824 | 1440 |
| 83 | MOE | MARTIN, MICHAEL PAUL | 09-CR-00760 JCH | 100729 | 1440 |
| 84 | NCM | Hallman, David Matthew | 12-CR-00010 | 130108 | 1440 |
| 85 | VAW | Cobler, James Robert | 12-CR-00026 | 130215 | 1440 |
| 86 | NCM | Hallman, David Matthew | 12-CR-00010 | 130108 | 1440 |
| 87 | VAW | Cobler, James Robert | 12-CR-00026 | 130215 | 1440 |
| 88 | TXW | Callaway, Harold Bruce | 13-CR-00187-M | 140912 | 1440 |
| 89 | IAS | Zollman, Timothy Ryan | 15-CR-00167 | 160912 | 1440 |
| 90 | MN | Edge, Deborah Susan | 14-CR-00201 | 151002 | 1440 |
| 91 | NYE | VALERIO, JOSEPH | 14-CR-00094-02 | 170926 | 1440 |
| 92 | INS | Hodge, Larry Everett | 11-CR-00007-RLY-WGH-3 | 120531 | 1380 |
| 93 | ILN | Boroczk, Darrick C. | 09-CR-00647 | 120110 | 1340 |
| 94 | FLM | DICKERSON, IVORY | 07-CR-00150-ORL | 90407 | 1320 |
| 95 | MT | Fox, Ralph | CR 07-47-M-DWM | 81017 | 1320 |
| 96 | KYW | Davis, Tony | 12-CR-00028-B-M | 130531 | 1320 |
| 97 | IAN | Stong, Benton | 13-CR-02014 | 140204 | 1320 |
| 98 | INS | Al-Awadi, Ali | 15-CR-00072-TWP-DML-1 | 160630 | 1296 |
| 99 | FLM | CHANSLER, LUCAS MICHAEL | 10-CR-00100-J | 141117 | 1260 |
| 100 | FLM | SARRAS, DONATOS | 6:07-CR-92-ORL | 80410 | 1200 |
| 101 | MOE | GREENWELL, JEFFREY | 09-CR-00757 CAS | 111018 | 1200 |
| 102 | FLS | Williams, Scott Michael | 12-CR-10029-JLK | 130723 | 1200 |
| 103 | MD | Scott, Jason T. | 10-CR-00031 | 130719 | 1200 |
| 104 | MOW | Hajny, James | 14-CR-05022-01 | 161215 | 1200 |
| 105 | MIW | HERRICK, SCOTT ALLAN | 10-CR-00207 | 120117 | 1140 |
| 106 | TXW | Moreno, Luis | 11-CR-00882-S | 131226 | 1140 |
| 107 | TXE | Stewart, James Rustin | 09-CR-00159-1 | 100823 | 1080 |
| 108 | OHN | Lennard, Shawn M. | 09-CR-00444 | 101005 | 1080 |
| 109 | FLM | BRANDT JR., WESLEY | 11-CR-00058-T | 111109 | 1080 |
| 110 | GAS | Rivera, Angel Luis | 11-CR-00007 | 130118 | 1080 |
| 111 | ILS | Horton, Christopher Michael | 13-CR-30042-DRH | 140310 | 1080 |
| 112 | FLM | SPEER, STEVEN | 13-CR-00561-T | 141106 | 1080 |
| 113 | NYN | Staples, Ryan | 13-CR-00440 | 141024 | 1080 |
| 114 | ALN | Lee, Gregory Jerome | 16-CR-00081-VEH-TMP-5 | 170930 | 1080 |
| 115 | MIE | Pierce, Michael | 16-CR-20192 | 170925 | 1080 |
| 116 | MT | Threadgill, Kenneth | CR 07-89-GF-SEH | 80116 | 1020 |
| 117 | CT | Sensi, Edgardo M. | 08-CR-00253 | 120209 | 1020 |

| 118 | OHS | Guy, David A. | 15-CR-00018-1 | 160711 | 1020 |

These sentences exceeding 1,020 months represent a broad cross-section and are not confined to a few districts in a small area of the country where more severe sentences might be perceived to be more common. Indeed, these 118 sentences come from 52 different districts, from the District of Vermont to the Eastern District of California; from the District of Idaho to the Southern District of Florida. Moreover, many of these cases have facts that are less egregious than the facts in Augusta's case.

For example, in *United States v. Guy*, 15-CR-18 (NDNY), the defendant was sentenced to 1,020 months for producing child pornography with one seven-year-old victim. In *United States v. Napier*, 13-CR-16 (SDOH), the defendant was sentenced to 2,880 months for producing child pornography of a nine-year-old and an infant. In *United States v. Howells*, 14-CR-340 (NDNY), the defendant, also a first-time offender, was sentenced to 6,960 months for producing child pornography of six victims, including using Ambien and Benadryl on the children, similar to Augusta and Ira Task's use of a drug on Victim-1 prior to their sexual assault of him. In *United States v. Wares*, 15-CR-570 (DNJ), the 39-year-old defendant was sentenced to Life for coercing two victims, ages 13 and 14, to send him sexually explicit photographs, and then meeting the 14-year-old in person and

engaging in oral sex. *See United States v. Wares*, 689 F. App'x 719 (3d Cir. 2017) (affirming Life sentence).

This District has not seen an offender as depraved and dangerous as Augusta in many years, if ever. Indeed, this Court, in *United States v. Walpole*, 10-CR-340 (MDPA) (Kane, J.) sentenced that defendant to 600 months for surreptitiously recording a 14-year-old child masturbating, and for his large collection of child pornography acquired from peer-to-peer file-sharing. The Third Circuit affirmed, but remanded for resentencing due to a criminal history calculation error that the Court of Appeals was uncertain how it affected this Court's "thoughtful consideration in designing the sentence it imposed." *United States v. Walpole*, 543 F. App'x 224, 231 (3d Cir. 2013). On remand, after changing the defendant's criminal history score from V to I, this Court nevertheless imposed the same 600-month sentence, and the Third Circuit affirmed, concluding that this Court "meaningfully considered the arguments of the parties and discussed the sentencing factors" and "explained that the sentence was warranted given [the defendant's] sexual exploitation of a child and the quantity of the images in [the defendant's] child pornography collection." *United States v. Walpole*, 599 F. App'x 56, 58 (3d Cir.), *cert. denied*, 136 S. Ct. 155 (2015).

Moreover, in the Middle District of Pennsylvania, the largest sentence for a § 2251(a) violation in the past several years was that of Daniel Curran, who

sexually abused a 9-year-old boy for about two months, and documented that sexual abuse in photos and videos. Judge Caldwell sentenced that individual to 840 months, the statutory maximum, by running the three counts of conviction consecutive. Defendant Curran was 41 years old at the time of sentencing, and he had no prior convictions or history of sexual abuse of children. On appeal, Curran argued that a sentence of 840 months would make him 111 years old at the time his sentence was completed. The Third Circuit affirmed the sentence as reasonable, noting that the District Court acknowledged that the sentence "could be a life sentence." *United States v. Curran*, 638 F. App'x 149, 152 (3d Cir.), *cert. denied*, 137 S. Ct. 180 (2016).

Just this week, on October 25, 2017, the Honorable Sylvia Rambo sentenced Defendant Michael Clarke, age 44, to 600 months for producing, transporting and possessing child pornography. *See United States v. Matthew Charles Clarke,* No. 1:16-CR-103.  Clarke raped his minor victim from the ages of 5 to 12 and recorded these assaults and also surreptitiously recorded another minor victim while naked and transported that pornography across state lines.

This case arguably merits a considerably larger sentence than *Walpole, Clarke* and *Curran* based on the nature and circumstances of the offense alone. Indeed, here, the relevant conduct spanned from early 2013 to July 2015, which is much greater than the two months in *Curran*, and the more truncated events of

32

*Walpole*. In addition to the larger volume of atrocities committed by Defendant Augusta, he also committed more severe conduct than Curran, Clarke or Walpole, such as when Augusta transferred control of Victim-1 to Ira Task, a stranger who was HIV-positive, who sexually abused Victim-1. Moreover, during that event with Task, Augusta allowed Victim-1 to be administered a narcotic by Task. Defendant Augusta again transferred control of Victim-1, albeit in different form, to co-Defendant Stamm on multiple occasions, as evidenced by the horrendous audio recordings documenting what Stamm ordered Victim-1 to do via video communication, which felt as real and terrifying to Victim-1 as if Stamm were there in person. Additionally, Defendant Augusta sexually abused an infant (Victim-2), as well as two other adolescents who were not listed in the indictment. That brings his child victim total to at least 4, and does not include the way he sexually victimized his own mother in surreptitiously recorded images.

Defendant, in his sentencing memo, cites to three cases from this District as examples of sentences for production of child pornography. First, Defendant cites *United States v. Kelson*, 13-CR-61 (M.D. Pa 2014 (Brann, J.), noting that the defendant "took pornographic photos of a 4-year-old female for whom he was a live-in babysitter" and was ultimately sentenced to the mandatory minimum of 15 years. Defendant fails to elucidate the additional facts that put the *Kelson* case in stark contrast to the instant matter. Indeed, the only similarities are the age of the

defendant (21) and the age of the prepubescent victim (4); after that, the facts widely diverge.

The defendant in *Kelson* took 8 photographs of the 4-year-old child's buttocks and vaginal area. A forensic examination of his devices did not locate any additional images of child pornography. The defendant, who was 21-years-old at the time, also had a 16-year-old girlfriend with whom he had engaged in sex. Photos from his camera showed there were two photos of the 16-year-old showing her naked. Additionally, one of the photos showed the defendant's penis penetrating the 16-year-old. The Guidelines range was 235-293 months, but the plea agreement, pursuant to Rule 11(c)(1)C), bound the Court and the parties to a range of 180-240 months. The Court sentenced the defendant at the bottom of the stipulated range. These facts are a far cry from the severely sadistic and prolonged time period during which Augusta forcefully and brutally raped Victim-1.

Next, Defendant cites *United States v. O'Connor*, No. 12-CR-217 (M.D. Pa. 2014) (Conner, C.J.), noting that the defendant "streamed his sexual encounters with a 14-year-old male over the internet" and was ultimately sentenced to 35 years for this first offense.[3]  The facts in the O'Connor case are also extremely

---

[3] Defendant states O'Connor received a 40 year sentence, but after reviewing the sentencing transcript and the Third Circuit appeal, the sentence imposed was 35 years.  *See* Def's Sent. Memo. at *14.  AUSA Meredith Taylor and Federal Public Defender Heidi Freese handled the *O'Connor* case.  AUSA Meredith Taylor also prosecuted the cases of *United States v. Daniel Curran*, *United States v. Brian Kelson*, *United States v. Michael Clarke and assisted with the prosecution of United States v. Berwager*, cited above, if the Court needs more details about these prosecutions.

divergent from those in Augusta's case.   While O'Connor did stream sexual abuse

of a minor boy online, O'Connor's conduct cannot be placed into the same

category as the brutality Augusta visited upon Victim-1.  The evidence in

O'Connor's case consisted of approximately 2-3 incidents of O'Connor manually

stimulating the minor's penis and having the minor manually stimulate O'Connor's

penis.  There was no penetration, no force, no bondage and no weapons.  This type

of contact with a minor, while reprehensible and deserving of punishment, is not

akin to the heinous acts Augusta forced on Victim-1.

Next, Defendant cites *United States v. Brooks*, 08-CR-455 (M.D. Pa 2011)

(McClure, J.), noting that the defendant "produced pornographic images of her 9-

year-old adopted daughter and taught her how to use various sex toys" and was

ultimately sentenced to 20 years. Again, Defendant fails to provide the salient

details that demonstrate how vastly different that case was from the instant matter.

In *Brooks*, the defendant persuaded her 9-year-old adopted daughter to pose in

various sexual position on a webcam for others to watch. The defendant further

showed the child how to use a "butterfly" sex toy on her clitoris. A forensic

analysis of the electronic devices from the home revealed approximately 40

photographs of the child, some of which were only topless, and a 90-second video

of the child posing naked from the waste up, and at times removing her underwear

to expose her genitalia. The defendant in *Brooks* went to trial, and was convicted

on two counts, one of production, and one of possession of child pornography. Her Guidelines range was 235-293 months, and she was ultimately sentenced to 240 months, which was obviously within the range. There was nothing in *Brooks* even closely approximating the forcible rape and sodomy of Victim-1. Instead, the defendant in *Brooks* engaged in largely psychological grooming of the child to make her believe that what she was doing was normal and acceptable. By contrast, Augusta hit, slapped, punched, sodomized, and orally raped Victim-1 until he vomited on himself. These two cases are not analogous.

The Third Circuit has affirmed even more significant sentences in cases less egregious than this. For example, the Third Circuit posthumously affirmed Judge Harold A. Ackerman of the District of New Jersey, who sentenced Russell Christie to the statutory maximum of 1,080 months (via consecutive sentences) for his role as the moderator of a child pornography website where people traded child pornography. That is, Christie was convicted of child pornography trafficking, not production, and despite the defendant having no history of hands-on sexual abuse of children, the Court of Appeals affirmed his sentence, saying "we are satisfied that the sentence was within the bounds of reasonableness." *United States v. Christie*, 624 F.3d 558, 575 (3d Cir. 2010).

Similarly, in *United States v. Eyster*, 386 F. App'x 180, 183 (3d Cir. 2010), the Third Circuit had "no difficulty in concluding that [the defendant's] sentence

[of 840 months] is reasonable," where the defendant was convicted of one count of production of child pornography and one count of possession. Again, in *United States v. Mazer*, 604 F. App'x 126 (3d Cir. 2015), the Third Circuit affirmed a statutory maximum sentence of 720-months for two counts of production of child pornography based upon the defendant's recorded images of his sexual abuse of two children under the age of three that occurred in December 2011.

Augusta's ongoing criminal conduct, which he engaged in repeatedly over the course of several years, is, at the very least, similar to the conduct of the defendants in *Christie, Eyster and Mazer*, cases that were approved by the Third Circuit, and, in most instances, substantially more serious. Therefore, a sentence of Life should be imposed; any sentence less severe would create an unwarranted disparity. Indeed, if this Court declines to sentence this defendant to Life, it will be creating a nearly insurmountable hurdle for all future prosecutions in this District (not to mention other districts when word gets out). That is, the facts of this case are well documented, uncontested and horrifyingly brutal. These brutal facts will be compared to all future child pornography production cases, and anything less than Life here will mean that there is almost no set of facts (in a non-homicide context) that would justify a Life sentence in any future production case.

### G. Lifetime Supervised Release is Reasonable and Appropriate

To the extent this Court considers a sentence of a term of years that is less than Life, it should impose a term of supervised release that extends for the life of Augusta. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. *See Irey*, 612 F.3d at 1210. The life term recommendation contained in Section 5D1.2(b) reflects powerful evidence indicating that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant

sexual disorders that are not likely to disappear within a few years of release from

prison. Many of these offenders need long term or lifetime monitoring and

oversight.  *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003

U.S.C.C.A.N. 683, 684.

Courts have routinely affirmed lifetime supervised release for criminal

conduct. *See United States v. Ortega*, 485 Fed. App'x. 656, 659 (5th Cir. 2012)

(lifetime supervised release appropriate when defendant used the internet to induce

a minor to engage in sexual activity); *United States v. Antone*, 375 Fed. App'x.

752, 753 (9th Cir. 2010) (affirming lifetime supervised release following

convictions for Title 18 U.S.C. §§ 2243(a), 2246(c), and 1153(a)). A term of

supervised release for life is reasonable and appropriate in this case to achieve

rehabilitative ends and to protect children from further victimization.

## H. Conclusion

When the Court considers all of the factors enumerated in 18 U.S.C. §

3553(a), a sentence of Life is the only reasonable and appropriate sentence for this

defendant.  Augusta is a predator.  He preyed on his own blood relative who was

completely incapable of resisting the physical force used by Augusta to make

Victim-1 engage in multiple sexual acts. Augusta forcibly raped this poor boy

repeatedly, viciously, and without any regard for the boy's wellbeing. He preyed

on the boy's fears, using the threat of continued physical abuse and disgusting

tactics of degradation and humiliation to keep the boy "compliant."

Defendant committed this abuse over a period of more than 2 years (a third

of the boy's life), but in so doing, he gave Victim-1 a lifetime of hard

conversations. To really know Victim-1 is to know about Defendant and what he

did to him. Forevermore, Victim-1 will have to have embarrassing, stressful, awful

conversations with every friend he ever has, every person he ever dates seriously,

and some day—if he lives that long—his own kids. It is one of the burdens that

Defendant saddled this boy with for the rest of his life. It is an albatross of anxiety

whose stinking, rotting corpse cannot be buried, but instead must be shouldered by

this boy until he is laid to eternal rest. His life is forever changed in the most

profound ways; at the very least, Augusta's life should be behind bars forever,

where Victim-1 and other children cannot be further harmed by him. Just as

importantly, he should be behind bars to simply give Victim-1 the comfort and

peace of mind of knowing that he never has to look over his shoulder wondering if

today is the day Augusta tries to find him again.

The sentence requested by the United States is reasonable given the

defendant's criminal conduct. Moreover, it will promote respect for the law and

protect the public from future crimes of the defendant; serve to generally deter the

behavior exemplified by the defendant; and avoid unwarranted sentencing

disparities among similarly situated defendants.

<div style="margin-left: 40%;">

Bruce D. Brandler
United States Attorney

By:   /s/ Meredith A. Taylor
MEREDITH A. TAYLOR
Assistant United States Attorney

/s/ Austin M. Berry
AUSTIN M. BERRY
Trial Attorney

</div>

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **NO. 1:16-CR-82** |
| | ) | |
| **v.** | ) | **(Judge Yvette Kane)** |
| | ) | |
| **WILLIAM CHANDLER AUGUSTA,** | ) | |
| **aka "Guy Johnson"** | ) | |
| | ) | **(Electronically Filed)** |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the

United States Attorney for the Middle District of Pennsylvania and is a person of

such age and discretion to be competent to serve papers.

That this 30th day of October, 2017, she served a copy of the attached

**UNITED STATES' SENTENCING MEMORANDUM**

by electronic means by sending a copy to the e-mail addresses stated

below:

Heidi Freese, Esquire
Heidi_Freese@fd.org

Crystal Bard, Senior Probation Officer
crystal_bard@pamp.uscourts.gov

/s/ Bethany Haase
Bethany Haase
Legal Assistant

42