IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :   Case No. 1:16-CR-082-1
                                  :
            vs.                   :   (Judge Kane)
                                  :
WILLIAM CHANDLER AUGUSTA,         :
                Defendant         :

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE YVETTE KANE
UNITED STATES DISTRICT COURT JUDGE
OCTOBER 31, 2017; 10:00 A.M.
HARRISBURG, PENNSYLVANIA

FOR THE GOVERNMENT:

    Meredith A. Taylor, Assistant United States Attorney
    United States Attorney's Office
    228 Walnut Street, Second Floor
    Harrisburg, PA  17101

    Austin M. Berry, Trial Attorney
    United States Department of Justice
    Child Exploitation and Obscenity Section
    1400 New York Avenue, N.W., Suite 600
    Washington, D.C.  20005

FOR THE DEFENDANT:

    Heidi R. Freese, Federal Public Defender
    Federal Public Defender's Office
    100 Chestnut Street, Suite 306
    Harrisburg, PA  17101

ALSO PRESENT:

    Crystal Bard, United States Probation Officer

Lori A. Shuey
Federal Certified Realtime Reporter
United States Courthouse
228 Walnut Street, P.O. Box 983
Harrisburg, PA  17108-0983
717-215-1270
lori_shuey@pamd.uscourts.gov
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1                           I N D E X

2

3                      DEFENSE WITNESSES

4    LOUISE LUCK, M.A.                                    PAGE

5    Direct Examination by Ms. Freese                        9
     Cross-Examination by Ms. Taylor                        75
6    Redirect Examination by Mr. Freese                     91
     Recross-Examination by Mr. Taylor                      96
7
     RICHARD KRUEGER, M.D.                                PAGE
8
     Direct Examination by Ms. Freese                       31
9    Examination by The Court                               72
     Cross-Examination by Mr. Berry                         97
10   Redirect Examination by Ms. Freese                    152

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Good morning, counsel.  We're here on the

2  Augusta matter.  I understand there's a preliminary matter that

3  needs to be addressed.

4           MR. BERRY:  Yes, Your Honor.

5           THE COURT:  Okay.  Mr. Berry.

6           MR. BERRY:  Good to see you again.  There's an issue

7  with regards to Rule 26.2, which under the rule says that after

8  the defense puts on a witness, I have an opportunity to stand

9  up and make a motion before the court to ask for prior

10 statements of that witness that are within the subject matter

11 of his or her testimony.

12          It is a rule that I think is not as often utilized or

13 understood in many contexts, and so in the interest of

14 efficiency, I reached out to Ms. Freese last week and advised

15 her that I would be making that motion.  I realize it's not a

16 rule of discovery, that I was not entitled to receive that in

17 advance of this hearing, but I just wanted her to know that I

18 would be doing that today at the conclusion of her witnesses'

19 testimony, specifically Dr. Krueger.

20          There was some back and forth between Ms. Freese and

21 I.  She provided some documents and then basically took the

22 position that she doesn't think that the email correspondence

23 between her or her staff and Dr. Krueger or Ms. Luck would come

24 within the rule.  Our reading of the rule is essentially that

25 if she believes that some of that is privileged -- certainly

1    things like her own emails to them very likely would be

2    excluded, but the witnesses' statements back should come within

3    the rule, in our view.

4           But in any event, what the rule says is, if you

5    believe that some of that is privileged, then you're to provide

6    that in camera for Your Honor to review and to make an

7    in-camera decision without my input as to whether I'm entitled

8    to it or not, and that's sort of the stalemate that we're at

9    right now.

10          The last communication that we received from the

11   defense was that the defense was not going to conduct a server

12   search for these emails, and so I don't know the status,

13   whether they've been gathered, whether they're available for

14   Your Honor to review, anything along those lines, but I do know

15   that it will be an issue because I will make that motion.

16          *THE COURT:*  Mr. Berry, is Dr. Krueger the only witness

17   involved in this 26.2 dispute?

18          *MR. BERRY:*  No.  To be fair, to be candid, I think I

19   only initially asked for Dr. Krueger, not thinking about sort

20   of -- we sort of divided and conquered here and not thinking

21   about Ms. Luck, but she is calling, the defense is calling two

22   witnesses, and so it would apply to both of those witnesses.

23          And specifically what I think exists, just to be

24   clear, and I don't think it's a large volume of material, but I

25   don't know -- just through experience, I suspect that it's not

1    a large volume of material -- that it would likely be email

2    correspondence with these witnesses about the subject matter of

3    their testimony that may or may not comport with their reports

4    and what they're going to say on the stand.  And that is

5    essentially the purpose of 26.2, is to provide us an

6    opportunity to compare and contrast those statements.

7              *THE COURT:*  All right.  Ms. Freese.

8              *MS. FREESE:*  Thank you, Your Honor.  I concur with the

9    chronological request that was made by the government.  Late

10   last week the request was made for Dr. Krueger, and yesterday

11   morning the request was made with respect to Ms. Luck.

12             I have carefully reviewed the rule, and to be

13   perfectly candid with the court, that is correct, this is the

14   first time I've received such a request from the government in

15   relation to my work product with my agents, with my experts, or

16   with witnesses that I've retained in this matter.

17             I've reviewed the rule carefully, and I've also

18   reviewed a number of decisions, including this court's

19   decisions in the civil context, and my initial position is that

20   in order to be a statement under the rule, it would have to be

21   relevant to the subject matter.

22             So in an abundance of caution -- my position is that

23   it's not discoverable, that it doesn't fall under the rule.  If

24   the court determines that, in fact, it potentially does, my

25   position is that it is privileged work product and that it

1    falls specifically under that doctrine.

2         Because I did not want to delay these proceedings, I,

3    in an abundance of caution, do have with me today the emails.

4    Late last night my staff and I did conduct a server search, and

5    I have correspondence.  It is not redacted because of the time

6    constraints.  It is simply PDFs of my email communications with

7    both Dr. Krueger and Ms. Luck.

8         So I do have it available, and as I indicated to the

9    court -- or, excuse me, to the government yesterday, obviously

10   I would comply with any court order.  But my initial position

11   is that -- which is why my initial response to -- which was

12   quoted in the United States' sentencing memorandum was that I

13   don't think such a statement exists, because I was simply

14   thinking about a traditional statement that I would request

15   from the government, which is why I don't typically request

16   their emails with their agents about strategy, about things

17   like that, because I consider that to be work product.

18        So that's the state of affairs.  I did not turn it

19   over to the government because I didn't believe, frankly, that

20   I could without a court order or that it fell within the rules

21   of criminal procedure.

22        THE COURT:  So what you're saying is that you have a

23   collection of emails that may be, in the court's view, covered

24   by the rule?

25        MS. FREESE:  Today with me, Your Honor, yes.  Late

1    last night I did compile PDFs of my email correspondence --

2    again, I believe that this is as comprehensive as I can

3    obtain -- my email correspondence with Dr. Krueger and my email

4    correspondence with Ms. Luck.

5            THE COURT:  And is it your view that all of the

6    documents contained on that device are work product?

7            MS. FREESE:  Yes, Your Honor.

8            THE COURT:  All right.  Counsel, how many witnesses do

9    you have here today?

10            MS. FREESE:  Your Honor, I have two professional

11    witnesses, Louise Luck, who I'm not offering as an expert but

12    who is a historian, you know, for the client.

13            THE COURT:  Right.

14            MS. FREESE:  And I have Dr. Krueger.  And then I have

15    three individuals who -- what I would call would be more

16    traditional reading a statement to the court who have been

17    acquainted with my client throughout his life.

18            THE COURT:  Okay.  Well, I propose that we proceed as

19    follows:  I would like -- I heard you say Dr. Krueger, and

20    Mr. Berry said Dr. Krueger.  Which one is it?

21            MS. FREESE:  It is Dr. Krueger.

22            THE COURT:  It's Krueger.  Okay.

23            MS. FREESE:  It's Dr. Krueger.

24            THE COURT:  All right.  Let's hear from Dr. Krueger,

25    and then we'll move on --

1          *MR. BERRY:*  I think she wants to go with Ms. Luck

2    first.

3          *THE COURT:*  Okay.

4          *MS. FREESE:*  That is correct, Your Honor.  I thought

5    it made chronological sense to start with Ms. Luck.

6          *THE COURT:*  Sure, however you want to go.  Let's hear

7    from the witnesses, and then we'll see where we are with these

8    objections.

9          *MS. FREESE:*  Thank you, Your Honor.  Ms. Luck.

10         *MR. BERRY:*  Could we ask that Dr. Krueger step out of

11   the courtroom?

12         *THE COURT:*  Yes.

13         *MS. FREESE:*  Your Honor, I would request, because he

14   has reviewed her report and her report and social history was

15   part of his opinion in this matter, because he's an expert

16   witness, that he be permitted to remain in the courtroom.

17         *MR. BERRY:*  Experts are typically allowed to remain in

18   the courtroom to view, for example, the government's experts

19   and witnesses, but to the extent that he's going to watch the

20   cross-examination of this witness to help aid him in the

21   cross-examination, I think that's precisely what's not fair and

22   what the rule excludes from him.

23         He doesn't need to see her testimony to form the basis

24   of his opinion.  As she said, he's already read her report, so

25   he should be excluded.

1          *THE COURT:*  All right.  I agree that he should be
2  excluded.
3       *LOUISE LUCK, M.A., called as a witness, having been duly*
4  *sworn or affirmed, testified as follows:*
5          *COURTROOM DEPUTY:*  For the record, please state your
6  full name.
7          *THE WITNESS:*  Louise Luck.
8          *COURTROOM DEPUTY:*  Could you spell your last name,
9  please.
10          *THE WITNESS:*  Luck, L-u-c-k.
11          *COURTROOM DEPUTY:*  Thank you.  You may be seated.
12          *THE WITNESS:*  Thank you.
13                         DIRECT EXAMINATION
14  BY MS. FREESE:
15  Q.  Ms. Luck, good morning.
16  A.  Good morning.
17  Q.  I'm going to note before we get started that there's a
18  large binder up there on the witness stand, and that's simply
19  to assist you with some of the documents that you reviewed
20  should you be asked about them.  Okay?
21  A.  Great.  Thank you so much.
22  Q.  Okay.  Very good.  Ms. Luck, if you could, please indicate
23  to the court what your educational background is.
24  A.  I have a master's in community psychology from Marist
25  College in Poughkeepsie, New York.

Direct/Freese - Luck

1    Q.   Okay.  And how are you currently employed?

2    A.   I am the director and mitigation specialist for Court

3    Consultation Services, a business that I started myself almost

4    30 years ago.

5    Q.   Okay.  Now, do you also have experience with the New York

6    Department of Corrections?

7    A.   Yes.

8    Q.   In what capacity?

9    A.   Well, I started -- my first job while I was still in school

10   obtaining my master's was an Orange County probation officer.

11   Q.   Okay.

12   A.   I did supervision and writing of reports on juvenile

13   probationers.  Then I went on to the adult division, and I

14   worked there a number of years doing investigations and

15   supervision of clients.

16   Q.   And let me just stop you.  When you say "investigations,"

17   do you mean presentence investigations?

18   A.   Yes, yes.

19   Q.   Okay.  Go ahead and continue.

20   A.   Okay.  And after that, I took a position with the New York

21   State Division of Parole where I was an institutional parole

22   officer.  I prepared parole memorandums for incarcerated

23   individuals, and I also, for a period of time, worked for the

24   Department of Corrections as a correction counselor doing

25   classification of inmates.

Direct/Freese - Luck

1    Q.   Okay.  In your capacity as director of Court Consultation

2    Services, have you prepared any social history reports for what

3    we call juvenile lifers in Pennsylvania?

4    A.   Yes, I have.

5    Q.   Now, have you previously testified in court?

6    A.   Oh, yes.

7    Q.   Approximately how many times?

8    A.   30, 40.

9    Q.   Okay.  Have you ever testified in the Middle District of

10   Pennsylvania?

11   A.   Yes, I have.

12   Q.   Did you prepare in this matter, were you retained by the

13   Federal Public Defender's Office to conduct a social history

14   and background investigation in this case?

15   A.   I was.

16   Q.   And did you, in fact, conduct that background

17   investigation?

18   A.   I did.

19   Q.   Now, in preparation and during your investigation, did you

20   review a number of documents?

21   A.   Yes, I did.

22   Q.   I'm going to ask you to take a look at what's been marked

23   Defendant's Exhibit Number 2.  It's in that large binder.

24   A.   Okay.  Okay, I'm there.

25   Q.   And just let me know when you're there.

Direct/Freese - Luck

1    A.   I'm there.

2    Q.   Okay.  And do you recognize that document?

3    A.   Yes.

4    Q.   What is it?

5    A.   It is the report that I prepared.

6    Q.   Okay.  And I'm going to ask you to take a look at -- it's

7    not numbered Pages 2 and 3, but just behind your cover sheet,

8    the documents reviewed.

9    A.   Yes.

10   Q.   Do you see where we are?

11   A.   Yes, the documents reviewed sheet.

12   Q.   And I'm going to ask you to take a look at those two pages.

13   A.   I'm there.

14   Q.   Does that accurately depict the documents that you reviewed

15   during and in preparation for your investigation?

16   A.   Yes.

17   Q.   And then I'm going to ask you to take a look at the

18   following page, which, again, is not numbered but would be Page

19   Number 4.

20   A.   Yes.

21   Q.   Persons interviewed.

22   A.   Yes.

23   Q.   And does that accurately depict the individuals you

24   interviewed --

25   A.   It does.

Direct/Freese - Luck

1  Q.  -- as part of your investigation?

2  A.  It does.

3       *MS. FREESE:*  Okay.  Your Honor, at this point I would

4  move for the admission of Defendant's Exhibit Number 2,

5  Ms. Luck's report.

6       *THE COURT:*  Any objection to two, counsel?

7       *MS. TAYLOR:*  No, Your Honor.

8       *THE COURT:*  Exhibit 2 is admitted.

9  BY MS. FREESE:

10 Q.  And, Ms. Luck, I would note, as you're familiar, this

11 social history report has been previously provided to the

12 court, so what I'd like to do this morning is really just touch

13 on certain highlights in the chronology of William's life.

14 Okay?

15 A.  That's fine.

16 Q.  So I'm going to first ask you -- and because I'm not

17 tendering you as an expert, not looking for opinions, just

18 simply your factual investigation.  Okay?

19 A.  Sure.

20 Q.  So I want to go all the way back, really, to William's

21 conception and the pregnancy and birth.  Did you interview any

22 witnesses that were able to give you information relating to

23 this?

24 A.  I did.

25 Q.  Could you tell the court anything significant about that

Direct/Freese - Luck

1   portion of the investigation?

2   A.  Well, I think probably one of the most significant ones was

3   when I went to the home of Ruben Augusta in Brooklyn.  I

4   knocked on his door.  He was suspected to be the potential

5   father.  And it was early in the morning.  It was earlier than

6   8:00 a.m., and he was dressed and ready to go to work.  He was

7   working in the finance industry.  And I told him what I was

8   there for, and he said, I'm not a bit surprised that you came

9   looking for me.  And he was able to sit down and talk to me.

10  He gave me about an hour of his time.

11          He explained that he was in a long-term relationship

12  with William's mother, that they were college sweethearts, that

13  they had intentions of being married, and there was a point in

14  time within the relationship that she had come to him and told

15  him that she was pregnant.  And he was very happy about that,

16  and they had put together a wedding date.

17          And during the pregnancy, there were suspicions that

18  maybe she was involved with someone else.  And it became

19  confirmed later on that she had an affair with a Kenny Hunter.

20  Simultaneously, when she was involved with Ruben Augusta, she

21  had also been telling Kenny Hunter that he was the father of

22  her child.

23          Now, his family had their own suspicions about the

24  paternity and didn't believe it was Kenny's son.  So it was a

25  very, very traumatic time in their life.  There were many, many

Direct/Freese - Luck

1    arguments.  The pregnancy was a very difficult one for her, and

2    there was a lot of deception, a lot of secrets being told

3    throughout.  His --

4    Q.  Now -- go ahead.

5    A.  His birth was also difficult.  He had a seizure.  He was on

6    phenobarbital for a period of time, and he had a lot of

7    muscular atrophy following his birth.

8    Q.  During the course of your investigation, did you actually

9    receive a copy of a paternity test to show whether or not Ruben

10   Augusta was the father?

11   A.  Yes.  He said, I have some very important papers that I

12   want you to see.  And I was down in his dining room, and he had

13   gone upstairs in the bedroom.  He had saved those papers all

14   that time and brought them down to prove that he was not his

15   father.

16          And it was very difficult because he was -- the baby

17   was being brought around to his family being told it was his

18   child up until about the time that William was about one and a

19   half, two years old.

20   Q.  And were there any other witnesses that you interviewed,

21   Ms. Luck, that specifically talked about any of the trauma or

22   tumult surrounding the pregnancy and birth of Mr. Augusta?

23   A.  Yeah, Robin Bell was speaking to that, too.

24   Q.  And what, if anything, did she tell you?

25   A.  The same type of thing, that it was a difficult pregnancy,

Direct/Freese - Luck

1   that there were questions regarding the paternity, and, you

2   know, it was a very, very ugly time.  There were a lot of

3   fights within the relationship, with Ruben Augusta.  Kenny was

4   away for a period of time.  He was in jail and in and out.

5   Q.  And I just want to interrupt you.  When you say "Kenny,"

6   who are you referring to?

7   A.  Kenny Hunter, who was later shown to be the biological

8   father.

9   Q.  Thank you for that clarification.  Okay.  Moving forward to

10  what I would call sort of the early childhood years of

11  Mr. Augusta, you know, what I would characterize maybe between

12  the ages of five and eight, did you interview any witnesses

13  that indicated there was any trauma or abuse to my client as a

14  small child?

15  A.  Oh, much.  Before Kenny came into the picture, his

16  situation with his mother appeared, from what we hear, to be

17  quite -- well, once Kenny comes into the house, he doesn't like

18  the way that William is being babied.  He calls him a faggot,

19  that he should dress up -- put on a dress.  He's demoralizing

20  William constantly.

21          There's frequent, frequent domestic abuse within the

22  house, domestic abuse in terms of Kenny against the mother,

23  Kenny with the grandmother, the mother and Kenny fighting with

24  each other.  There were episodes that William would be dragged

25  out of the house in the middle of the night while he and the

Direct/Freese - Luck

1   mother were fleeing to grocery stores and other places to hide

2   from Kenny.

3           It was a horrible situation.  He was frequently

4   physically abused by Kenny.  It was a nightmare of a situation

5   growing up for him.

6   Q.  Was there any evidence that his mother physically abused --

7   let me just clarify, that William, my client, that his mother

8   physically abused him?

9   A.  Yes.  There was -- when Kenny -- Kenny is in and out of

10  their lives, and when Kenny left the house, the mother more or

11  less took on the persona of the father at that point and

12  becomes very, very aggressive with him.  And there are reports

13  that she chases him down and beats him like a man, just

14  horrible things.

15  Q.  And did that come from a witness?

16  A.  Yes.

17  Q.  A witness told you that?

18  A.  Yes, to the point where she offered, one of the witnesses

19  actually offered to take him in because she was so upset about

20  the way he was being treated within that home.

21  Q.  And who specifically told you that?

22  A.  I think that was Nichelle.

23  Q.  Did you learn through your review of records or your

24  interviews of witnesses whether there were any suicide attempts

25  by my client as a child?

Direct/Freese - Luck

1    A.  Yeah, there was a suicide attempt when he was approximately

2    eight years old.

3    Q.  And did you review any hospitalization records that verify

4    that?

5    A.  Yes.  He was hospitalized by the time he was ten years old.

6    Q.  Do you recall where that was, Ms. Luck?  If I said it was

7    at the Meadows, does that sound correct?

8    A.  Yes, yes, that's correct.

9    Q.  Okay.  Was there anything significant about that

10   hospitalization or records you reviewed?

11   A.  Yes, it was quite a frightening ordeal for him with that

12   hospitalization.  He was restrained during that -- imagine

13   being a young child at approximately ten years old and being

14   put into physical restraints.  It was just horrible for him.

15   Another incident when you were asking about abuse, if I can

16   just go back a little bit, would that be all right?

17   Q.  Sure.

18   A.  Okay.  The father was extremely physically abusive,

19   emotionally abusive.  There was a situation that he was taken

20   out to eat and not allowed to have food.  Everybody else in the

21   family was able to eat except for William.  He was put down in

22   front of his siblings, in front of everybody, and they created

23   an atmosphere that he was the hated one within the family, and

24   he was treated differently.  He was the family scapegoat.

25             There was a situation that he had gone into, I think

Direct/Freese - Luck

1    it was a McDonald's, and he wanted an adult meal instead of the

2    kid's meal, and that's a few more dollars.  And a lot of kids

3    have big eyes and want to eat.  He, in that case, did.

4           MS. TAYLOR:  Your Honor, I'm going to object at this

5    time.  I didn't hear Ms. Luck indicate who was giving this

6    information, who is providing this information.

7           MS. FREESE:  I'll be happy to clarify, Your Honor.

8    BY MS. FREESE:

9    Q.  Who told you specifically about this?  You were just

10   discussing a McDonald's incident.  Who told you about that?

11   A.  That was William.

12   Q.  Okay.  And what did he tell you?

13   A.  He told me that on that particular episode, he had ordered

14   that adult meal and it was too much for him to eat and his

15   father forced him to eat that meal.  And he got sick as a

16   result of eating it, and he vomited, and his father made him

17   eat the vomit.

18   Q.  Okay.  I'm going to sort of -- was there anything else

19   about what I call the early childhood years or prepubescent

20   years with respect to your investigation that was significant?

21   A.  Yes, there was.

22   Q.  And what was that?

23   A.  He was a very, very isolated child.  He didn't have any --

24          MS. TAYLOR:  Again, Your Honor, if Ms. Luck could

25   indicate where that information is coming from.

Direct/Freese - Luck

1          THE WITNESS:  We have that, I believe, even in the

2     records from the Meadows.  I think the mother had said that he

3     hadn't had a friend the entire time.  And then --

4          THE COURT:  Can you just indicate whether you've drawn

5     conclusions based on particular facts or are you reciting the

6     facts as told to you?

7          THE WITNESS:  I'm reciting as told.

8          THE COURT:  Okay.  Thank you.  And what the source of

9     the facts are.

10         THE WITNESS:  Yeah, and I think that was the report

11    from the Meadows where the mother had indicated that he was

12    isolated and had no friends.

13    BY MS. FREESE:

14    Q.  Did any of the other witnesses that you interviewed touch

15    on the subject, as well, whether for -- you interviewed some

16    teachers.  Is that correct?

17    A.  Yes.

18    Q.  Okay.  Did anyone else offer any information about whether

19    or not he was isolated as a child?

20    A.  He just started to make friends when he was about in high

21    school.

22    Q.  Okay.  Is that what your investigation revealed, the

23    witnesses you interviewed?

24    A.  Yes, yeah.

25    Q.  And so that's sort of where I want to go next, is what I

Direct/Freese - Luck

1  would call the early teen years, which, I mean, his teenage
2  years is actually when the conduct that's the subject of these
3  charges started.
4         But let's go back to maybe 11, 12, 13, okay, those
5  early teen years.  Did you talk to anyone, including, of
6  course, Mr. Augusta, that gave you information about what
7  happened during this time in his life?
8  A.  Yes.  I interviewed a Janet Folson, a Marianne Krahulec, a
9  Susan Fry, and a Cheryl Parsons.
10 Q.  And what, if anything, were you able to determine -- and
11 you also talked to my client.  Is that correct?
12 A.  Yes, yes.
13 Q.  And I should ask you this, clarify this, approximately how
14 long did you spend with Mr. Augusta?
15 A.  About six hours.
16 Q.  And during your conversation with him, did you elicit a
17 social history from him?
18 A.  Yes, I did.
19 Q.  And that social history that you elicited from him, was
20 that similar to the social history that you elicited when you
21 were a probation or a parole officer?
22 A.  No, we spent much shorter times.  We would probably sit
23 with our clients about an hour to an hour and a half, and we
24 didn't have the luxury to be able to reach out and interview as
25 many parties as we did.  We usually based our social history on

Direct/Freese - Luck

1  what our client told us, and then we would send some releases
2  out.  If we got the information back, that was great, we
3  included it.  But we really went to great extents to try to
4  interview as many people as possible in this case.
5  Q.  And did you do more than that here?
6  A.  Yes, yes, clearly.
7  Q.  Okay.  So back to these witnesses during what I'm calling
8  the early, you know, teen years that you interviewed.  What, if
9  anything, was significant about your investigation into these
10  years of William's life?
11  A.  That he was just starting to make friends.  He had got
12  involved in some theater and music.  He was -- he tried to be
13  kind to the people that he met.  He tried to be a good friend
14  to them, but it was difficult for him.
15        He never wanted to be home.  That was a consistent
16  thing.  The teachers would say that he wanted to stay and help
17  out extra time and try to be away from home as much as
18  possible.  That was a consistent message.
19  Q.  And did William report to you in your interview with him
20  any conduct or anything significant about this time in his
21  life?
22  A.  Yeah.  During this period of time, he starts entering the
23  chat rooms, and the chat rooms become sexualized chat rooms.
24  Q.  At about what age did he report that that conduct started?
25  A.  He starts entering the chat room about age 12.

Direct/Freese - Luck

1   Q.  And did he tell you anything about the nature of those

2   discussions or who he was talking with?

3   A.  He did.

4   Q.  And what did he tell you?

5   A.  He was talking to other individuals, other men, and

6   eventually, like, older men, and they had become sexualized.

7   Q.  Okay.  Did he ever indicate to you whether these were

8   typing discussions?  Did they involve instances where the older

9   men could see him or he was -- you know, sort of a Skype or

10  something similar to that?

11  A.  It eventually went to physical contact with these

12  individuals.

13  Q.  Over the Internet?

14  A.  Over the Internet that he met them.

15  Q.  Did he ever report meeting up with any of these

16  individuals?

17  A.  Yes.

18  Q.  And what did he report with respect to that?

19  A.  That he would have sex with them and try to do what they

20  wanted him to do.

21  Q.  And did he indicate the ages of any of these men?

22  A.  That they were older, all different ages.

23  Q.  What else about these teenage years or anything else with

24  respect to your investigation that may have been significant,

25  highlights of your report?  Well, let me direct you.

Direct/Freese - Luck

1   A.  Okay.

2   Q.  That's sort of a very broad question.

3   A.  Yeah.  Thank you.

4   Q.  I'm going to ask you to take a look at Page 6 of your

5   report.

6   A.  Yes.

7   Q.  Okay.  And I'm going to ask you to take a look, actually,

8   at the second full paragraph.  It starts with the words,

9   Records from that hospitalization.

10  A.  Yes.

11  Q.  So did you review any records that revealed that he

12  suffered from posttraumatic stress disorder?

13  A.  Yes, I did.

14  Q.  And what, if anything, did those records indicate?

15  A.  That he also suffered from staring spells, that he had

16  flashbacks.  This was the time that he was ten years old, so

17  that was a little bit earlier.  The hospitalizations said he

18  had PTS flashbacks for the last five years and had school

19  related anxiety.  He was very isolated in school during those

20  early years.

21  Q.  That was another question about the school records that you

22  reviewed.  Did you -- was there any evidence of bullying or

23  anything like that with respect to his attendance at school?

24  A.  Yes.  He was bullied from early on.  His demeanor was

25  different than the other -- he was very bright, but I think he

Direct/Freese - Luck

1   had a little bit more maybe an effeminate demeanor.  He was

2   very isolated by other children.

3   Q.  Did he report to you any specific instances of bullying, or

4   did you review that in any counselor records?

5   A.  Yes, he was bullied even early on from the first school he

6   was at at age six.  He was frequently hit by the other boys and

7   forced to -- well, he had a sexual act with one of the boys at

8   six years old.

9        MS. TAYLOR:  Again, Your Honor, I would object to this

10  testimony and ask that the witness indicate where this

11  information is attributed to or whom she's attributing it to.

12       THE COURT:  Okay.  Could you back up and --

13       THE WITNESS:  That particular -- the sexual aspect of

14  it was through William.  And I did make an attempt to

15  interview -- I mean, I had a name of a young man, and I went to

16  his home on two occasions and knocked on that door and made --

17  you know, put a note on the door to have him call me.  I called

18  the family house to try to interview the young man, but they

19  didn't call back.

20  BY MS. FREESE:

21  Q.  And just so we're clear, when you say you attempted to

22  interview the young man, what young man are you talking about?

23  A.  This boy that was bullying him in school and the one that

24  sexually, you know, touched him when they were six years old.

25  Q.  Okay.  So when you interviewed William, did he provide you

Direct/Freese - Luck

1    with a name?

2    A.  Yes, he did.

3    Q.  And you attempted to run that down?

4    A.  Yes.  And I did, I found out where they lived, and I went

5    to the home twice.  And then my office ended up even asking the

6    father if the young man could please reach us, but he never

7    called back.

8         THE COURT:  I just want to clarify, the sexual

9    involvement with the other six-year-old, was it reported to you

10   as being nonconsensual?

11        THE WITNESS:  No, it wasn't reported as nonconsensual,

12   but it was a situation with a boy that didn't like him, that

13   was actually beating him up in school and bothering him.  There

14   were two twin brothers, and it was the one brother that was the

15   one that did this with him.  And I did go to their house on two

16   occasions.

17        THE COURT:  All right.  Thank you.

18   BY MS. FREESE:

19   Q.  Ms. Luck, I think that concludes my specific questions, but

20   I just want to summarize it by indicating, is everything in

21   your report an accurate account of your investigation in this

22   matter?

23   A.  Yes.

24   Q.  Is there anything about the investigation that was

25   significant that you did not include within your report?

1    A.   No.

2         MS. FREESE:  Your Honor, that concludes my questions

3    for Ms. Luck.

4         THE COURT:  For the government.

5         MS. TAYLOR:  Your Honor, at this time I would request

6    the statements of Ms. Luck pursuant to 26.2.

7         THE COURT:  What statements are there?

8         MS. TAYLOR:  Specifically what I'm referring to are

9    any statements that would be contained in the email

10   communications.

11        MS. FREESE:  Your Honor, to the best of -- I mean, my

12   collection last night, and I did attempt to review them when I

13   was saving them, they are discussions between the two of us

14   about her invoices, receipts being paid, traveling here to

15   testify.  There was, in this case, a draft report that was

16   prepared by Ms. Luck.  It was not a final report.  There were

17   grammatical changes.

18        There is one communication where, you know, we don't

19   discuss the substance of that, I simply indicate to her I would

20   like it to be easier to read, and so she redoes the report,

21   adds some grammatical changes, and sends it back to me.  That

22   is, what I would say, a summary, setting up phone conferences,

23   logistics of her travel here and retention.

24        THE COURT:  All right.  Ms. Taylor, which of these are

25   you seeking to use in your cross-examination?

1          MS. TAYLOR:  Well, Your Honor, I haven't had a chance

2     to review any of them.  You know, if Ms. Freese would like the

3     court to review them briefly in camera to see if any of them

4     are privileged.  I'd like an opportunity to review any of them

5     that are relevant to Ms. Luck's -- relevant to this case and

6     that fall under 26.2 before we proceed with her

7     cross-examination.  So any that aren't privileged, I'd like an

8     opportunity to review briefly.

9          MS. FREESE:  I believe they're all privileged.  She's

10    my agent, I retained her.  She's open to cross, she's

11    available, she prepared a comprehensive report.  They were

12    prepared in preparation for litigation.  I think that all of my

13    communications are an extension of the attorney-client

14    relationship.

15         She's here.  Certainly her compensation, all of those

16    things are fair game.  Her detailed invoices, Your Honor, I

17    would argue, are privileged in the sense that they also

18    reference other cases she worked on.  Some of the receipts

19    indicate other people who have retained her services.

20         So if the court believes that they -- I'm invoking the

21    work product privilege, and if the court orders, as I've

22    indicated, I certainly have -- everything I could attempt to

23    collect within 18 hours is here.

24         And there are, by the way, I should indicate to the

25    court, there are not hundreds of emails.  Our email

1    communication was actually quite limited.  I usually

2    corresponded with her assistant.

3           *THE COURT:*  All right.

4           *MS. TAYLOR:*  Well, Your Honor, we're not interested in

5    the invoices or in any of Ms. Luck's other clients, obviously,

6    but certainly anything that has to do with draft reports or

7    anything that appears to be substantive as to Mr. Augusta's

8    case and involving Ms. Luck fits within 26.2.

9           *THE COURT:*  All right, counsel.  Let me have -- do you

10   have them separated by Dr. Krueger and Ms. Luck?

11          *MS. FREESE:*  I believe so.  I asked our computer

12   systems administrator this morning to do just that.

13          *THE COURT:*  All right.  Would it be obvious to me if I

14   opened the device that you're supplying or will I need your

15   assistance to review them and determine which of these you

16   claim to be privileged?

17          *MS. FREESE:*  It may be helpful, Your Honor, if I get

18   it started to expedite the process.  But I haven't actually

19   viewed it because of the time constraints.  My CSA did it early

20   this morning.  So I believe -- I asked him to separate it into

21   folders, but I haven't actually viewed this flash drive.

22          *THE COURT:*  How long do we have your witnesses?

23          *MS. FREESE:*  Today.

24          *THE COURT:*  Just today.  It might make sense to hear

25   from Dr. Krueger and then come back to this witness.

1          *MS. FREESE:*  For cross-examination?

2          *THE COURT:*  Yes, yes.

3          *MR. BERRY:*  So just to be clear, Your Honor, after

4    Dr. Krueger's testimony, we'll make the same motion.  I guess

5    at that time is when Your Honor will review --

6          *THE COURT:*  Yes.

7          *MR. BERRY:*  -- both sets of emails, and then we'll

8    come back and do seriatim the crosses?

9          *THE COURT:*  Yes.

10          *MR. BERRY:*  Okay.  Thank you.

11          *THE COURT:*  Would you step down, please.

12          *THE WITNESS:*  Sure.

13          *MS. FREESE:*  Your Honor, I've asked Ms. Luck to step

14    out --

15          *THE COURT:*  Yes.

16          *MS. FREESE:*  -- while Dr. Krueger testifies, as well.

17          *THE COURT:*  Okay.  Thank you.  Come forward, if you

18    would, please.  Good morning, Doctor.

19          *DR. KRUEGER:*  Good morning.

20     *RICHARD KRUEGER, M.D., called as a witness, having been*

21    *duly sworn or affirmed, testified as follows:*

22          *COURTROOM DEPUTY:*  For the record, please state your

23    full name.

24          *THE WITNESS:*  Richard Bohn Krueger.

25          *COURTROOM DEPUTY:*  Could you spell your last name,

1    please.

2              *THE WITNESS:*  K-r-u-e-g-e-r.

3              *COURTROOM DEPUTY:*  Thank you.

4                        DIRECT EXAMINATION

5    BY MS. FREESE:

6    Q.  Good morning, Dr. Krueger.

7    A.  Good morning.

8    Q.  Dr. Krueger, if you could, could you please tell the court

9    about your formal education?

10   A.  Yes.  I went to undergraduate college at a place called

11   Albion College in Southern Michigan.  I went to medical school,

12   graduated from Harvard Medical School in 1977.  I had training

13   in internal medicine at the Boston VA Hospital from '77 to '80,

14   1980, and became board certified in medicine in 1981, 1980 to

15   1981.

16              I did a psychiatry residency at Boston University and

17   became board certified -- from 1980 to 1983 and became board

18   certified in psychiatry in 1984.  I subsequently have had

19   experience and been board certified in forensic psychiatry and

20   addiction psychiatry for ten-year periods on three occasions.

21   I just passed my boards in 2016 again for ten years.

22   Q.  Okay.  So what are the current certifications that you

23   hold?

24   A.  Well, I'm board certified in psychiatry, board certified in

25   internal medicine, board certified in addiction psychiatry, and

Direct/Freese - Dr. Krueger

1    board certified in forensic psychiatry.

2    Q.  And where are you currently employed?

3    A.  I am self-employed.  I'm also employed four days per week

4    by the New York State Psychiatric Institute, which is a state

5    psychiatric research hospital in Manhattan.

6    Q.  Okay.  And do you also do work with the Sexual Behavior

7    Clinic?

8    A.  Yes.  My job title -- well, actually, I'm a Clinical

9    Specialist II on the sort of payroll, but my function is to be

10   medical director of the Sexual Behavior Clinic, which is a

11   clinic which has existed for some 30 years at New York State

12   Psychiatric Institute, which offers a program of treatment to

13   juveniles who committed sexual offenses.

14          Part of the clinic's responsibility and my

15   responsibility is to advise the various individuals in the New

16   York State Office of Mental Health on the evaluation, risk

17   assessment, and treatment of sexual offenders within the Office

18   of Mental Health System, which I've done for 20-plus years.

19   Q.  Okay.  And during the course of your experience, have you

20   specifically conducted sex offender evaluations?

21   A.  Yes.

22   Q.  Approximately how many, ballpark?

23   A.  I would say, ballpark, a thousand.

24   Q.  And what about mental health evaluations, have you

25   conducted them?

Direct/Freese - Dr. Krueger

1   A.   Ballpark, about 5,000 in my career overall.

2   Q.   And have you published peer-reviewed articles?

3   A.   Yes.

4   Q.   And are they detailed in your CV?

5   A.   Yes.

6   Q.   I'm actually going to -- well, let me just ask you this,

7   how about case reports or any chapters in books, are you

8   published in any of these areas?

9   A.   There are a number of chapters.  I think there are some

10  case reports.  There are a fair number of peer-reviewed

11  articles.  These are all detailed in my CV.

12  Q.   And I'm going to ask you to take a look at that large

13  binder that's up in front of you.

14  A.   Okay.

15  Q.   If you go to Tab 3.

16  A.   Okay.

17  Q.   And are you there?

18  A.   Yes, I am.

19  Q.   Do you recognize that document?

20  A.   Yes.

21  Q.   And what is that?

22  A.   It's my CV as of May 3rd, 2017.

23       *MS. FREESE:*  Okay.  Your Honor, at this point -- well,

24  I would first move for the admission of his CV, which I have

25  marked as Defendant's Exhibit Number 3, but the government has

Direct/Freese - Dr. Krueger

1   just indicated that they have no objection at this point to me

2   tendering Dr. Krueger as an expert.  And we would be offering

3   him, Your Honor, in the area of an expert of forensic

4   psychiatry and sex offender evaluation.

5           *THE COURT:*  He'll be so qualified.

6   BY MS. FREESE:

7   Q.  Now, moving along, you were retained by the Federal Public

8   Defender's Office to conduct an evaluation in this case.  Is

9   that correct?

10  A.  Yes.

11  Q.  Okay.  And did you, in fact, conduct an evaluation --

12  A.  Yes.

13  Q.  -- of Mr. Augusta?

14  A.  I did.

15  Q.  And did you meet with him?

16  A.  I did.

17  Q.  And approximately how long did you spend with him?

18  A.  I think for about four or five hours.

19  Q.  Okay.  And did you review a number of other documents as

20  part of your analysis and evaluation in this matter?

21  A.  I did.

22  Q.  And I'm going to ask you to then just turn to Number 4 in

23  that large binder.

24  A.  Yes.

25  Q.  And that's thick, but I'm going to ask you to look through

Direct/Freese - Dr. Krueger

1   that, to page through that.  The first portion, is that a copy

2   of your report?

3   A.  Yes.  Under four, it's a copy of my report, yes.

4   Q.  And that's a report you prepared in this matter?

5   A.  That's correct.

6   Q.  And behind that then would be some of the raw scoring data

7   that you provided to my office as part of your evaluation.  Is

8   that correct?

9   A.  Well, under Item Number 6, there is a copy of the basic

10  testing that I did.

11          MS. FREESE:  Okay.  Your Honor, at this point I'm

12  going to offer the report prepared by Dr. Krueger, which was

13  also appended to our sentencing memorandum, into evidence at

14  this time.

15          THE COURT:  That would be Exhibit 4?

16          MS. FREESE:  That's correct, Your Honor.

17          MR. BERRY:  And just to be clear, Your Honor, are we

18  admitting the 16-page document only, or are we admitting the

19  16-page document along with what appears to be, I don't know,

20  an inch thick of pages of the SCID, the S-C-I-D, that says,

21  Tests, slash, Risk Assessment Instruments, which is still

22  behind Tab 4, and an even thicker stack which is what the

23  doctor just identified as the actual risk assessment

24  instruments, diagnostic instruments that he utilized under Tab

25  6?  It's unclear to me what we're offering.

Direct/Freese - Dr. Krueger

1      MS. FREESE:  And, Your Honor, my apologies, I'm only

2  offering the report itself into evidence.

3      THE COURT:  So that would be the 16 pages?

4      MR. BERRY:  The 16 pages?

5      MS. FREESE:  That's correct, Your Honor.

6      THE COURT:  Okay.

7      MR. BERRY:  No objection, Your Honor.

8      THE COURT:  Exhibit 4 is admitted.

9  BY MS. FREESE:

10  Q.  Okay.  So the court has, as you know, had the benefit of

11  reviewing the report, your report.  I'm going to ask you to

12  turn to Page 2 of your 16-page report.

13  A.  Okay.

14  Q.  And that details, as of the date that you prepared this

15  report, some documents that you reviewed.  Is that right?

16  A.  Yes.

17  Q.  Okay.  Now, since that time, you've also reviewed the

18  presentence report that was prepared by the probation officer

19  in this matter.  Right?

20  A.  Yes.

21  Q.  And you prepared the sentencing memoranda filed by both

22  parties.  Is that right?

23  A.  I reviewed the sentencing memoranda, yes.

24  Q.  Okay.  Now, I'm not going to ask you to recount the social

25  history because, well, Ms. Luck testified, and, again, the

Direct/Freese - Dr. Krueger

1    court has reviewed the report.

2           But what I am going to ask you to do, Dr. Krueger, is

3    to identify any significant factors about his prior social

4    history with respect to your evaluation.  Was there anything

5    about his social history that was significant to you in

6    reaching your conclusions?

7    A.  Well, I would say there's a lot.  I think in the first

8    instance, he was a product of a -- this is not quite a social

9    history, but appropriate medical history, he was a product of

10   this complicated pregnancy.  He had, I think, some significant

11   brain issues, seizure disorder and so on, yet he emerged from

12   this with an IQ of 124.  That's overall quite a remarkable

13   occurrence.

14          He was subjected to very significant physical abuse on

15   the part of both his mother and his father, which I think

16   Louise Luck documented.  I think he had a -- there were a lot

17   of moves.  He had a very unstable childhood going from place to

18   place.  It sounds like he was not supervised as well as he

19   might have been.

20          He continued in school and graduated from school,

21   which I think is quite remarkable given the overall

22   circumstances, and appeared to have some interest and aptitude

23   in the arts.

24          And he was quite an unhappy child.  He was somewhat

25   effeminate.  He was very bullied.  At one point early on he

Direct/Freese - Dr. Krueger

1   attempted suicide.  He had a brief psychiatric hospitalization.

2   And I think those would be the main, main characteristics.

3   Q.  Was there anything that you reviewed to indicate that he

4   had any prior sex offender treatment of any type?

5   A.  He had had -- there was nothing I reviewed to suggest that.

6   It appeared that he did not.

7   Q.  Okay.  And was there any evidence of what I'm going to call

8   prior imposition of a legal sanction or any prior criminal

9   convictions?

10  A.  This was his first -- these two arrests, the state arrests

11  and then the federal arrests were the two arrests.  I think

12  he -- when I spoke with him, he characterized when he was a

13  juvenile that he had somehow been arrested for purportedly

14  assaulting his grandmother, but I discussed, and there's no

15  legal record of this, there's no evidence of conviction, so

16  this could have been his misunderstanding.

17  Q.  Well, let me ask you about the -- whether or not that's a

18  significant fact.  Is prior imposition of a legal sanction, as

19  part of your analysis, a significant fact or not?

20  A.  Yes, it would be.

21  Q.  Why?

22  A.  Because generally associated with the risk of recidivism

23  would be, first of all, the imposition of a legal sanction.  If

24  somebody has been arrested as a juvenile or as an adult, this

25  would create a history that would suggest that somebody is

Direct/Freese - Dr. Krueger

1    antisocial.  That's one element.

2         The second element is if they have been arrested and

3    sanctioned, this would then impose some deterrence on them.

4    And the question in assessing sexual offenders is -- really any

5    offender is whether they respond to this imposition of a legal

6    sanction.  And if one has been imposed and they don't respond

7    to it, this tells you a lot.

8         In this case, there was no prior legal sanction, so

9    this is basically a first arrest.  The fact that there were no

10   prior legal sanctions which he then went on to violate is, I

11   think, notable.

12   Q.  And I want to touch upon a sexual history, his self-report

13   and, of course, the records that you reviewed.  Did you ask him

14   about prior sexual abuse?

15   A.  I did.

16   Q.  And what was his response?

17   A.  He said that he had not been sexually abused.  I regularly

18   ask this as part of my assessment of sexual functioning.  I

19   then -- within the information provided, it was evident that

20   he -- he gave a history of having engaged in sexually related

21   chatting, cybersexual interactions from 12 or 13 onwards with

22   adults, not with peers but with adults.  This would certainly

23   be considered sexual abuse.

24        I was kind of struck that there was no history of, you

25   know, sexual abuse mentioned in the records or anything I could

Direct/Freese - Dr. Krueger

1  find.  I actually sort of discussed this with Louise Luck a

2  little bit.  I was kind of surprised.

3         But in my view, this would constitute sexual abuse,

4  the interaction of himself as a minor with adults over the

5  Internet in a cybersexual way.  This would be considered sexual

6  abuse.  Louise Luck agreed.

7  Q.  But he didn't report it as that?

8  A.  That's correct.

9  Q.  So what I'd like to do next is really move to and highlight

10  some of the testing that you did, talk about its significance.

11  So let me first start with, Dr. Krueger, how do you determine,

12  in a case like this, which tests to administer?

13  A.  Well, generally I involve a series that I use regularly to

14  assess sexual offenders, which is basically the series that was

15  applied here.  I think that within, say, forensic psychiatry,

16  individuals -- or the assessment of sexual offenders,

17  individuals, experts are free to develop and use their own sort

18  of package of instruments.

19         You want to use, as much as possible, agreed-upon

20  standard instruments, from a psychiatric point of view

21  agreed-upon and validated psychiatric instruments.  And this is

22  the sort of final composition of what I use.  So these are --

23  this basically presents in order the package that I usually

24  use, and I have used it for many years.  It has been pretty

25  stable for many years.

Direct/Freese - Dr. Krueger

1   Q.  Okay.  And I just -- you've already been qualified as an

2   expert, but I think this is relevant to your credibility.  Have

3   you, you know, received training and actually traveled the

4   world on this topic?

5   A.  Yes, I would say -- so the diagnostic manual that's used to

6   assess, to determine psychiatric disorders is called the

7   Diagnostic and Statistical Manual published by the American

8   Psychiatric Association.  And the New York State Psychiatric

9   Institute and Columbia have had a large role in this going

10  forward.  And the most recent edition was Diagnostic and

11  Statistical Manual, Fifth Edition, DSM-5.

12          And I was involved for five years in the writing and

13  revision of the sexual disorders and the paraphilic disorders

14  chapter of that manual.  Actually, my areas of specialty were

15  sexual masochism, sexual sadism, and paraphilic coercive

16  disorder, and I published in articles regarding at least the

17  former.

18          Subsequent to that, I was invited to revise, help

19  revise the classification manual which is used by most of the

20  world called the International Classification of Disease.  So

21  the current manual is ICD-10, International Classification of

22  Disease, Tenth Edition.

23          So for the past six years I've been involved in

24  revision of the paraphilic disorders -- the whole sexual

25  disorders chapter and the paraphilic disorders chapter of

Direct/Freese - Dr. Krueger

1   ICD-10.  We've published our recommendations.  I'm sort of the

2   lead author on the publication in terms of revision of this

3   chapter from ICD-10 to ICD-11.

4   Q.  So before we get to -- thank you for that explanation.

5   Before we get to the specific highlights of some of the tests,

6   as part of the materials, did you review a report that was

7   prepared by a Dr. Timothy Foley?

8   A.  I did.

9   Q.  And that was a report that I provided to you.  Is that

10  correct?

11  A.  That's correct.

12  Q.  Okay.  And that was an evaluation of my client, William

13  Augusta.  Right?

14  A.  Yes.

15  Q.  All right.  Now, one of the screens, one of the tests you

16  did not do is something known as the Abel screen.

17  A.  Yes.

18  Q.  And I would like -- I'm curious, why did you not perform

19  that test?

20  A.  Well, actually, Dr. Abel had started our Sexual Behavior

21  Clinic 35 years ago and then moved to Atlanta to develop this

22  assessment instrument.  I think that -- it uses something

23  called viewing time.  It presents a whole large series of

24  questions.

25          It also relies on something called viewing time in

Direct/Freese - Dr. Krueger

1   which -- the idea is to, in some fashion -- similar to treating

2   drug abusers or assessing drug abusers, you want to find some

3   objective instrument that beyond their self-report will allow

4   you to assess what their true sexual interest is.

5          The tradition or the best study instrument is penile

6   plethysmography in the field where you have somebody attach a

7   device to their penis and present stimuli and see how much

8   arousal they have.  This is refined in Canada.  There are large

9   issues of it in the U.S. and generally.

10          A sort of -- Dr. Abel tried this.  He developed as

11  a -- sort of a more succinct way of doing this something called

12  viewing time in which he would present images of various

13  categories, adults, children, and so on, to someone for them to

14  rate and try and assess their degree of sexual interest.

15          He promulgated this.  There have been only a couple of

16  articles that really have -- that he's produced that have

17  independently validated this.  But within the field, I think

18  there's a lot of concern that this is -- there's not adequate

19  validation.  We did this in the past.  We don't do it any

20  longer just because of the lack of substantial validation of

21  it.

22  Q.  Okay.  Thank you.  So let's move, if we could, to Page 9 of

23  your report.  And this is where you really summarize some of

24  the tests that you administered in this case.

25  A.  Yes.

Direct/Freese - Dr. Krueger

1  Q.  So the first test I want to review with you is what you

2  referred to as the sexual SCID?

3  A.  Yes.

4  Q.  S-C-I-D?

5  A.  Yes.

6  Q.  What is it about your administration of this test that's

7  significant in this case, if anything?

8  A.  Well, I would say sexual SCID stands for the Structured

9  Clinical Interview for Diagnoses.  Again, this is a methodology

10  that was developed at Columbia and Psychiatric Institute and

11  applied to a number of other psychiatric disorders, depression,

12  mania, and so on.

13       And basically the case that -- it can become --

14  there's unreliability in terms of making psychiatric diagnoses,

15  and the SCID was a structured way of leading trained clinicians

16  to achieve diagnoses.  And using these written instruments, one

17  is able to achieve a much higher rate of test/retest

18  reliability, of interrater reliability, of validity.  This is

19  with the various other disorders.

20       Now, in the field of sexual disorders, there are --

21  when I sort of wrote this SCID, there were five or six other

22  SCIDs that had been used in various studies, some of which were

23  reported in the American Journal of Psychiatry and otherwise.

24       But there's an issue in terms of the validation of

25  this instrument, that it has not been broadly validated, but

Direct/Freese - Dr. Krueger

1   there is no such instrument to achieve a diagnosis of deviant

2   sexual interest that has been validated.

3          In any event, this is a structured way of making a

4   psychiatric diagnosis, and I have used this for ten years or

5   more.  And using this, Mr. -- so it would rely on an interview

6   of the individual, but also all other available information.

7   Typically one would use a criminal record.  If there is

8   Internet material, you would use that, collateral historians,

9   victim statements, whatever information is out there.

10         Using this, I made a diagnosis of pedophilia, even

11  though Mr. Augusta denied that he was sexually aroused by his

12  brother.  He made a criteria for sexual masochism.  This was

13  actually his preferred manner of sexual arousal.  He also made

14  a criteria for sexual sadism and for something called a sexual

15  disorder not otherwise specified or hypersexual disorder

16  characterized by compulsive masturbation, sex with others,

17  pornography dependence, and cybersexual interactions.

18         This whole notion of sort of a hypersexual disorder, a

19  compulsive sexual behavior disorder is something new.  It's

20  something that we recommended for inclusion in the DSM-5, which

21  was not.  But this is recognized more and more, and it will,

22  for instance, be part of the ICD-11.  But it would generally

23  reflect that Mr. Augusta has been hypersexual, extremely sexual

24  from his juvenile years onward, basically.

25  Q.  The next test of note is, which you list is the Bancroft

Direct/Freese - Dr. Krueger

1    Self-Report Scale of Sexual Interest and Activity.  Why did you

2    administer that test?

3    A.  Again, this is just a ballpark way of characterizing

4    somebody's degree of sexual arousal or of sexual drive.  This

5    was a -- again, within the field, there are not good,

6    well-validated instruments for the use of assessing sexual

7    drive.

8         The Bancroft I would say was used in a modified

9    version in an article which is published in the New England

10   Journal of Medicine.  Dr. Bancroft developed this 50 years ago

11   for some inpatient studies.  It basically asks an individual on

12   a line or on a Likert Scale, on a scale from zero to five, how

13   much they've been interested in sex in the past week and how

14   many ejaculations they've had.

15        And I would do this for current -- for the week prior

16   to the interview, and then just to get some idea of how

17   somebody had been prior to their sort of incarceration or the

18   imposition of a legal offense, I would ask for the same scores

19   in an earlier time period.

20        This indicated Mr. Augusta said he was quite

21   interested in sex, four out of five for both time periods, but

22   that he had an average of fourteen ejaculations per week prior

23   to his incarceration and three ejaculations per week before I

24   interviewed him.

25        So, again, this would -- I mean, lots of individuals

Direct/Freese - Dr. Krueger

1   might want to sort of deceive and just sort of say they're not

2   sexually interested at all.  This was -- you know, this

3   suggested that he was being forthright.  It also suggested

4   broadly that his hypersexuality had decreased with his

5   incarceration, which is what you see.

6   Q.  I was going to say, is that typical?

7   A.  Yes, very typical.

8   Q.  The next sort of significant, and I know we're going to

9   jump over some of these, but is the Clinical Global Impression

10  Scale which you had detailed on Page 10.  Why did you

11  administer this test?

12  A.  Well, again, if you're looking at psychiatric disorders,

13  they're quite complex.  It becomes very hard to sort of rate

14  them and rate their degree of severity.  The Clinical Global

15  Impression Scale acknowledged this.  It was developed 50 or 60

16  years ago at the National Institute of Mental Health.

17          And it basically asks a clinician who has some

18  familiarity with the diagnosis in question in a particular

19  area, how ill is this individual from one, not ill at all, to

20  seven, among the most extremely ill patients that I've

21  evaluated.  And in this case, I gave Mr. Augusta a five,

22  indicating that he was markedly ill.  He was not among the most

23  ill that I've evaluated, but he was markedly ill.

24  Q.  And you indicate specifically that your focus there, if you

25  go one, two, three, four, the fourth line from the bottom of

Direct/Freese - Dr. Krueger

1   Paragraph 3, that in this case, the focus of your estimation
2   involved the sexual and paraphilic disorders.  Is that right?
3   A.  Yes, that's correct.
4   Q.  How about the Abel and Becker Cardsort, why did you
5   administer that test?
6   A.  Again, this is something that was developed by Dr. Abel at
7   the clinic.  Basically, again, it's a quite subjective
8   instrument.  But you would -- it used to be that you would give
9   individuals cards with various scenarios and they would sort
10   them, but this has just developed into a questionnaire.  And
11   Mr. Augusta endorsed -- it's, again, an attempt to get somebody
12   to reveal what their sexual interest is.  It's obviously quite
13   subjective.
14        But he reported an interest in sexual activity with
15   males, adult males, females, transvestic fetishism, dressing up
16   in clothes of the opposite sex, voyeurism, and masochism.  This
17   is consistent with the history that I obtained from him.
18   Q.  And jumping down now to Number 7 on Page 10, the next test
19   that I'd like you to highlight is, and I will probably
20   mispronounce this, but is it the Derogatis?
21   A.  It's the Derogatis, yes.
22   Q.  Derogatis Interview for Sexual Function.  Why was this
23   significant, or why did you administer this test?
24   A.  Well, again, there's a dearth, a lack of validated
25   instruments, but this was developed by Leonard Derogatis for

Direct/Freese - Dr. Krueger

1    assessment of male sexual functioning.  It gives you generally

2    a ballpark idea of how somebody's sexual functioning is over

3    the past month and compares this with norms which are within

4    the grading pages of the instrument.

5            Mr. Augusta was in the fourth percentile, very low

6    percentile in terms of sexual functioning, which, again, is

7    what you would expect with somebody who is incarcerated.  They

8    just shut down.  Some shut down, some don't.

9    Q.  In your experience -- and we've just sort of covered this.

10   You said some shut down, some don't.  In your experience,

11   Doctor, do you typically see a shutdown?

12   A.  Yes, yes.

13   Q.  And the next test would be the Coleman Compulsive Sexual

14   Behavior Inventory.  If you could, please, highlight for the

15   court why you administered that test and if there was anything

16   significant about Mr. Augusta's results.

17   A.   Again, this is a test that was developed by Eli Coleman and

18   others at the University of Minnesota just to establish how

19   much -- how compulsive somebody's sexual behavior was and how

20   much control they would have over their sexual behavior.

21           This indicated that he was -- that Mr. Augusta was

22   quite compulsive when he engaged in this.  This was the first

23   point prior to his arrest.  And compared with how he is -- how

24   he was at the time I evaluated him, things had become much less

25   compulsive.  He was much less involved in compulsive -- he

Direct/Freese - Dr. Krueger

1    assessed his behavior as being much less compulsive.

2    Q.  And what --

3    A.  Meaning his degree of control had increased.  I think that

4    would be the better way to report this.

5    Q.  And in your experience, what, if any, impact does

6    incarceration typically have on them?

7    A.  Again, it would sort of settle individuals down.  They

8    would become -- they stop doing whatever they're doing, in

9    large part.

10   Q.  The next test that I'd like to review is the

11   Pathological/Problematic Sexual Behavior Scale.

12   A.  This is, again, something called the YBOCS, Yale-Brown

13   Obsessive Compulsive Scale, which presents various scenarios

14   and which has been extended to other -- it was developed for

15   obsessive compulsive disorder, but it has extended to many

16   other disorders, body dysmorphic disorder, pathological

17   gambling.

18        In this case, it has been applied to sexual behavior,

19   and it gives some sense of how much an individual is involved

20   with compulsive sexual behavior.  In his case, he got a score

21   of -- zero is sort of no involvement.  He got a score of 24

22   prior to his arrest and zero now, meaning that he, again, was

23   not engaged in compulsive sexual behavior.

24   Q.  Is that the type of result that you'd expect to see from

25   someone incarcerated?

Direct/Freese - Dr. Krueger

1   A.  Yes.

2   Q.  Okay.  And the final test under this portion of your report

3   with respect to deviant sexual behavior was the Kinsey Scale.

4   A.  Again, one would not assert that homosexuality is

5   associated with or heterosexuality are associated with any

6   particular increased risk of sexual -- of criminal sexual

7   behavior, but this gives a ballpark idea of what somebody's

8   sexual orientation is.  And he indicated -- he circled a five

9   out of six, six being exclusively homosexual.  He was pretty

10  much in that direction, but he had some interest in females.

11  Q.  There are three tests with respect to the screenings you

12  conducted on psychiatric syndromes that I'd like to highlight.

13  Obviously all are included within your report.

14          The first test that I'd like you to touch on for the

15  judge is the SCID or the SCID-I which you administered.  Could

16  you first explain why you administered the test and the

17  significance of the results, if any?

18  A.  Well, again, this is sort of the -- kind of

19  original Structured Clinical Interview for Diagnoses.  And I

20  administer this pretty much in all the evaluations just to

21  establish if there are any nonsexual psychiatric disorders that

22  are -- that this individual has experienced.

23          And in this case, he -- this resulted in a diagnosis

24  of Bipolar I disorder, which is where somebody has recurrent

25  depression and hypomanic episodes and posttraumatic stress

Direct/Freese - Dr. Krueger

1  disorder, chronic, severe.

2  Q.  And moving down to what's detailed as Number 13, my first

3  question is, why do you -- what is the significance of alcohol

4  abuse or evidence of alcohol abuse during the course of your

5  evaluations?

6  A.  Well, just substance use is such a common component to

7  criminal behavior that I regularly assess for drug abuse and

8  alcohol abuse just clinically and with these -- with a couple

9  of screening instruments.

10         In this case, the Michigan Alcohol Screening Test, the

11  MAST, he got a score of zero, suggesting that he -- being

12  consistent with the history that he did not have alcohol abuse

13  problems or a disorder.

14  Q.  And the final test, again, in this category that I'd like

15  to spend some time on is the Adverse Childhood Experiences

16  scale.  First, if you could explain to the court why you

17  administered the test in this instance, and then I would like

18  to talk to you a little bit about your results.  So, first, why

19  did you administer this test here?

20  A.  Well, again, it's part of a -- kind of general of the sort

21  of list of instruments, instruments that I use in sort of a

22  general psychiatric assessment.  It gives a broad ballpark but

23  very substantive way of assessing how adverse somebody's

24  childhood experience has been.  This is really quite a

25  well-validated test which I've used for many years.

Direct/Freese - Dr. Krueger

1        A high score is ten, a score of five is -- or six, I

2   think he had, is -- suggests a very significant childhood

3   adversity.

4   Q.  Now, in your report on Page 12, you indicate that this

5   score of six is what you called extremely elevated and, in

6   fact, the worst you've encountered in your experience.

7   A.  Yes.

8   Q.  Explain that.  In other words, you've done thousands of

9   evaluations, so explain the significance of that.

10  A.  I've been using this probably for the past three or four

11  years.

12  Q.  Okay.

13  A.  So a hundred couple, maybe a hundred evaluations, a hundred

14  plus.  And it basically gives, presents ten questions to an

15  individual which they answer, you know, were you sexually

16  abused, were you physically abused, was a parent lost to you by

17  incarceration, questions such as that.

18        And this was a high score, an elevated score.  I

19  actually -- I subsequently have done an evaluation where

20  somebody had a score of seven, so this is no longer the most --

21  the worst that I've seen.

22  Q.  Okay.  Now, you reviewed the government's sentencing

23  memorandum in this case.  Is that right?

24  A.  Yes.

25  Q.  And in it you saw that the government spent some time

Direct/Freese - Dr. Krueger

1    discussing this ACE scale in reference to the victim, one of

2    the victims in this case.  Is that correct?

3    A.  Yes.

4    Q.  And that specifically was something that we discussed this

5    morning.  Is that correct?

6    A.  Yes.

7    Q.  Okay.  One of the assertions in the government's memorandum

8    is that Mr. Augusta's crimes will most certainly shorten the

9    life span of the victim based upon, at least in part, this test

10   and the child's adverse experiences.  Did you review that

11   portion of the memorandum?

12   A.  Yes.

13   Q.  And you didn't evaluate Victim Number 1 in this case, did

14   you?

15   A.  That's correct, yes.

16   Q.  You didn't evaluate any victims in this?

17   A.  No.  We don't usually do this in the course of such

18   evaluations.

19   Q.  Right.  I mean, you were retained for the purpose of

20   conducting an evaluation of Mr. Augusta.  Correct?

21   A.  Yes.

22   Q.  What, if any, opinion do you have with respect to the

23   application of these factors to Victim Number 1 to the extent

24   that the government argues my client's conduct has shortened

25   the life span of Victim 1?

Direct/Freese - Dr. Krueger

1    A.  Well, I actually -- I'm not -- if I could be permitted, I

2    just -- I have a copy of the test that I applied here, and I

3    just want to see -- one question which emerges is, does one

4    have to be an adult or of a certain age for this to be

5    administered, and I'm not sure that's the case.

6            In any event, I sort of went through this.  I mean,

7    clearly Mr. Augusta's behavior towards Victim Number 1 could

8    result in a score of two or three on this instrument, or two or

9    three items.  But overall, I think that -- I mean, this is

10   basically a -- these are statistical matters, and I think that

11   to draw a one-to-one correlation between a particular score and

12   to say, to assert that it's going to decrease somebody's life

13   by X amount I think is improper.

14           I would say that it would increase the risk of

15   early -- the risk of early, earlier death of various physical

16   or other diseases by a certain amount.  The other element is

17   that there are other matters in the environment of Victim

18   Number 1 that would also contribute to whatever score this

19   individual may have had.

20   Q.  So is it -- and correct me if I'm wrong, I mean, are you

21   able to score Victim Number 1 without actually evaluating him?

22   A.  Sure, I believe one could.  I guess the main question in my

23   mind is, is there a minimum age at which point this has to be

24   applied, can it be applied to kids that young.

25           I mean, it's sort of -- I think there are questions

Direct/Freese - Dr. Krueger

1  with prior to 18 and so on, which this may not be developed for

2  individuals of such a minor age.  I'm not that familiar with

3  the instrument to be able to answer that.

4  Q.  Okay.  And next I'd like to focus on the risk assessment

5  portion of your evaluation and the instruments you use.  One of

6  the risk assessment instruments was the Static-99R.  Is that

7  right?

8  A.  Yes.

9  Q.  Okay.  Why did you select this instrument?  Why did you

10 administer this test in this instance?

11 A.  Because it's the most validated, well-studied test,

12 actuarial instrument for assessing the risk of reoffense.  It

13 was developed in Canada.  It's been used widely in many

14 countries.  There's large literature in many countries that

15 support its validity.  So this is the one, one main instrument

16 that I use.

17 Q.  Okay.  And what, if anything, was significant about

18 Mr. Augusta's results?

19 A.  Well, so there's this -- you can get a scale of minus three

20 to plus twelve, and he had a score of four.  Now, this puts him

21 in a moderate, moderate high risk category.  I think there's a

22 new sort of set of scoring that a four may be in an above

23 average risk category or even a high risk category.

24 Q.  And is that now, Dr. Krueger?

25 A.  This would be now, if he were released into the community

Direct/Freese - Dr. Krueger

1    now.

2    Q.  Okay.

3    A.  On the other hand, given that he's going to be incarcerated

4    for, I'm not sure, a minimum of 30 years or 45 years -- crime

5    is a young man's game, basically, and the older somebody is,

6    the less risk they present of sexual recidivism.

7         So if he were to age out, I computed a score, a

8    reduction of his score from four to two, which would put him in

9    a -- still in a low moderate, a low moderate or only average

10   category of risk.

11   Q.  And that would be if released after 30 years?

12   A.  Yes.

13   Q.  Okay.  Now, you're aware that he's actually serving a

14   45-year sentence for the Commonwealth of Pennsylvania.

15   Correct?

16   A.  Yes.

17   Q.  So I'm going to ask you the same question.  What if he were

18   released in 45 years, what would that do to his score, if

19   anything?

20   A.  This would reduce it even more.  I mean, I think there's

21   sort of a threshold.  If somebody is at least 60 or 65, maybe

22   60, they get a big decrement, according to the construction of

23   the instrument.  So instead of minus one point, you get minus

24   three points.  This would substantially reduce his risk.

25   Q.  Now, in the government's sentencing memorandum, they

Direct/Freese - Dr. Krueger

1    indicate that there's powerful evidence -- that's actually a

2    direct quote from Page 38 -- indicating that recidivism rates

3    for sex offenders do not appreciably decline as offenders age.

4    A.   This is flat out wrong.   I mean, it's just -- there's vast

5    literature that very much supports that the older -- that the

6    older somebody is, the less likely they are to recidivate, both

7    with respect to sexual crimes and nonsexual crimes.

8         *THE COURT:*   Doctor, can I interrupt you there and ask

9    you whether there is a difference in contact offenders and

10   pornographers with these rates of recidivism?

11        *THE WITNESS:*   This has been in much dispute.   There is

12   a new instrument that's developed by Michael Seto that looks at

13   the risk for Internet offenders.   I'm just blacking on the

14   name.   I'll think of it.

15        In any event, Mr. Augusta is clearly a contact

16   offender, and I think this would sort of drown out or reduce

17   the sort of consideration of the risk associated with child

18   pornography.   He's a contact offender.   You would treat him

19   basically as a contact offender.

20        If he were solely an Internet offender, there's a

21   large literature, there's been a lot of debate -- actually, the

22   instrument Michael Seto had developed, who is the world's

23   authority, I would say, on pedophilia in Canada at the

24   University of Ottawa, is called the CPORT, and this is coming

25   into use.

Direct/Freese - Dr. Krueger

1      He would -- Mr. Augusta would have a high score on the

2  CPORT in any event.  He definitely would be considered a

3  contact offender.

4      *THE COURT:*  Okay.  Thank you.

5      *THE WITNESS:*  I would say that the fact that he is a

6  contact offender makes very legitimate the use of these other

7  instruments which were developed and based upon contact --

8  assessments of contact offenders.

9  BY MS. FREESE:

10 Q.  And, you know, based on, actually, the court's question, I

11 do have a followup sort of question.  In your community of

12 psychiatry and among the scholars, has there been discussion of

13 the Adam Walsh Act in the field itself?

14 A.  Yes, I would say some.  I mean, I think that there are some

15 misunderstandings within -- I can't quote with great detail,

16 but there is -- for instance, within the Adam Walsh Act, there

17 are penalties for this sort of crime, contact, noncontact.

18 There may be penalties regarding number of victims.

19      And both of these variables, for instance, have not

20 been proven to be validated risk factors in terms of predicting

21 risk of reoffense.  And I think there's great, within the

22 professional community, skepticism about many of the -- much of

23 the construction of the Adam Walsh Act.

24 Q.  The next sort of focus on the risk assessment instruments

25 is the Sexual Violence Risk-20.  Why did you administer this

Direct/Freese - Dr. Krueger

1    test on Mr. Augusta?

2    A.  Well, again, this becomes an organized way of thinking of

3    doing a risk assessment.  This pushes an assessor to look for a

4    number of factors which may be -- which should be considered in

5    developing and assessing risk and treatment planning.

6         In this case, Mr. Augusta had a large number of

7    factors.  You can get a high of 20 factors.  I would put zero

8    to five as sort of a lower risk category, six to ten as a

9    moderate risk.  I rated him as having ten of -- say above ten,

10   ten to fifteen is moderate, and above fifteen is high.  This is

11   my general gestalt in terms of assessing risk.  He has a high

12   number of factors.

13   Q.  And with respect to these high number of factors, again, is

14   there any age correlation?  In other words, with respect to in

15   45 years or 30 years with the same test, would you expect to

16   see any results or is it simply unknown?

17   A.  I would just have to take a look at the instrument, if I

18   may.  Let's just see.  The order is not quite the order that I

19   had organized these in.  Well, my best guess would be that

20   there's -- bear with me, please.

21        *MS. FREESE:*  Your Honor, may I approach the witness?

22        *THE COURT:*  Yes.

23   BY MS. FREESE:

24   Q.  The government actually handed over a particular -- I'm

25   going to ask you to take a look at the SVR-20 coding sheet.  Is

Direct/Freese - Dr. Krueger

1   this -- you found it.

2   A.   I have this.  So, I mean, he would -- many of these factors

3   are basically static factors, so I don't really think that

4   they're going to be influenced much by incarceration.

5   Q.   Okay.  So these would be static factors probably and may

6   not change as much with age?

7   A.   That's correct.

8   Q.   As opposed to the Static-99, if I understand your

9   explanation?

10  A.   The Static-99, likewise, is static.  There are -- it looks

11  at static factors, but age, in this case, is not static.  It

12  would be changeable.  Static factors are something that are

13  more malleable within a brief period of time, such as

14  attitudes, degree of sexual drive, this kind of thing.

15  Q.   The final risk assessment -- or, I'm sorry, actually the

16  second to last is the SONAR.  Now, the SONAR is an older scale.

17  Is that correct?

18  A.   That's correct.

19  Q.   So why do you still use it?

20  A.   Well, the SONAR was written to accompany the Static-99 and

21  has been replaced by something called the STABLE and something

22  else called the ACUTE.

23          These are basically instruments that are developed in

24  Canada and are used by federal probation to give a ballpark

25  estimate of somebody's -- of the degree of risk that a parolee

Direct/Freese - Dr. Krueger

1   will present to probation officers and how much attention that

2   they should spend, how many resources they should expend in

3   terms of initially following and subsequently following

4   somebody.

5        So the Sex Offender Needs Assessment Rating scale was

6   a pilot scale.  It was actually published, and there's a

7   publication, Sexual Abuse, that references this.

8        The two other manuals, the ACUTE and the STABLE, have

9   been written, but they keep changing all the time.  It was only

10  recently, within a couple of years ago, that a stable manual

11  was finally decided upon.

12       So I use some of these assessments for -- as part of a

13  research project, and it helps to have a printed publication

14  that people can refer to which is stable.  So I just use this

15  for that stability.  It approaches the same sort of variables,

16  although not in as much detail as the more contemporary

17  instruments.  He had a score of six, putting him in the, I

18  think, moderate risk category.

19  Q.  Okay.  And what, if anything -- so that would be a moderate

20  risk?

21  A.  Yes.

22  Q.  The same question with respect to that risk assessment

23  tool.  What, if any, impact would age have on it, on the

24  results?

25  A.  Well, I think that age would -- age is not particularly a

Direct/Freese - Dr. Krueger

1  factor there, but sort of treatment would have a substantial

2  factor on it.  These concern attitudes that -- cognitive

3  distortions that an individual might have, as well as other

4  factors which are changeable.

5         So there would be some, I would say, benefit with

6  increased time provided -- I think it would be more dependent

7  upon the therapy that somebody had received rather than just

8  the passage of time.

9  Q.  And the final risk assessment is detailed on Page 13, the

10  Level of Service/Case Management Inventory.  Again, why -- the

11  first question is why, why did you administer this test, and

12  then I'd like to talk to you in detail about your results.

13  A.  Well, actually, I began using this again maybe six, eight

14  years ago.  I actually began using it in the context of

15  assessing child pornography offenders.

16         There was no good risk assessment instrument then, so

17  I approached the author, the main author of the Static-99, a

18  guy named Karl Hanson, and said, Karl, what should I use, and

19  he suggested this Level of Service/Case Management Inventory,

20  which is validated against broad populations of criminals, but

21  it doesn't really sort of exclude child pornography offenders.

22  It can be used sort of as an aggregate, as an instrument for

23  all comers.

24         And it's broadly used not only for sex offenders, but

25  for more general offenders.  And this is, again, broadly used

Direct/Freese - Dr. Krueger

1    in Canada.  This is -- so that's why I used it.  It just

2    gives -- it's another tool that gives you some sense of -- some

3    ability to assess somebody's risk.  It has, actually, a benefit

4    of including information on drugs and alcohol, which some of

5    the instruments, other instruments, the Static-99 does not.

6           In terms of the specific score, he had a score of

7    eight out of 43.  The higher the score, the greater the risk.

8    And this puts him in the fourth percentile, basically, in terms

9    of risk of reoffense and need for services compared with

10   individuals who are incarcerated and then the 25th percentile

11   compared with individuals who are in the community.  So

12   ballpark, in a lesser risk category.

13   Q.  Do those results, the results of that test, surprise you at

14   all?

15   A.  No.  I mean, the sort of interesting thing about

16   Mr. Augusta or notable thing is that he has no substantial

17   prior criminal record, no prior criminal record.  This is

18   generally -- and this is consistent with that.  He also has no

19   substance use record.  Both of those would increase his score

20   substantially.

21   Q.  I think that concludes my review of the tests.  I do have

22   some specific questions, though, about a couple of things in

23   the government's sentencing memorandum.

24          First of all, on Page 23, the government references

25   Mr. Augusta's psychosis.  Based on your evaluation, did you

Direct/Freese - Dr. Krueger

1    find any evidence at all of psychosis?

2    A.   No.  I mean, he's not psychotic.  There's no history of

3    psychosis at all.

4    Q.   And, additionally, and this is one of the things we

5    discussed this morning -- give me one moment to get to it.

6    There's a reference -- do you have a copy of the government's

7    sentencing memorandum in front of you?  If you don't, I'm happy

8    to provide you with a copy.

9    A.   I'm not sure if it's in this large --

10   Q.   It's not.

11   A.   Okay.  I don't.

12   Q.   So let me just --

13          MS. FREESE:  May I approach, Your Honor?

14          THE COURT:  Yes.

15   BY MS. FREESE:

16   Q.   I'm just going to ask you to take a look at this.  And I've

17   turned it, actually, to Page 11.  And I'm going to direct your

18   attention towards the bottom of Page 11, Dr. Krueger.

19   A.   Okay.

20   Q.   Eleven, twelve, thirteen, I guess really into fourteen it

21   discusses, perhaps, a suggestion by the defense or some

22   correlation about child molestation and then later becoming a

23   sex offender.

24   A.   Yes.

25   Q.   And did you review those portions of the sentencing

Direct/Freese - Dr. Krueger

1  memorandum?

2  A.  Yes.

3  Q.  Okay.  In your vast experience, what are the statistics

4  with respect to sex offenders and gender?

5  A.  The vast majority of sex offenders are male, 90,

6  95 percent.  There are female sex offenders, but it's more a

7  male kind of behavior.

8  Q.  So knowing that, based upon your decades of experience, the

9  government indicates at the top of Page 12, If being sexually

10  abused makes one more likely to offend in a like manner, then

11  perhaps Defendant can explain why girls, who make up a

12  disproportionately large percentage of child exploitation

13  victims, do not also make up an equally large percentage of

14  child exploitation offenders.

15       So I'm interested, particularly, in whether you have

16  any opinion on that statement.

17  A.  Well, I mean, they make up some.  I mean, I think that

18  broad epidemiologic surveys indicate that roughly 20 percent of

19  females and 10 percent of males will have been sexually abused.

20  This is present in the U.S., in Canada, in Great Britain, and

21  other studies.  Of those who have been sexually abused, the

22  vast majority don't go on to sexually abuse.

23       I think if you look at sexual offenders, I reviewed

24  this literature some time ago, not more recently, but there's

25  roughly -- and there are articles which are -- come down on

Direct/Freese - Dr. Krueger

1    either side of this, but that roughly somebody who commits a

2    sexual offense has roughly twice the likelihood of having

3    themselves been sexually abused.

4            So it becomes a risk factor, which, you know, I would

5    say is much more operative in men.  I'm not even sure if this

6    stat is available for women or not.  But when I looked at it,

7    it was for basically male, for male populations.

8    Q.  And there was also cited to in the government's memorandum

9    some literature that suggested a defendant could fabricate an

10   instance of sexual abuse for purposes of litigation, maybe

11   by -- I think the quote was an enthusiastic defense attorney.

12           In your experience, you know, have you encountered

13   this, where one fabricates that?

14   A.  Sure.  I mean, this happens -- this would be understood.

15   In fact, he, Mr. Augusta, denied -- I asked him if he had been

16   sexually abused.  He denied this, repeatedly denied it.

17   Q.  Did you ask him that more than once, Dr. Krueger?

18   A.  Yes.  I mean, I was quite surprised by this whole thing.

19   And then sort of as I was writing this out, even in the time of

20   the interview, it became -- it struck me that, I mean, as a

21   juvenile, if he's interacting with adults in cybersexual

22   interactions, he's clearly a victim in that circumstance and I

23   would say sexually abused.

24   Q.  So in conclusion, I just have a couple questions about

25   specific opinions, whether or not you were able to reach them

Direct/Freese - Dr. Krueger

1   in this instance.

2           Based upon specifically the Static-99R, do you have --

3   are you able to offer any opinion today to the court with

4   respect to Mr. Augusta's risk of recidivism?

5   A.  Yes.

6   Q.  And what, if any, opinion can you offer?

7   A.  Going forward, just by virtue of age and his scores, it

8   would be sort of moderate low according to the old scoring,

9   sort of average, I think, according to new scoring.  My overall

10  estimate is that I think that he would be at a moderate or low

11  risk going forward.

12  Q.  And based upon the fact that he's serving a 45-year

13  sentence in state prison, what, if any, opinions are you able

14  to offer about his risk of recidivism in 45 years from now?

15  A.  Again, what I just said, had anticipated that, but I would

16  say it would be a moderate low or low 45 years from now.  It

17  would be reduced if he were to have some therapy.  I think it

18  would be very well managed with, you know, tight conditions of

19  federal probation, for instance.

20          In my opinion, he could be managed in the community

21  now.  I mean, federal probation has a very strong control over

22  somebody.  These were Internet crimes.  They could easily

23  monitor his Internet activity, his residence.

24  Q.  But they were also contact offenses.  I mean, you

25  understand that.

Direct/Freese - Dr. Krueger

1  A.   I understand that, but, you know, there are many contact

2  offenders -- we have a small sex offender program.  There are

3  many contact offenders that we monitor in the community.

4  Q.   Do you have an opinion as to whether Mr. Augusta is a good

5  candidate for treatment?

6  A.   Yes.

7  Q.   And why do you believe he's a good --

8  A.   Yes, my opinion is that he would be, you know, good.  I

9  mean, look, he's bright, he's obviously motivated, and, you

10 know, he's amenable to treatment, amenable to therapy.

11 Q.   I want to sort of jump back even though this is in the

12 facts.  Is there any --

13      MS. TAYLOR:  I'm sorry, I don't mean to interrupt, but

14 I just want to make sure I understood what the doctor said

15 before Ms. Freese moves on.

16      THE COURT:  Just a second.  Is Mr. Berry going to be

17 handling this witness or are you?

18      MS. TAYLOR:  He's likely to do Mr. Krueger's cross,

19 Your Honor.

20      THE COURT:  Well, then I want him to be the person to

21 speak on this witness.

22      MS. TAYLOR:  Yes, Your Honor.

23      MR. BERRY:  Your Honor, I think there was just sort of

24 a note-taking issue.  We wanted to make sure we understood him

25 before we move forward.

Direct/Freese - Dr. Krueger

1          *THE COURT:*  Okay.

2          *MR. BERRY:*  Which is that did the doctor say that the

3   defendant would be a good candidate for treatment and that he

4   could be managed in the community now, is what we were trying

5   to make sure we understood.

6          *THE WITNESS:*  Yes, I would say that's my opinion.

7          *MR. BERRY:*  Thank you, Your Honor.

8          *THE COURT:*  All right.

9   BY MS. FREESE:

10  Q.  One of the things I -- and it didn't really come up in the

11  context of the tests that you administered, but in your

12  experience of evaluating sex offenders, what, if any,

13  significance is there attached to whether a contact victim is

14  known or is a stranger?  Is there any significance there?

15  A.  Yes.  Let's say within the Static-99, there's a very

16  thorough, detailed explanation of these definitions.  A

17  stranger is somebody that's -- in which sexual abuse has

18  started to occur within 24 hours of somebody having met this

19  particular individual, the victim.

20          So that a stranger victim, if somebody is identified

21  as a stranger, would imply sort of predatory, typically

22  predatory behavior, where somebody is out recruiting, is not --

23  most sexual abuse victims will know, have had some prior

24  contact or some knowledge of their victimizer, I think up to

25  90 percent.  But if there's a stranger victim, this would imply

Direct/Freese - Dr. Krueger

1   both -- would imply increased risk of reoffense, basically.

2   Q.  And was there anything that you reviewed in this case to

3   indicate that there was any stranger contact victims?

4   A.  There was not.

5   Q.  Okay.  So what, if any, you know, significance then does

6   that have?

7   A.  Well, again, I indicated in my report that this was

8   essentially an incest crime, basically within the family, which

9   is the lowest risk category.  In reviewing the presentence

10  memorandum, there was another -- I think a minor victim who was

11  not related.  This was known to the -- to Mr. Augusta, but not

12  a stranger victim.

13          Overall, I think that his criminal behavior was

14  opportunistic and related to his immediate environment and did

15  not involve predatory behavior.  And I think generally

16  speaking, this would put him in a lower risk and easier to

17  treat category.

18  Q.  Dr. Krueger, my final questions are really just about the

19  report that you prepared in this matter.  Okay?  After you

20  evaluated Mr. Augusta, did you transcribe notes of your

21  interview and your impressions?

22  A.  I did, yes.

23  Q.  And you provided them to me?

24  A.  Yes.

25  Q.  And did you also prepare a draft report in this matter?

1    A.  I configured, you know, on my computer a report that I

2    emailed to you.  This was a draft.  I think there was one

3    change with an area code or some such thing as that.  But there

4    was no other draft report.  This is the -- the report was

5    basically the final report that I gave you.

6    Q.  And at any time did I suggest any revisions that you make

7    to the substantive portion of your report?

8    A.  No, no suggestions at all.

9         MS. FREESE:  Your Honor, I have no further questions

10   for Dr. Krueger.

11        THE COURT:  All right.  Thank you.

12                            EXAMINATION

13   BY THE COURT:

14   Q.  Dr. Krueger, as you evaluated the risk of recidivism, did

15   you factor in the disparate age of the defendant and the victim

16   in this case?

17   A.  Again, I'm aware of it in terms of age.  The sort of age of

18   a victim has not been, in various studies and so on, proven to

19   be a risk, a risk category, a risk factor.  I mean, it's

20   obvious that this was his younger brother, there were infant

21   victims and so on, but this does not sort out to be a

22   particular risk factor.

23   Q.  Okay.  And what about the length of time over which the

24   criminal conduct occurred or the repeated nature of the

25   assaults?

1   A.   Again, I'm aware of this.  I think in terms of validated

2   measures, neither the length of time, number of victims, number

3   of assaults are associated with risk of recidivism.  It's

4   basically -- the main factor is the imposition of the legal

5   sanction and the violation in spite of that.

6   Q.   Okay.  So the number of victims and the different types of

7   criminal conduct would also not be factors?

8   A.   Well, in terms of an absolute risk of reoffense, they would

9   not be factors.  In terms of -- past behavior is the best

10  predictor of future behavior.

11  Q.   Right.

12  A.   If you were going to follow him, you would certainly be

13  aware of this.  But in terms of his actual risk of reoffense,

14  it's not a demonstrated factor.

15       THE COURT:  All right.  Thank you.  Counsel, I'd like

16  to see counsel in chambers in 15 minutes.  We'll look at the

17  documents that the defense has disclosed, and then we can make

18  a determination of whether we can resume now or after the lunch

19  hour has passed.  So I'll see you at 12:15.

20       MS. FREESE:  Thank you, Your Honor.

21       COURTROOM DEPUTY:  Court is in recess.

22   (Luncheon recess taken.)

23       THE COURT:  Ms. Taylor, I see you at the podium, so

24  that suggests to me that you're going to cross-examine

25  Ms. Luck.

1          MS. TAYLOR:  Yes, Your Honor.  We did ask Ms. Freese

2     if she would inquire of the witnesses in terms of their travel

3     plans which one needed to leave first, and I believe Ms. Luck

4     indicated --

5          THE COURT:  Okay.

6          MS. TAYLOR:  If we could take her first, if that would

7     be okay with the court.

8          THE COURT:  That's fine.

9          MS. TAYLOR:  But, Your Honor, I believe Ms. Freese had

10    a matter she wanted to put on the record briefly before we got

11    started.

12         THE COURT:  All right.

13         MS. FREESE:  First I would note for the record that

14    Dr. Krueger is leaving the courtroom.  Thank you, Dr. Krueger.

15         Second, Your Honor, I just wanted to memorialize on

16    the record the court's ruling and our discussion in chambers,

17    that the government obviously moved on the record for

18    disclosure of certain documents pursuant to Federal Rule of

19    Criminal Procedure 26.2, that I objected to the disclosure of

20    that document, those documents; however, the court conducted an

21    in-camera review and granted the government's request with

22    respect to three emails and two draft reports, one being of

23    Ms. Luck, the other of Dr. Krueger.

24         In support of my objection, I took the position that

25    the material at hand did not constitute a statement and invoked

1    the work product privilege.  The court overruled that

2    objection, and in accord with the court's order, I turned over

3    the documents.

4              THE COURT:  All right.  Thank you.

5              MS. FREESE:  Thank you, Your Honor.

6              THE COURT:  Where is the witness?  Okay.

7              MS. TAYLOR:  Your Honor, we would just ask Ms. Luck to

8    retake the stand.

9              THE COURT:  Ms. Luck, you're still under oath.

10             THE WITNESS:  Yes.  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MS. TAYLOR:

13   Q.  Ms. Luck, on direct examination, you indicated that one of

14   the most significant -- those were the terms you used, the

15   "most significant" -- witnesses that you interviewed was Ruben

16   Augusta.  Do you recall that testimony?

17   A.  Yes.

18   Q.  Now, Mr. Augusta is the gentleman who, according to the DNA

19   test, was excluded from being the father of the defendant?

20   A.  That's correct.

21   Q.  Now, Mr. Augusta, Mr. Ruben Augusta, he provided you no

22   information about this defendant that occurred in the past,

23   say, five years?

24   A.  That's correct.

25   Q.  And he provided you no information about this defendant

Cross/Taylor - Luck

1    that would have occurred over the past ten years?

2    A.   That's correct.

3    Q.   Yet it was your opinion that he was one of the most

4    significant witnesses that you spoke with?

5    A.   These were all significant witnesses that I spoke to.

6    Q.   But your testimony was that he was one of the most

7    significant?

8    A.   They're all significant.

9    Q.   Now, the DNA test that you had an opportunity to review,

10   that did not establish who the defendant's father was?

11   A.   That's correct.

12   Q.   It simply says that Ruben Augusta was excluded?

13   A.   That's correct.

14   Q.   Yet your report indicates that Kenneth Hunter is the

15   biological father of the defendant?

16   A.   Yes, as far as we know.

17   Q.   Now, that's simply based on speculation by witnesses that

18   you spoke to.  Right?

19   A.   Yes.

20   Q.   You didn't speak with Kenneth Hunter, did you?

21   A.   No, I didn't.

22   Q.   How about the defendant's grandmother, Sarah, you didn't

23   speak with her, did you?

24   A.   No.  I didn't have that opportunity to.

25   Q.   Now, you also didn't have the opportunity to speak with the

Cross/Taylor - Luck

1   defendant's mother, Kendra, who you mentioned an awful lot

2   throughout your report.  Right?

3   A.  Yes.

4   Q.  Because she's in a vegetative state?

5   A.  Yes.

6   Q.  And you mention in your report purportedly a reason why

7   she's in that state?

8   A.  Yes.

9   Q.  Now, your report also indicates, in the first couple of

10  pages, a number of documents that you reviewed.  At my count,

11  it was over 60 documents that you would have reviewed that were

12  connected to this case?

13  A.  Yes.

14  Q.  Including the discovery in this case, in the co-defendants

15  of the case?

16  A.  What discovery was sent to me, yes, that's correct.

17  Q.  In reviewing the discovery, do you recall reviewing the

18  online chats of the defendant that discuss that he, in fact,

19  put his mother in that vegetative state once she discovered

20  that he had been raping his brother?

21  A.  I don't recall that.

22  Q.  Now, Ms. Freese asked you some questions about what she

23  called the early teen years of the defendant.  She defined that

24  time period as when he was 11, 12, and 13 years old.

25  A.  Yes.

Cross/Taylor - Luck

1   Q.  Now, you indicated that the defendant, at around the age of

2   12, reported to you that he entered online chat rooms with

3   older men, and those chats were sexualized.  Do you recall

4   that?

5   A.  Yes.

6   Q.  You also indicated that these chats developed into physical

7   sexual contact?

8   A.  Yes.

9   Q.  Did you have an opportunity to review Dr. Krueger's report

10  or speak with him about his findings?

11  A.  I did review Dr. Krueger's report.

12  Q.  Then it must have surprised you that what the defendant

13  self-reported to Dr. Krueger was different than what he

14  self-reported to you as to that issue?

15  A.  No.

16  Q.  Well, you have the binder of the defendant's exhibits

17  before you?

18  A.  Yes.

19  Q.  Dr. Krueger's report is contained in that binder, and it

20  indicates that he did not have sexual contact with --

21  A.  Can you refer me to the page, please?

22  Q.  Sure.  Dr. Krueger's report should be behind Tab 4, I

23  believe.  Do you see that?

24  A.  And what page are we referring to?

25  Q.  And it's Pages 4 and 5.  But looking at Page 4 --

Cross/Taylor - Luck

1    A.   Yes.

2    Q.   -- do you see that he's discussing his sexual -- the

3    defendant's self-report of sexual activities at the age of six?

4    A.   I thought you were asking me about the chat rooms.

5    Q.   That's on Page 5.

6    A.   Yeah, on Page 5, it says at the age of 12, he would go to

7    chat rooms and initially engaged in nonsexual chatting, which

8    became quite compulsive, and then it grew into become sexual.

9    Q.   Okay.

10   A.   That's what I had said.  That's what he had told me.

11   Q.   And does it say that he engaged in sexual contact with an

12   adult at the age of 12?  If you look at the top of Page 5, the

13   first full paragraph.

14   A.   He said at age 13, he experimented sexually with a

15   15-year-old boy.  This is not about the chat rooms, though.

16   Q.   In the middle of that paragraph, he said he had no other

17   physical contacts until he was 18.

18   A.   I don't think he's referring to the chat room there.

19   Q.   Can you show me then where in Dr. Krueger's report he talks

20   about having sexual contact with an adult connected to the chat

21   rooms?

22   A.   I have to go through the report and read it again.  Okay.

23   Q.   At the bottom of Page 4 is where he talks about his history

24   of sexual development, and he talks about engaging with

25   another -- at the age of six, he engages with another

Cross/Taylor - Luck

1    six-year-old in oral sex; at the age of 12, oral sex with a

2    14-year-old.

3    A.   Okay.  And he did engage in sexual relations with other

4    individuals at age -- that he met in the chat room.

5    Q.   You're at the bottom of page --

6    A.   No, I'm just telling you what my report has said, and

7    that's what he had told me.

8    Q.   I'm not on your report, I'm on Dr. Krueger's report.

9    A.   Okay.

10   Q.   Then at the age of 13, he experimented with a 15-year-old,

11   mutual masturbation, at the age of 15.

12   A.   I think you're better off discussing that with Dr. Krueger.

13   Q.   I'm asking you if you were surprised to find out that his

14   self-report to Dr. Krueger was different than his self-report

15   to you.

16   A.   No, I don't think it necessarily was.  Maybe it just wasn't

17   included in here, but that's what he reported to me.  And I'm

18   sure that's -- I'm quite confident that's what happened.

19   Q.   Okay.  But does it say in here that at the age of 12, he

20   was having sex with adults?  Because when I'm looking through

21   his sexual history at the age of 12, I don't -- he talks about

22   his sexual activities, and I'm not seeing that.

23          I see the paragraph where he talks about him chatting

24   online, but he doesn't report it going further, as far as I can

25   tell.  Do you see anything else?

Cross/Taylor - Luck

1   A.  I think you should address that with him, with Dr. Krueger.

2   Q.  In the review of the materials that you did, you saw that

3   the defendant has -- his self-reporting has been questioned

4   before.  Right?

5   A.  In reference to what?

6   Q.  To self-reporting to a doctor.

7   A.  Specifically, what are you referring to?

8   Q.  Take a look at Exhibit 9, please, in the binder.  And I

9   would direct you to page -- I believe if you look at -- there

10  are a couple of page numbers in this document.

11          So if we look at the page numbers that go by -- where

12  it says at the top left-hand corner, William Hunter, followed

13  by the page number and then the date, which is August 12th of

14  '08, you're looking for William Hunter, Page 5.

15  A.  Okay.

16  Q.  The heading of that paragraph says, Appearance, Demeanor,

17  and Mental Status.  Are you on that page?

18  A.  Yes.

19  Q.  The middle of that paragraph, there's a line that says, The

20  veracity of his self-report was questionable.

21  A.  I see where that particular person made that assessment.

22  Q.  Did you have an opportunity to review this document that's

23  tabbed as -- in the defendant's binder as Tab 9?  Now, this is

24  the Pennsylvania Counseling Services, Children's Services,

25  psychological evaluation done of the defendant when he was age

Cross/Taylor - Luck

1    12 back on August 12th of 2008.

2    A.  Yes.

3    Q.  So you saw that the defendant's -- the veracity of his

4    self-reporting was questioned, has been questioned by Dr. Brian

5    Andrews, who is a licensed psychologist in Pennsylvania,

6    before?

7    A.  Yes.  In many cases, what happens is, on these evaluations,

8    they do not have access to all the information and the --

9    Q.  Are you questioning this particular doctor's report?  Did

10   you have an opportunity to talk to him?

11   A.  I'm just -- I wanted to share something, or should I just

12   wait for Ms. Freese?

13   Q.  I'm sure Ms. Freese will ask you some questions about it.

14   A.  Okay, okay.

15   Q.  You also testified about the defendant being the victim of

16   bullying throughout his life.  Right?

17   A.  Yes.

18   Q.  In fact, you said that at the age of 12, that he was kind

19   to the people he met and that he was a good friend to people.

20   Those were direct quotes that you made today on the stand.

21   A.  In high school, when he started making friends, afterwards,

22   he really tried to be a good friend to the people that he met.

23   Q.  Well, today what you said on the stand was, at the age of

24   12, he was kind to the people he met, and he was a good friend

25   to people.

Cross/Taylor - Luck

1   A.   From going into high school, he tried -- he started to make

2   friends for the first time, and it was a very positive

3   situation where he was very -- he tried to be very loving,

4   considering that he was never shown anything close to love

5   himself.

6   Q.   Now, you don't have any personal knowledge of that.  Right?

7   A.   When your father calls you a faggot and your mother beats

8   you up and your father beats you up, that would be a home

9   that's not very loving.

10  Q.   But you don't know that those things happened.  Right?  You

11  have been told those things.

12  A.   If you're a probation officer and you're doing an

13  investigation, that's what you would put in your report as

14  information.  I have reached out to many other people, much

15  more than in a probation investigation, so I'm quite satisfied

16  with the material that was in this report, very much satisfied.

17  Q.   You were just questioning the report of another licensed

18  psychologist.

19  A.   Because he didn't have the opportunity to have all the

20  information that I had and interview the same parties that I

21  interviewed and had as much information.

22  Q.   Do you know what Dr. Brian Andrews would have had before

23  him in 2008?

24  A.   I don't think he would have had the whole history.  And we

25  were very intent on obtaining as many records as we could.

Cross/Taylor - Luck

1   Q.  Isn't it true that the defendant has actually been the

2   bully, not the victim, in the incidents that have been

3   documented?

4              *MS. FREESE:*  Objection.  Argumentative.

5              *THE COURT:*  Overruled.

6              *THE WITNESS:*  It's not uncommon for someone that's

7   bullied to eventually be the bully.  In fact, that's one of the

8   reasons that these bullying situations occur.

9   BY MS. TAYLOR:

10  Q.  Ma'am, I'm not asking you to generalize.  I'm asking you

11  specifically.

12  A.  But I'm answering in a factual way, as well.  Yes, there

13  were situations that he bullied, but I guess there was a

14  certain period of time that he had enough of being the victim,

15  and they do stand up eventually.  That's very common in

16  bullying situations.

17  Q.  You didn't include that, though, in your report, did you?

18  A.  No, it's not there.

19  Q.  In the same report that we were just looking at behind Tab

20  9, that counseling report when the defendant was 12, the

21  psychological evaluation, if you could take a look at that on

22  Page 2.  Again, I'm going on the page numbers at the top in the

23  left-hand corner.

24         Now, this is, again, when the defendant is only 12,

25  not when he's in high school, but when he's only 12, this

Cross/Taylor - Luck

1    psychological evaluation describes an incident on Page 2 in the

2    middle paragraph that's captioned, Relevant Information,

3    Concerns.

4              That middle paragraph describes an incident at a

5    swimming pool at the YMCA in the summer of 2008, and it says

6    the defendant became enraged.  That's the word that this doctor

7    used.

8    A.  Okay.

9    Q.  Do you see where I am?

10   A.  I see that paragraph.

11   Q.  The sentence says, starts, For example, while attending

12   camp during the summer of 2008, William became enraged with a

13   female peer.

14   A.  In the swimming pool at the YMCA who was teasing him.

15   Q.  Right, that's the end of the sentence.  And then it

16   continues, He grappled with her and pulled her down under

17   water, and had staff not intervened and jumped into the pool

18   and dragged him off of her, William may well have drowned or

19   seriously injured this peer.

20   A.  We were dealing --

21   Q.  I'm just asking, do you see that information in this?

22   A.  Yes.  And you see there was a teasing incident, and we have

23   a child that was so severely damaged, that by the time he was

24   eight years old, he made a suicide attempt and ends up in a

25   psychiatric hospital at --

Cross/Taylor - Luck

1    Q.   Ma'am, you see this doctor saying that he was teased at a

2    swimming pool and he almost drowned a child when he was 12?  Do

3    you see that's what it says?

4    A.   Yes.  He was a very traumatized child.

5    Q.   And then the next paragraph, do you see what it says?

6    A.   He was a victim of much abuse and bullying.

7    Q.   Do you see the next paragraph?

8    A.   Yes.  Go ahead.

9    Q.   It starts, During his sixth-grade year.  That's the

10   following paragraph.

11   A.   Yes.

12   Q.   It indicates, the following sentence, He is large for his

13   size and tends to bully and dominate his peers.  He often does

14   not know how to interact with them otherwise and tends to

15   engage with children who are much younger than he is because

16   they are much easier for him to dominate and control.  Do you

17   see that indication there?

18   A.   Yes.  And also --

19   Q.   That information is not in your report, is it?

20   A.   No, but there are also situations where children are

21   bullied, they tend to seek out younger children because they're

22   not as tormented by the younger children.

23   Q.   Younger children like his younger brother?

24   A.   I'm not saying that.  I'm just saying in situations of

25   bullying.  And I'm sure you've probably read about that, as

Cross/Taylor - Luck

1    well.

2    Q.  You mentioned the Pennsylvania Counseling report that we're

3    referencing here in your report.

4    A.  Yes.

5    Q.  But none of this information that I'm asking you about here

6    today, none of this is referenced in your report?

7    A.  The report is quite lengthy, and there was a lot of

8    material to go through.  I didn't have to go through this whole

9    report.  We already have it.

10   Q.  But you specifically mention this report, and you

11   specifically talk about bullying in your report.

12   A.  And he was tremendously bullied and isolated.  And there

13   were situations where he just was content just to sit by

14   himself in the back of the classroom as to not be bullied and

15   bothered.

16   Q.  But you think your report is accurate to only paint him as

17   a victim of bullying and not to bring out the fact that he was

18   a bully at points in time?

19   A.  I think the report is very accurate speaking about the

20   trauma this young man had gone through, which was incredibly

21   mind-boggling what he had suffered.

22   Q.  Who wrote your report?

23   A.  Who wrote my report?

24   Q.  Yes, ma'am.

25   A.  What's that supposed to mean?

Cross/Taylor - Luck

1  Q.  I'm sorry, the question wasn't clear?

2  A.  Who wrote my report?

3  Q.  Who wrote your report?

4  A.  I wrote my report.

5  Q.  The final version that we have was not the only version.

6  Right?

7  A.  Yes, there was editing to my report.  Yes.

8  Q.  There's a version dated July 12th, 2017.  Right?

9  A.  A version?  You mean an edit?

10 Q.  There's a version of your report that's not the final

11 version that we received that's dated --

12 A.  Yes, the report was edited grammatically and to make it

13 read more smoothly.

14 Q.  And this first version dated July 12th, 2017, is it your

15 testimony that you yourself drafted this first version?

16 A.  Yes.  It's not a version, it's the same report.  It was

17 just edited and made a little bit more readable.

18 Q.  Now, the Public Defender's Office asked you to edit certain

19 things that were in it, though.  Correct?

20 A.  To make it more readable.  They wanted a more flowing

21 report instead of just facts after facts.

22 Q.  Well, the July 12th version starts off with the defendant's

23 name.  Right?

24 A.  And we just tried to put the -- we were just explaining,

25 trying to make it easier to understand who the people were

Cross/Taylor - Luck

1   within the report.

2   Q.  And the final version that was provided to the government

3   that's dated October 12th, the defendant's name is not at the

4   beginning of the report?

5   A.  Yes, that's correct.

6   Q.  Now the beginning of the report starts off talking about

7   how Kenneth Hunter is a criminal?

8   A.  Yes.

9   Q.  As though the focus of the report is now not the defendant?

10  A.  No, the focus of the report is not Kenny Hunter.  It's

11  talking about -- it's a family history, it's a social history,

12  and we started -- rather than mentioning him first, we

13  mentioned his father first.

14  Q.  Mr. Hunter, that's the person who a number of people

15  speculate is the defendant's father?

16  A.  Yes.

17  Q.  And that's also a witness that you didn't speak to?

18  A.  Well, we wanted to speak to him.  He didn't want to be

19  interviewed.

20  Q.  And his grandmother who he lived with for most of his life,

21  another witness that you didn't speak to?

22  A.  No, we wanted to interview her, as well, and would not be

23  interviewed.

24  Q.  What about his mother's caregivers, did you have an

25  opportunity to speak with them?

Cross/Taylor - Luck

1   A.   No, I did not.

2   Q.   So all the information about the medical condition of the

3   defendant's mother came from the defendant and other

4   witnesses --

5   A.   Yes.

6   Q.   -- who are speculating on what her medical condition is?

7   A.   No, his aunt actually went to see her, his paternal aunt.

8   Q.   She went to see her and then --

9   A.   Said she was in a -- that she was in a very bad vegetative

10  state.  She couldn't speak to her.  She didn't initially know

11  how damaged she was until she saw her in person.

12  Q.   But how she ended up in that state --

13  A.   She visited her while she was --

14  Q.   -- that information was speculation given to you?

15  A.   That was information that William had given me.

16  Q.   His self-reporting?

17  A.   Yes.  I don't have a release signed by her because she

18  wasn't in the state to sign a release to get her medical

19  reports.

20  Q.   And no attempts were made to have any release signed?

21  A.   She's in a vegetative state.  It couldn't be signed.

22  Q.   By other family members or the court?

23  A.   We didn't have a court order to get her medical records.

24  Q.   And no attempts were made to get a court order, was my

25  question?

1    A.  No, there were no attempts made to get a court order to get

2    her medical records.  We know she's in a vegetative state.

3    Q.  My question is about how she got in that vegetative state.

4    Your information about that is simply speculative from

5    witnesses or from the defendant?

6    A.  From witnesses and the defendant.

7                MS. TAYLOR:  That's all I have, Your Honor.

8                THE COURT:  Ms. Freese.

9                MS. FREESE:  Thank you, Your Honor, just briefly.

10                        REDIRECT EXAMINATION

11   BY MS. FREESE:

12   Q.  Ms. Luck, you were asked on cross some questions about your

13   investigation regarding my client's father.

14   A.  Yes.

15   Q.  Biological father.  And I think this is pretty clear,

16   that -- am I correct that the paternity tests that you reviewed

17   and provided that are in the binders excluded Ruben Augusta as

18   the biological father?  Is that right?

19   A.  That's correct.

20   Q.  Did you review school records in this matter?

21   A.  Yes, I did.

22   Q.  And what name were the school records under?

23   A.  His father was named as Kenny Hunter.

24   Q.  And did the last name on the school records reflect Hunter?

25   A.  It did.

Redirect/Freese - Luck

1    Q.  And did the mother's name in the school records reflect

2    Hunter?

3    A.  Yes, they did.

4    Q.  Did you interview any other witnesses that told you that

5    Kenneth Hunter was his biological father?

6    A.  Yes.

7    Q.  And did one witness tell you that he looked just like him?

8    A.  Yes.

9    Q.  Based upon your investigation, did you receive any

10   information indicating that someone other than Mr. Augusta or

11   Mr. Hunter were the biological father?

12   A.  Never.

13   Q.  You were also asked some questions about -- and I don't

14   know if you're there in your binder, Tab 19, that you reviewed

15   the Pennsylvania Counseling Services records.  I'll give you a

16   minute to get that.

17   A.  Okay.  Tab 19 is Carlisle High School.

18   Q.  I'm sorry, my apologies.  It's Number 9.  I'm sorry.

19   A.  Yes.  I'm there.

20   Q.  Okay.  Thank you.  So under "residence" on the first page

21   of those reports, under "other child services" -- do you see

22   where I am that's underlined on the first page?

23   A.  Yes.

24   Q.  Is there any indication here whether or not this was at or

25   about the time that Children and Youth Services had an open

Redirect/Freese - Luck

1   file in this matter?

2   A.   Yes.

3   Q.   And in 2008, am I correct that based on his date of birth

4   listed here, that he'd be approximately 12 years old?  Is that

5   right?

6   A.   That's correct.

7   Q.   In fact, that's actually stated in the records?

8   A.   Um-hum.

9   Q.   So to the extent that there's any self-report there, was

10  this prior to his involvement in any sexualized chat rooms?

11  A.   It was.

12  Q.   Okay.  And if you turn, you were asked some specific

13  questions about -- and, again, I think Ms. Taylor directed you

14  to Page 6 -- my apologies, something else underlined, Page 7

15  (sic) of those where there was a statement she asked you about

16  where the doctor said the veracity of his self-report was

17  questionable.

18  A.   Yes.

19  Q.   At that point did it appear that he was being asked

20  anything at all about his sexual development or anything?

21  A.   No.

22  Q.   Now, you were asked a number of questions -- well, first

23  about some attempted interviews, and you sort of got to this, I

24  think, at the end of your cross.  Did you attempt to locate and

25  interview Kenneth Hunter?

Redirect/Freese - Luck

1  A.  Yes, I did.  I spoke to his sister, and the sister was

2  asked -- I asked her if she could reach out to him on our

3  behalf and have him speak to us.  And we got back to her, and

4  she said, no, he was not interested in speaking to us.

5  Q.  Okay.  So you did attempt it?

6  A.  Yes.

7  Q.  And I'd like to talk to you, as well, about William's

8  grandmother.

9  A.  Yes.

10  Q.  Was she a person of interest that you would have liked to

11  interview?

12  A.  Yes, very much so.

13  Q.  Okay.  What, if any, attempts did you make, Ms. Luck, to

14  try to interview her?

15  A.  We had attempted to reach out to her and had no luck in

16  having her call us back to speak with us.

17  Q.  So, again, you wanted to interview her.  Right?

18  A.  Yes, very much so.

19  Q.  Now, you were asked a number of questions about

20  Dr. Krueger's report.  Do you happen to have it up there, Page

21  4?  Or, excuse me, Exhibit 4.

22  A.  I'll get it.  Yes.

23  Q.  Okay.  Specifically, I'm going to direct your attention to

24  Page 5.

25  A.  Yes.

Redirect/Freese - Luck

1  Q.  Now, on cross-examination, do you recall Ms. Taylor asking

2  you a number of questions with respect to purported

3  inconsistencies?  Do you recall that?

4  A.  Yes, I do.

5  Q.  And one of the concerns -- most of those questions were

6  directed towards his self-report of sexual interactions with

7  older men when he was a minor?

8  A.  Yes.

9  Q.  Is that correct?

10  A.  That's correct.

11  Q.  I'm going to ask you to take a look at a second full

12  paragraph, which starts with, Mr. Augusta, comma, when asked

13  further.  Do you see that?

14  A.  Yes.

15  Q.  I'm going to ask you to read the first seven lines of

16  Dr. Krueger's report.

17  A.  Okay.  (Reading:)  Mr. Augusta, when asked further about

18  his sexual behavior, said at the age of 12 or 13, he would go

19  into chat rooms.  He said that initially he was engaged in

20  nonsexual chatting, which at times became compulsive.  He said

21  that this chatting grew to include not one, but several

22  individuals who would participate and that it became sexual.

23          He said he would engage in role-play in which he would

24  adopt the role of a victim and have others abuse him.  He did

25  this for about a year or two, he said.  And then when he was 14

1   or so, members of the audience would ask him if he had a

2   younger brother or sister, and he would engage in sexualized

3   conversations involving himself.

4   Q.   Okay.   Is there anything about that information in

5   Dr. Krueger's report that's inconsistent with what he told you?

6   A.   No.

7          MS. FREESE:   Your Honor, I have no further questions

8   for Ms. Luck.

9          THE COURT:   All right.   Thank you.   Does that conclude

10  the testimony of this witness?

11         MS. TAYLOR:   I just have one brief question.

12         THE COURT:   Okay.   Go ahead.

13                        RECROSS-EXAMINATION

14  BY MS. TAYLOR:

15  Q.   Ma'am, you don't think there's an inconsistency between

16  physical sexual contact and role-play that's online?

17  A.   He had physical contact, as well, if that's what you're

18  asking me, yes.

19  Q.   I'm not understanding your answer.

20  A.   Is there a difference?   There's a difference, yes, but he

21  had sexual contact, as well.

22  Q.   In Dr. Krueger's report or in your report are you referring

23  to?

24  A.   In both.

25         MS. TAYLOR:   I think that makes it clear, Your Honor.

1  Thank you.

2          THE COURT:  Thank you.

3          THE WITNESS:  Thank you, Your Honor.  Am I excused?

4          MS. FREESE:  I have no additional questions.

5          THE COURT:  Yes.

6          THE WITNESS:  Thank you.

7          MR. BERRY:  Your Honor, Dr. Krueger is on the stand.

8  May I proceed?

9          THE COURT:  You may.

10          MR. BERRY:  Thank you.

11                          CROSS-EXAMINATION

12  BY MR. BERRY:

13  Q.  Good afternoon, Dr. Krueger.  How are you today?

14  A.  Fine.  Thanks.

15  Q.  Great.  Now, in the report that you generated, the 16-page

16  report that we talked about here today, your

17  opinion/recommendation section at the very end, Page 16, you

18  have a few opinions and recommendations that you make in there.

19          One of them is that Mr. Augusta's ACE score is the

20  worst that you've seen in your career, and you testified you've

21  now had one slightly worse than that.  Correct?

22  A.  Yes.

23  Q.  You also put in there that you see his risk of recidivism

24  ranges from moderate high to moderate to low, depending on the

25  diagnostic tool.  Correct?

Cross/Berry - Dr. Krueger

1   A.  Yes, or the circumstances of release.

2   Q.  Okay.  You also put in that section that Augusta is an

3   excellent candidate for sex offender-specific therapy.

4   Correct?

5   A.  Yes.

6   Q.  You also say that his prognosis for treatment is, quote,

7   good.  Correct?

8   A.  Yes.

9   Q.  You say that Augusta is at a significant risk of being

10  sexually abused in prison.  That's one of your final

11  recommendations or opinions.  Correct?

12  A.  Yes.

13  Q.  And that you believe that he could be safely managed in the

14  community.  Correct?

15  A.  Yes.

16  Q.  Are there any other sort of major salient opinions or

17  recommendations that you want to add to that section here today

18  before we move forward?

19  A.  No.

20  Q.  Okay.  Now, your opinion and recommendations, what I call

21  the output, comes from a set of inputs.  Fair to say?

22  A.  Yes.

23  Q.  All right.  And those inputs, for simple purposes of my

24  country lawyer, West Texas brain, I break it into three

25  categories.  And one of them is pretty important and Ms. Freese

Cross/Berry - Dr. Krueger

1   mentions it to you and she says it's the interview you did of

2   Augusta for five hours on June 22nd, 2017.  That's one pretty

3   specific input.  Correct?

4   A.  Yes.

5   Q.  And then you also review a number of documentary items,

6   pieces of information from the case file, discovery materials,

7   medical records, Ms. Luck's report.  Those are all sort of one

8   category of inputs.  Is that fair to say?

9   A.  Yes.

10   Q.  And then sort of your third basis for your opinion,

11   interview, documentary exhibits or information, and then the

12   diagnostic tools that you applied to Mr. Augusta's case.

13   Correct?

14   A.  Yes.

15   Q.  Now, on those diagnostic tools or psychiatric testing,

16   Tests 1 to 10 test the -- test to assess the deviant and

17   nondeviant sexual behavior.  Right?  That's one through ten?

18   A.  Yes.

19   Q.  And then even 11 to 15 test to screen for other psychiatric

20   symptoms.  Correct?

21   A.  Yes.

22   Q.  And then 16 is sort of on its own, and it's the Hare

23   psychopathy test that you sometimes refer to as the PCL-R,

24   Psychopathy Checklist-Revised.  Correct?

25   A.  Yes.

Cross/Berry - Dr. Krueger

1  Q.  And then 17 to 20 are the actual risk assessment

2  instruments that you applied.  Is that correct?

3  A.  Yes, in addition to the Hare, which many would consider

4  important for risk assessment.

5  Q.  Okay.  So we'll lump the Hare into the risk assessment,

6  even though it's kind of set off by itself.

7  A.  You could do that, sure.

8  Q.  Okay.  And that's sort of the way your report reads to me,

9  as well, just have it broken up differently in the report, so I

10  want to make sure I'm clear on your view of it.

11         Now, you agree, don't you, that some of the

12  information you rely upon is subjective and some of it is more

13  objective?  Do you agree with that?

14  A.  Yes.

15  Q.  Give me an example of some of the objective information

16  that you relied upon.

17  A.  I think basically all the historical information and

18  documentation, which is listed in my list of sources of

19  information.  You know, this would include descriptions of

20  the -- as well as the -- well, descriptions of the abuse.

21  Q.  Which abuse?

22  A.  Of the abuse of his -- of the Victim 1, basically.

23  Q.  The abuse he caused?

24  A.  That's correct, that's what I mean.

25  Q.  Go ahead.

Cross/Berry - Dr. Krueger

1    A.  That would be one objective.  The second objective source

2    of information would be my observations of him, not his

3    self-report, but what I see before me.

4    Q.  Okay.

5    A.  I think the third set of information of an objective nature

6    would be these various risk assessment instruments.  For

7    instance, the Static-99R, one can score not only in the absence

8    of any history from him, you could -- and this is done, you

9    know, for a thousand individuals a year based on records by the

10   New York State Office of Mental Health for screening for

11   individuals who are released into the community.  So there are

12   sort of demographic factors which are not reported by this

13   individual and objective.

14   Q.  So you consider the Static-99 one of the more objective of

15   the instruments that you utilized?

16   A.  Yeah, sure.

17   Q.  Fair to say?

18   A.  Yes, as well as the other risk assessment instruments.  The

19   Hare relies on both observation and interview.  The SVR is a

20   rating scale which relies upon documentation.  The SONAR, the

21   Level of Service/Case Management Inventory are also instruments

22   which rely upon demographic information in addition to some

23   subjective information.

24   Q.  Okay.  So you agree that some of those instruments contain

25   some subjective information in them?

Cross/Berry - Dr. Krueger

1    A.   Sure.

2    Q.   What would you consider to be sort of the most

3    subjective -- we just talked about the objective, let's talk

4    about the subjective inputs that you received in making your

5    assessment.  What would you say was the most subjective

6    information that helped you form part of your opinion?

7    A.   His description of what arouses him sexually.

8    Q.   Okay.  Anything else?

9    A.   His narration of his history, his narration of his crimes,

10   his responses to me as I went through a very -- a psychiatric

11   history.  I mean, all these were based upon -- were based in

12   part upon his self-report.

13   Q.   So the self-report tends to be rather subjective by

14   definition?

15   A.   Of course, yes.

16   Q.   Right.  Of the diagnostic tools that you utilized -- you

17   rattled them off, the Static-99, the SVR-20, the SONAR, the

18   Hare psychopathy test, do you -- would you rate those on a

19   scale of subjective to objective, or do you think they're all

20   equally objective?

21   A.   I think that probably some are more objective than others.

22   I think the Static --

23   Q.   Educate us.

24   A.   Well, I think the Static-99R relies upon demographic

25   factors which are fixed and really immutable.  I think that the

Cross/Berry - Dr. Krueger

1   Level of Service/Case Management Inventory relies upon

2   subjective responses but also a review of records.  But I think

3   that that's an instrument which is largely based on objective

4   information.  I think the --

5   Q.  All right.  So let's go to the bottom of your list then.

6   We got your top two.

7   A.  Okay.

8   Q.  Give me your bottom two, most objective.

9   A.  The bottom two I would say would be the SONAR and the -- I

10  would say the SONAR and the SVR-20.

11  Q.  All right.  Thank you.  Let's talk about the Hare, PCL-R.

12  I'm going to call it the PCL-R just because I don't want it to

13  be spelled h-a-i-r in the transcript all day.

14          You agree that the PCL-R contains a lot of room for

15  subjectivity on the part of the rater in this case.  Don't you

16  agree?

17  A.  Sure.

18  Q.  In fact, it's been criticized in the literature as

19  containing items that are, quote, hardly measurable and too

20  speculative and suggestive, end quote.

21  A.  I don't know that particular statement.  I would -- I think

22  that one could certainly make that statement about the Hare.

23  Q.  Not completely unreasonable to make that assessment, would

24  it?

25  A.  Yes.

Cross/Berry - Dr. Krueger

1          MR. BERRY:  May I approach the witness, Your Honor?

2          THE COURT:  Yes.

3          MR. BERRY:  And I have this for Your Honor, as well.

4    BY MR. BERRY:

5    Q.  Do you see what I've handed you, Dr. Krueger?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's my scoring sheet for the Hare.

9    Q.  And that's actually the one you did, correct, not just a

10   blank?

11   A.  Yes.

12         MR. BERRY:  At this time, Your Honor, the United

13   States moves for the admission of Government's Exhibit 1.

14         MS. FREESE:  No objection.

15         THE COURT:  One is admitted.

16         MR. BERRY:  May I publish, Your Honor?

17         THE COURT:  Yes.

18   BY MR. BERRY:

19   Q.  So let's zoom in on -- so just to be clear, Dr. Krueger,

20   this PCL-R has 20 criteria.  Correct?

21   A.  Yes.

22   Q.  They're basically contained on this sheet?

23   A.  Yes.

24   Q.  And it has them out to the side numbered one down to

25   twenty, and then you can rate them as a no, which gives a zero.

Cross/Berry - Dr. Krueger

1    Correct?

2    A.   Yes.

3    Q.   A maybe gets a one?

4    A.   Yes.

5    Q.   A yes gets a two, and then you could select an omit, you

6    just didn't want to consider that one for whatever reason?

7    A.   Yes.

8    Q.   Okay.  Now, we don't have to worry about the omit column

9    because you didn't do that on any of these.  Correct?

10   A.   I did not do it, yes.

11   Q.   Everything gets something, a yes, a no, or a maybe.  Right?

12   A.   Correct.

13   Q.   So in terms of the items, you agree that you can't really

14   measure glibness and superficial charm in an objective and

15   reliable way.  Isn't that correct?

16   A.   Well, I would say these are very -- these are vague and

17   somewhat difficult to categorize notions.  However, there's a

18   manual which sets forth in a couple of paragraphs a description

19   of this item.

20        *MR. BERRY:*  Objection.  Nonresponsive, Your Honor.

21   BY MR. BERRY:

22   Q.   The question was, can you measure these in an objective and

23   reliable way?

24   A.   I would say yes, you can.

25   Q.   Really?  What's the tool to do that?

Cross/Berry - Dr. Krueger

1   A.   The tool are individuals who are trained in the use of the

2   Hare psychopathy checklist, who know well the criteria, who've,

3   you know, had one or two levels of training, and who then

4   interview somebody and who make a determination.

5        I mean, the Hare has been validated.  There are easily

6   a thousand peer-reviewed studies in many cultures, many

7   countries, that support the validity of the Hare.  So this is

8   not objective like one could actually see something, but there

9   is -- one can train observers to make judgments, and these

10  judgments with these trained observers can have a great degree

11  of consistency.

12  Q.   A great degree of consistency, what we refer to as

13  interrater reliability.  Correct?

14  A.   Yes.

15  Q.   So two raters could look at this and arguably come up with

16  different conclusions.  Correct?

17  A.   Yes.

18  Q.   So doesn't that make it more subjective than objective?

19  A.   Again, I would say that this is, within the literature, a

20  test which is highly validated, which relies upon objective

21  information.  In fact, this test can be administered in the

22  absence of any kind of interview.  So somebody could sit down

23  with a record, go through and rate a Hare if one is properly

24  trained on the basis of a review and judgments about the

25  particular behaviors that are described.

Cross/Berry - Dr. Krueger

1   Q.  But to be clear, the instrument measuring whether it's yes,

2   no, or maybe on the glibness or superficial charm, the

3   instrument is a person, in this case you.  Correct?

4   A.  The instrument is a trained individual who is using a --

5        *MR. BERRY:*  Objection.  Nonresponsive.

6   BY MR. BERRY:

7   Q.  Is it you or not?

8   A.  If I administer the Hare, sure, it's me.

9   Q.  You're the instrument.  Correct?

10  A.  No, the instrument is what's before us.  It's a description

11  of the Hare psychopathy checklist and --

12  Q.  The question, Dr. Krueger, was, can you measure glibness

13  and superficial charm with some instrument, and your answer is,

14  yes, a trained rater can do that.  Correct?

15  A.  Yes, sure.

16  Q.  What about superficial?  Like, what is -- how do you

17  measure whether the charm is superficial enough to be

18  pathological?  Can we see that somehow?

19  A.  Again, you would have to look at the paragraph, descriptive

20  paragraphs.  I don't have the manual before me, but you would

21  read this paragraph carefully, you'd be trained on it again and

22  again and again, and there's agreement that you can establish

23  if this is present or not.

24  Q.  And it's the interpretation of that manual, of what is

25  considered superficial enough that you interpret and then apply

Cross/Berry - Dr. Krueger

1    and decide yes, no, or maybe.  Correct?

2    A.   I would say not -- well, it's the reading of the manual,

3    yes, sure.

4    Q.   Right.  What about shallow affect?  You can't measure the

5    difference between shallow and real, either, can you?

6    A.   Again, using this methodology, you can, in my view.

7    There's a description of the item contained and training of it,

8    and you can get agreement among individuals who apply this.

9    And this is broadly accepted with huge -- it's probably the

10   most validated of instruments available for predicting risk.

11   Q.   Oh, that's interesting, because didn't you say that the

12   Static-99 is the most validated?

13   A.   The Hare is validated across a broad -- for all crimes,

14   basically.  The Static-99 is more for sexual crimes.

15   Q.   What about callousness and lack of empathy, can you measure

16   that with an instrument of some kind?  Is there a device that

17   you can say, ah, he's empathetic and he is not?

18   A.   Again, using this methodology, you can, I believe.

19   Q.   Again, it's the person making the decision.  Right?

20   A.   It's the trained professional using this manual who is

21   making a decision.

22   Q.   Unlike, for example, the Static-99, which you rate as the

23   highest objective one where it just simply looks at things like

24   was he convicted.  Right?  That's a yes/no, binary question.

25   Correct?  That's pretty objective.  You agree with that?

Cross/Berry - Dr. Krueger

1    A.  These are clear or binary questions, yes, but --

2    Q.  Whereas measuring someone's empathy, a little fuzzier.  Do

3    you agree with that?

4    A.  Yeah, sure.

5    Q.  The same with lack of -- let me scroll down.  Pardon me.

6    Lack of realistic long-term goals.  When I was nine, I wanted

7    to be a baseball player.  Was that unrealistic?

8    A.  For a nine-year-old, perhaps.  I think that, again, there

9    are full-item descriptions as to how you arrive at this.  I

10   don't have the manual, but they're very clearly described and

11   allow individuals to use this.  And over the 30 years that the

12   Hare has been developed, there's vast literature that supports

13   its validity.

14   Q.  But, again, it's going to be up to the rater, in this case

15   you, to determine whether his goals are realistic or not.  Yes

16   or no?

17   A.  Yes, the rater using his training --

18   Q.  I understand.  Obviously your experience and your training

19   come into it.  I get it.  But ultimately it's the rater's

20   decision.  Yes?

21   A.  Yes, sure.

22           MR. BERRY:  May I approach, Your Honor?

23           THE COURT:  Yes.

24   BY MR. BERRY:

25   Q.  Do you see what I've just handed you?

Cross/Berry - Dr. Krueger

1    A.  Yes.

2    Q.  What is it?

3    A.  It's the SVR-20 coding sheet that I completed.

4    Q.  Thank you.

5        *MR. BERRY:*  At this time, Your Honor, the United

6    States moves for the admission of Government's Exhibit 2.

7            *THE COURT:*  Any objection?

8            *MS. FREESE:*  No, Your Honor.

9            *THE COURT:*  Two is admitted.

10           *MR. BERRY:*  May I publish?

11           *THE COURT:*  Yes.

12           *MR. BERRY:*  Sorry, jumped the gun on that one.

13   BY MR. BERRY:

14   Q.  Now, Dr. Krueger, when we look at this one, just for ease

15   of reference for everyone else who is not quite as familiar

16   with your handwriting as yourself or even me at this point, is

17   it safe to say if it's circled, it's a yes, and if it's not

18   circled, it's a no?

19   A.  Yeah, sure.

20   Q.  Because sometimes the Y's and the N's are hard for me, but

21   that's sort of the way you solidify your Y, right, is with a

22   circle?

23   A.  Sure.

24   Q.  Okay.

25   A.  Exactly.

Cross/Berry - Dr. Krueger

1  Q.  I think it's just helpful for everyone reading along.  So

2  number three on this psychological -- or psychosocial

3  adjustment coding sheet here where it says "psychopathy,"

4  that's basically you importing the Hare into this one and

5  saying, no, he doesn't make that finding.  Correct?

6  A.  Yes.

7  Q.  Now, Question Number 2, is a victim of child abuse.  You

8  have that in there.  Right?

9  A.  Yes.

10  Q.  Now, is that -- that comes from his self-report.  Correct?

11  A.  Yes.

12  Q.  Which you said previously was some of the more subjective

13  information you received.  Correct?

14  A.  Yes.

15  Q.  Number 12 -- and some of this I'm just freewheeling here

16  because I don't really know what some of this means -- what is

17  high-density offense?  Explain that to me.

18  A.  These would be a lot of offenses within a very specific

19  period of time.  Like, somebody might go on a binge of sort of

20  sexual offending and, you know, engage in rape of many women

21  over a period of time.

22  Q.  And get caught and keep doing it, or does it matter whether

23  they were convicted?

24  A.  It doesn't matter.  It's just a description of the

25  frequency of events, frequency over time.

Cross/Berry - Dr. Krueger

1   Q.  And you marked him as a no?

2   A.  Yes.

3   Q.  Are you sticking with that?

4   A.  I would, yes.

5   Q.  Number 19, lacks realistic plans.  That's kind of similar

6   to the PCL-R question about long-term goals.  Right?

7   A.  Well, I mean, what realistic plan can he have?  He's going

8   to be in jail for 30 years or 45 years.  His plans are made out

9   for him, so --

10          MR. BERRY:  Objection.  Nonresponsive.

11          MS. FREESE:  Your Honor, I object.  I think he did

12   respond to the question.

13   BY MR. BERRY:

14   Q.  Is this similar to the question in the Hare, the PCL-R,

15   that talks about long-term goals, realistic or nonrealistic?

16   Is it similar?

17   A.  Similar, sure.

18   Q.  Okay.  You marked him the same between those two,

19   basically.  Right?  He doesn't have unrealistic ones.  Right?

20   A.  Correct.

21   Q.  And then Number 20, negative attitude toward intervention,

22   that also you would consider is a subjective input.  Correct?

23   A.  Yes, it would rely upon an interview of him and his

24   response.

25   Q.  Right.

Cross/Berry - Dr. Krueger

1          MR. BERRY:  Your Honor, the monitors are not on in the
2    gallery.  Do we want to turn them on for people in the gallery?
3          THE COURT:  Sure.
4          MR. BERRY:  May I approach?
5          THE COURT:  Yes.
6          THE WITNESS:  Thank you.
7    BY MR. BERRY:
8    Q.  Sure.  I've just handed you what's been marked as
9    Government's Exhibit 3.  Do you see that?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's the scoring sheet for the SONAR, S-O-N-A-R, which I
13   scored.
14         MR. BERRY:  At this time, Your Honor, the United
15   States moves for the admission of Government's Exhibit 3.
16         THE COURT:  Any objection to three?
17         MS. FREESE:  No, Your Honor.
18         THE COURT:  Three is admitted.
19   BY MR. BERRY:
20   Q.  And just to be clear, Dr. Krueger, this is the one -- one
21   of the two that you've put at the bottom of your list in terms
22   of objective to subjective, meaning the bottom being the
23   most -- one of the more subjective ones that you applied.
24   Correct?
25   A.  Yes.

Cross/Berry - Dr. Krueger

1   Q.  Now, on Page 2 of this particular exhibit, you've got your

2   scoring criteria there where you marked the six, basically, and

3   then out to the side, is that your handwriting that --

4   A.  Yes, yes.

5   Q.  The next page, if you look on your screen -- I don't know

6   that it's highlighted.  On the screen, you'll see some

7   highlighting in the version that's on that screen there.  Do

8   you see that?

9   A.  Yeah.

10  Q.  It's talking about intimacy deficits, which is one of the

11  scoring criteria.  Correct?

12  A.  Yes.

13  Q.  And in the explanation that you're provided here as the

14  person being the rater, it sort of educates you a little bit

15  and says, The degree of trouble should be sufficient to be of

16  concern to the man or his partner.  You agree that's a pretty

17  subjective assessment, don't you?

18  A.  Yes.

19  Q.  One of the other criteria is the social influence, and it

20  asks you whether a person is -- the number of people in his

21  life that are not paid to be in his life.  So, for example,

22  Ms. Freese, unfortunately, doesn't count here, right, because

23  she's paid to be in his life?

24  A.  Sure.

25  Q.  You don't count.  You're paid to be in his life.  Correct?

Cross/Berry - Dr. Krueger

1    A.  Sure.

2    Q.  And so it talks about positive or negative influences.  You

3    can't objectively measure positive or negative influences on a

4    person.  Right?  It's a subjective assessment.  Do you agree

5    with that?

6    A.  Yes.

7    Q.  And then the attitude section, which you scored him with a

8    zero, meaning he doesn't have any agreement with these

9    particular attitudes, it's broken down into rape and child

10   molestation.  Correct?

11   A.  Yes.

12   Q.  And it's based entirely on his answers to questions about

13   his attitudes towards rape and asks a series of questions and

14   attitudes towards child molestation and asks a series of

15   questions.  Correct?

16   A.  Yes.

17   Q.  Entirely subjective on his part.  Correct?

18   A.  Yes.

19   Q.  Now, you say that the Static-99 is what you consider to be

20   one of the more objective ones.  Correct?

21   A.  Yes.

22   Q.  You know that the manual says some scoring decisions do

23   require some judgment?  You know that?

24   A.  Sure, yeah.

25   Q.  So there's some subjectivity even within the Static-99.

Cross/Berry - Dr. Krueger

1    Correct?

2    A.   Sure.

3    Q.   And as you have mentioned here today, you agree that

4    there's clear acknowledgment that individuals under forensic

5    observation are historians -- as historians are poor historians

6    and it's hard to rely on them.   Correct?

7    A.   I would say the circumstances of -- generally speaking,

8    yes, the circumstances of forensic evaluation are such that

9    there's all sorts of different motives.   Nevertheless, you

10   can -- this is not always true and you can get sometimes

11   remarkable admissions from someone.

12   Q.   Do you remember testifying in the case of United States v.

13   Felix Cartegena in the Eastern District of New York in January,

14   2011?

15   A.   It rings a bell, yes.

16   Q.   You have it listed on your list of cases that you've

17   testified in.

18   A.   Okay.

19   Q.   So presumably it's -- I don't have the wrong Dr. Krueger.

20   In that, you said, at Page 12 of the transcript, Lines 7 to 10,

21   There is a clear acknowledgment that individuals under forensic

22   observation are poor historians and you can rely upon them, and

23   then you cut yourself off and you say --

24        MS. FREESE:   Your Honor, I just request a copy of the

25   transcript.   Excuse me.   I don't have -- I'm not privy to what

Cross/Berry - Dr. Krueger

1  he's looking at.

2      *(Handing.)*

3          *MS. FREESE:*  Thank you.  What page were you on?

4          *MR. BERRY:*  Page 12, Lines 7 to 10, of the Cartegena

5  transcript.

6  BY MR. BERRY:

7  Q.  You say, The reliability is, quote, exceedingly

8  questionable on self-report.  Does that sound right?

9  A.  Sure, yeah.

10 Q.  You don't put that in your report, though, do you?

11 A.  I did not indicate that specific disclaimer, no, in this

12 report.

13 Q.  In another transcript, in United States v. Rakesh Punn,

14 P-u-n-n, also in the Eastern District of New York -- this one

15 was more recent, in December of 2015.  Does that ring a bell?

16 A.  Sure.

17 Q.  In that one you said, It's a basic assumption that it could

18 not be truthful.  And you're referring to, in that case, that

19 defendant's self-report.  And that is Page 47, Lines 2 to 5, of

20 the transcript.  Does that sound about right?

21 A.  Sure.

22 Q.  You say, again, in that case, on Page 80, Lines 7 to 10,

23 His reliability is questionable.  The most important evidence

24 was that provided by the government's investigation.  Sound

25 about right?

Cross/Berry - Dr. Krueger

1   A.  Sure.

2   Q.  In your report, from Page 3 to 14 of your report, you refer

3   to "Augusta said" or "he said" 102 times.  Does that sound

4   about right?

5   A.  Sure.

6   Q.  And you've cited other authors in your report.  You talked

7   about Hanson and the other people that validate these

8   instruments.  But nowhere in your report do you say that

9   Augusta's statements should be understood in the context of

10  reliability that is, quote, exceedingly questionable.  You just

11  don't do that, do you?

12  A.  I did not put that in the report, no.

13  Q.  If you would, please, turn to your report -- and the court

14  may want to look at this, as well, Page 6.  It's the first full

15  paragraph.  It starts with, Mr. Augusta said that since his

16  arrest he had been in custody.  That's the first sentence.

17  When you're there, let me know.

18  A.  Yeah, sure.

19  Q.  Okay.  In that paragraph, you say something that's puzzling

20  to me, and I'm hoping you can enlighten me.  You say, a couple

21  lines down, Mr. Augusta also said that he had some child

22  pornography.  He said that he would not use this or masturbate

23  to these images even though he had a substantial number of

24  images in his possession.

25          This is in the paragraph about him being in custody.

Cross/Berry - Dr. Krueger

1   Are you saying that he had child pornography in jail?

2   A.  No, no.

3   Q.  Okay.

4   A.  This is a reference to the past.

5   Q.  Okay.  Because in the previous paragraph, you're talking

6   about all the past stuff, but when you pivot to this paragraph,

7   you're talking about in custody, he's had, on several

8   occasions, other inmates that threatened him, said that he had

9   never been physically attacked or abused, all that's about

10  custody, and then you throw in this line about possession of

11  child pornography.

12  A.  It was inartfully done, but yes.

13  Q.  I was giving you the benefit of the doubt, because I would

14  have been really stunned if that was the case, so I appreciate

15  you making that clear for me.

16          Did you know that -- one of the things you reviewed

17  was Dr. Foley's report.  Correct?

18  A.  Yes.

19  Q.  In Dr. Foley's report on Page 3, he says that -- Augusta

20  tells Dr. Foley that he tried suicide at age eight.  But on

21  Page 4 of your report, you say that he told you he tried

22  suicide in high school.  Did you note that discrepancy?

23  A.  I did not note it, did not note it.  I mean, it's not

24  unusual for there to be discrepancies.  I mean, a history,

25  I'm -- just in the whole matter of narration and so on, I'm

Cross/Berry - Dr. Krueger

1    writing quickly, I dictate, there's substantial room for error,

2    and I would just say that this -- I think this is consistent in

3    that he described this incident of attempted suicide at a young

4    age, eight, high school, whenever.

5    Q.  Eight, high school, whenever.  Is that your testimony?

6    A.  That's just what I said.  I think the -- what I was trying

7    to convey is that there can be discrepancies in history, in the

8    history that I obtain that are on the basis of transcription or

9    of note-taking and so on.

10        I think that the -- I would -- the fact that he

11   contained -- that he made a suicide attempt at a young age has

12   been documented, acquired and documented by several

13   individuals, and I think that's the important feature.

14   Q.  Also, Augusta told Dr. Foley on Page 4 that he had oral sex

15   with a 16-year-old, but he told you it was a 14-year-old.  You

16   didn't note that discrepancy in your report between you and

17   Dr. Foley, either.  Correct?

18   A.  I did not draw attention, even be aware of or draw

19   attention to that discrepancy.

20   Q.  Augusta told Dr. Foley on Page 4 of his report that he also

21   had sex at the age of 13 with, quote, another peer, Dr. Foley's

22   term, but he told you it was with a 15-year-old.  You didn't

23   explain that discrepancy, either, did you?

24   A.  Again, I did not go sort of line by line in terms of

25   discrepancies.  There can be, oftentimes, a lot of discrepancy

Cross/Berry - Dr. Krueger

1    in history depending upon how the question is presented, how

2    much challenge there is, and so on.  It's a -- history is not a

3    straightforward, objective matter.

4    Q.  It could also be made up.  Right?

5    A.  Sure, that's a possibility.

6    Q.  Augusta told Foley that he had tried marijuana, but he told

7    you only alcohol, no drugs.  You didn't note that discrepancy,

8    either, did you?

9    A.  Correct.

10   Q.  He also told you and you put in your report that, quote,

11   Perhaps a year prior to his arrest, he began slapping his

12   brother and sexually abusing him, end quote.  But what you

13   didn't do is explain in your report that he was minimizing,

14   because there is, in fact, video evidence that as early as

15   March of 2013, a full 28 months before he was arrested, that he

16   was sexually abusing members of his family, including Victim 1

17   in this case.  You didn't note that, did you?

18   A.  I did not note that.  Again, this is a narrative acquired,

19   and there are -- you can acquire -- there's a lot of

20   flexibility in terms of the information which can be obtained.

21   It depends upon the degree of denial or willingness of

22   somebody --

23        MR. BERRY:  Objection.  Nonresponsive.

24   BY MR. BERRY:

25   Q.  The question is yes or no.  Did you include it in your

Cross/Berry - Dr. Krueger

1   report?

2   A.   Did I include what in my report?

3   Q.   That there was a discrepancy between what he told you and

4   what he told Dr. Foley?

5   A.   I did not.

6   Q.   Now, with regards to the self-report and being subjective

7   and exceedingly questionable as you have testified before,

8   there is an objective instrument, and you discussed it earlier

9   today.  I'm going to call it the PPG just because I can't say

10  the word, to be quite frank.  Do you know what I'm referring

11  to?

12  A.   Sure.

13  Q.   Can you say it for me?

14  A.   The penile plethysmograph.

15  Q.   There you go.  Thank you.  So for the record, I'm going to

16  call it the PPG, and that's often what it's shortened as.

17  Correct?

18  A.   Sure.

19  Q.   You could have used that to try to confirm or corroborate

20  some of the subjective information you got from Mr. Augusta.

21  That was at least an instrument that's available.  Correct?

22  A.   Yes.

23  Q.   But you didn't do that, did you?

24  A.   Again, I think that I did not for many reasons.

25  Q.   Now, let's talk about these instruments that you utilized,

Cross/Berry - Dr. Krueger

1   these risk assessment instruments.  You agree that they are not
2   predictive.  Correct?
3   A.  Well, it depends what you mean by "predictive."  They'll
4   give you a -- they'll give you some risk, but there's no
5   absolute prediction of one thing or another.
6   Q.  In the Cartegena case in January of 2011, you said, The
7   diagnostic tools allow you to assess risk of recidivism.  You
8   can't predict future behavior.  Right?
9   A.  Sure, yeah.
10  Q.  So you agree they're not predictive.  Correct?
11  A.  Of course, yes.
12  Q.  And you agree that you personally cannot predict what this
13  man is going to do tomorrow or 45 years from now or 80 years
14  from now?
15  A.  Yes, I agree.
16  Q.  You can't predict whether this defendant will rape again,
17  can you?
18  A.  No.
19  Q.  All these tools do is establish a risk for a type of person
20  that has similar traits.  Correct?  Is that fair?
21  A.  Well, I think it allows you to -- some of these instruments
22  rely upon other types, and they would develop a risk.  I think
23  that a particular -- that an interview and this assessment
24  allows one to establish a risk for this particular person, a
25  risk of a general matter.  These would rely on statistical

Cross/Berry - Dr. Krueger

1    databases for these other risk assessment instruments, but this
2    interview and this assessment were for Mr. Augusta in
3    particular.
4    Q.   And even the Static-99, which seems to be one of your
5    favorites, cannot purport to make an individualized assessment
6    of future conduct any more than a life expectancy table can
7    provide an accurate prediction of when someone is going to die.
8    Do you agree with that?
9    A.   Yes, I agree.
10   Q.   In fact, do you know what the accuracy is of the Static-99?
11   A.   I'm not sure what you're referring to.  "Accuracy" is a
12   broad word.  I think that I would rely more upon its validation
13   research.  It really depends on the particular study and the
14   particular study's concern.
15   Q.   Well, did you know that the manual itself uses the term and
16   says, quote, The Static-99R also has a number of weaknesses; on
17   average, it demonstrates only moderate predictive accuracy, end
18   quote?  Do you know that?
19   A.   That sounds like a statement emanating from the manual, and
20   I would agree with it.  I would concur with the manual.
21   Q.   You didn't put that in your report, did you?
22   A.   I did not, no.
23   Q.   All right.  Let's talk about the word "recidivism."  We've
24   been throwing that around a lot today.  It's a pretty important
25   word in this case.  You never define it in your report.  Can

Cross/Berry - Dr. Krueger

1  you give me your definition of it today?

2  A.   Recidivism would be the likelihood of somebody committing

3  another sexual crime.

4  Q.   Committing another sexual crime?

5  A.   Yes, that would be sexual recidivism.

6  Q.   In the manual of the Static-99, it says, quote, For

7  Static-99R, the recidivism criteria is considered a new charge

8  or conviction for a sex offense.  That's different, don't you

9  agree, than committing another sexual crime?

10  A.   Yes, inasmuch as you have to be charged.  You could commit

11  a crime, and the Static-99 requires that you be charged with

12  that new crime.

13  Q.   So you agree there's a difference in that definition

14  between the one you just gave, which is recidivism means

15  committing another sexual offense?

16  A.   Yes.

17  Q.   That, I agree, is an important question, versus was he

18  charged or convicted of doing it.

19  A.   Yeah, sure.

20  Q.   Two different things?

21  A.   Of course.

22  Q.   In fact, are you aware of the cases that have criticized

23  the Static-99 as saying -- for example, United States v.

24  McIlrath, 512 F.3d, 421 at 425, a Seventh Circuit case from

25  2008 that says, The Static-99 treats as a recidivist only

Cross/Berry - Dr. Krueger

1    someone who is convicted of a further sex offense, but the

2    recidivism concern is with someone who commits a further

3    offense whether or not he is caught; yet if he is not caught,

4    his subsequent crime does not affect the data on which the

5    Static-99 calibrations are based.  Do you agree with that?

6    A.  Yes.

7    Q.  On Page 14 of your report, you reference the Static-99 and

8    you say, Mr. Augusta's risk of sexual reoffense is moderately

9    high.  Did you mean reoffense, or did you mean reconviction?

10   A.  I meant reoffense, the likelihood that he would do

11   another --

12   Q.  But the Static-99 is not validated for that, don't you

13   agree?

14   A.  Well, the sort of samples that are used to validate it

15   require this to come -- require crimes to come to some

16   attention, and the only way they're going to come to attention

17   is if somebody has been arrested, charged, convicted, or

18   whatever.  That's in terms of validation of the Static-99.

19          My understanding of the use of this is that it can be

20   used to give the risk of recidivism.  And recidivism is --

21   would be for any sexual crime, not for -- if you're talking

22   about an actual identified sexual crime, this would fall into

23   the sort of matter of validating the Static-99.

24          But in terms of its use in terms of predicting risk, I

25   don't think that this -- the risk pertains to, I would say, in

Cross/Berry - Dr. Krueger

1    my use of it and understanding of it, to behavior, to criminal

2    behavior, be it detected or not detected.

3    Q.  But we just went over the Static-99 manual, and it defines

4    recidivism as a new charge or conviction of a sex offense.  And

5    you're saying that you're going to use that basis to say he's

6    an above average risk or a moderate risk to say he's actually

7    going to rape again, and that's not what it does, does it?

8    A.  I would disagree.  I think that it gives you an estimation

9    of the likelihood of recidivism, measured or not.  The whole

10   idea of measuring it or not is a separate question that

11   contributes to the validation of the Static-99 or not.

12          Beyond that, there are these other instruments in this

13   whole evaluation which result, in my opinion, in terms of risk,

14   and that opinion about risk is not this narrowly defined risk

15   of reoffense and getting caught at it, it's the -- his risk of

16   doing this again.  That's --

17   Q.  Which of the tools you used, Dr. Krueger, can we go and

18   look at the manual and it says, this is validated for

19   reoffense, meaning raping again, versus reconviction or

20   recidivism as defined in the Static-99 and all these other

21   tools?  Which tool, Dr. Krueger, is about reoffense, not

22   reconviction?  Tell me.

23   A.  Again, these tools, that specific language is not going to

24   be found in these various instruments, but if -- in the manuals

25   of these various instruments.  But SVR-20, these are -- this

Cross/Berry - Dr. Krueger

1  will give you a capacity to identify features that should be

2  addressed in treatment.  It doesn't say that this is going to

3  be useful for identifying risk of some future measured sexual

4  crime.

5  Q.  Let me ask you this, Dr. Krueger.  Would you agree to the

6  kid that's getting raped that what matters is whether he gets

7  raped, not whether the guy gets convicted?

8  A.  Of course.

9  Q.  What was your referral question in this case?

10 A.  I was basically asked to do an assessment of Mr. Augusta

11 given these charges against him, given the -- I think he may

12 have pled by that point, but just to do an assessment which

13 would be a diagnostic and a risk assessment.

14 Q.  Do you consider yourself biased for the defendant in this

15 case?

16 A.  I'm hired by the defendant's attorney.  I think that the

17 evaluation that I do is an objective one.  I think that I've

18 had various defense attorneys fire me, basically, or not hire

19 me again, and I --

20 Q.  Like Dr. Foley, I guess.

21 A.  Well, he didn't hire me or fire me.  I don't know about

22 him.  But, I mean, I think that I would have a duty as a

23 forensic psychiatrist to protect the public, and I'm not going

24 to generate a report which is going to minimize somebody's

25 risk.  I mean, if he was a serious risk, I would so say it.  I

Cross/Berry - Dr. Krueger

1   do this with respect to cases in New York, civil commitments

2   and so on.

3   Q.  What are your billable hours in this case?

4   A.  How many are they?

5   Q.  Yes, sir.

6   A.  That would be, you know, maybe 20 or 40, probably,

7   ballpark, something like that.

8   Q.  Twenty to forty?

9   A.  Well, it's $400 per hour times 40 hours, basically, I

10  think.

11  Q.  And that includes the hour I'm keeping you here?

12  A.  It includes today, sure.

13  Q.  Okay.  Percentage of your work that was for defense

14  mitigation in the last five years, give me that percentage.

15  A.  I'm pretty much a hundred percent.  No, I would say

16  95 percent.  I just testified for the Attorney General in New

17  York.

18  Q.  All right.  Last year, percentage?  The same because you

19  just testified?

20  A.  Last year would be a hundred -- well, I --

21  Q.  That's close enough, Doctor.  Ninety-five to a hundred

22  percent?

23  A.  Yeah, correct.

24  Q.  That's close enough.  Thank you.  Let's talk about the ACE

25  score that you reference in your report.  There was some

Cross/Berry - Dr. Krueger

1    discussion about that between you and Ms. Freese.  Do you

2    recall that discussion?

3    A.  Sure.

4          MR. BERRY:  I'd point the court to Paragraph 15 of the

5    doctor's report on Page 12 for this section.  May I approach,

6    Your Honor?

7          THE COURT:  Yes.

8    BY MR. BERRY:

9    Q.  Dr. Krueger, I've handed you what's been marked as

10   Government's Exhibits 4 and 5.  Do you see those?

11   A.  Yes.

12   Q.  Number 4 is what?

13   A.  Number 4 is my scoring of the ACE.

14         MR. BERRY:  At this time, Your Honor, the United

15   States moves for the admission of Government's Exhibit 4.

16         MS. FREESE:  No objection.

17         THE COURT:  Four is admitted.

18   BY MR. BERRY:

19   Q.  What's Number 5?

20   A.  Number 5 is a letter dated October 31st, 2014, to AUSA

21   Clancy from Daniel Myshin.

22   Q.  Keep going.  Turn a couple pages.  Do you recognize it

23   more?

24   A.  It has a report appended of a Zachary Knight.

25   Q.  Who wrote that report?

Cross/Berry - Dr. Krueger

1    A.  I did.

2         MR. BERRY:  At this time, Your Honor, the United

3    States moves for the admission of Government's Exhibit 5.

4         MS. FREESE:  Your Honor, until I have more

5    information, I guess, on the purpose for the admission of this

6    exhibit, I would object to it.

7         THE COURT:  Sustained pending further explanation.

8         MR. BERRY:  Sure.

9    BY MR. BERRY:

10   Q.  So in this report, this Knight, what I'm calling the Knight

11   report, Exhibit 5, Doctor, did you also utilize the ACE scale

12   on that subject?

13   A.  Yes.

14        MR. BERRY:  That's the relevance, Your Honor.  It's

15   for impeachment about his assertion in this case versus that

16   one.

17        THE COURT:  I'm not sure I get the connection.  Who is

18   this defendant, Zachary Knight?

19        MR. BERRY:  Let me do it this way.

20        THE COURT:  Okay.

21        MR. BERRY:  Let me try another way.

22   BY MR. BERRY:

23   Q.  Dr. Krueger, in this case, you said Mr. Augusta had a score

24   of six, quote, which is an extremely elevated score, the worst

25   I have encountered in my experience, end quote, in your report

Cross/Berry - Dr. Krueger

1  in this case.  Correct?

2  A.  Yes.

3  Q.  Tell me what you scored Mr. Knight.

4  A.  Ten, ten out of ten.

5  Q.  Ten out of ten, yet this is the worst you've ever seen,

6  except for the one you did recently that was seven, and that's

7  also now the worst one.  Correct?

8  A.  This would be the worst.  My memory failed me.  This would

9  be in 2014, yes.

10       MR. BERRY:  At this time, Your Honor, the United

11  States moves for the admission of Government's Exhibit 5.

12       MS. FREESE:  I'd still object, Your Honor.  I mean,

13  it's offered for impeachment purposes.  It's in the record.  I

14  don't know that it's appropriate to enter the report in the

15  record.

16       MR. BERRY:  You know what, it's actually okay with me,

17  Your Honor.  Because it has some personal information, we would

18  probably want to redact everything except that paragraph.  So

19  I've got in what I needed.

20       THE COURT:  Okay.

21       MR. BERRY:  I'm happy to not admit the exhibit itself.

22  The court has heard the testimony.

23       THE COURT:  Okay.

24  BY MR. BERRY:

25  Q.  You agree that that report makes this report inaccurate, at

Cross/Berry - Dr. Krueger

1   best?

2   A.  Well, I would say that it makes my particular assertion

3   about the ACE, the score on the ACE, it definitely indicates

4   that I was erroneous in this assertion that this was the worst

5   that I had seen.  But I would take issue with applying that

6   error to the rest of the report.

7   Q.  Fair enough, Dr. Krueger.  I was not implying that.  I mean

8   with respect to the ACE scale, when you make the rather

9   assertive statement this is the worst I have encountered in my

10  life at a six, except for my testimony earlier today about the

11  seven that I did recently and except for this report that you

12  did in this district three years ago that was a ten out of ten,

13  except for that, you agree that this is inaccurate on this

14  point.  Correct?

15  A.  Yes.

16  Q.  You also agree that -- in your report you say that many of

17  the diagnostic instruments that I have used have not been

18  validated using DSM-5 criteria.  Correct?

19  A.  I'm sorry, what's -- yes, correct, yes.

20  Q.  You say that in your report here today.  Correct?

21  A.  Um-hum.

22  Q.  And the DSM-5 was published in 2013.  Correct?

23  A.  Yes.

24  Q.  And you were part, as you testified earlier today, part of

25  the team of people that helped write the 5, the DSM-5, for

Cross/Berry - Dr. Krueger

1   about five years.  Correct?

2   A.  Yes.

3   Q.  In fact, you have also advocated for greater tolerance of

4   pedophiles.  Isn't that correct?

5   A.  Yes, in a variety of venues, yes.

6   Q.  You actually wrote a commentary called, quote, A Favorable

7   View of the DSM-IV Diagnosis of Pedophilia and Empathy for the

8   Pedophile.  Correct?

9   A.  Yes.

10  Q.  And in that you said, quote, Overall, we have found that

11  individuals who are pedophiles have been and continue to be

12  subject to great condemnation and discrimination by society,

13  and any work that would enhance tolerance of them is most

14  welcome.  You wrote that.  Correct?

15  A.  Yes, sure.

16  Q.  Let's talk about the Static-99 for a moment.

17          *MR. BERRY:*  May I approach, Your Honor?

18          *THE COURT:*  Yes.

19  BY MR. BERRY:

20  Q.  I've handed you what's been marked as Government's Exhibit

21  6.  Do you see that?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's my scoring of the Static-99R.

25          *MR. BERRY:*  At this time, Your Honor, the United

Cross/Berry - Dr. Krueger

1    States moves for the admission of Government's Exhibit 6.

2              *THE COURT:*  Any objection to six, Ms. Freese?

3              *MS. FREESE:*  No, Your Honor.

4              *THE COURT:*  Six is admitted.

5              *MR. BERRY:*  May I publish?

6              *THE COURT:*  Yes.

7    BY MR. BERRY:

8    Q.  Now, when we look at this test, Dr. Krueger, when it talks

9    about the risk factors, age at release, ever lived with, index

10   nonsexual violence, all those things down through there, at no

11   point -- and I think maybe the judge got at this earlier, the

12   test does not account for the type of violence used by the

13   defendant, does it?

14   A.  It does not -- well, no, it would -- certainly it would

15   inasmuch as there's an issue of index nonsexual violence or

16   prior nonsexual violence.  So this would actually be violence

17   which is nonsexual.  So it considers violence important, but

18   not the type of sexual abuse.

19   Q.  So, for example, it doesn't account for the fact that he

20   used a handle of a hammer up the anus of a six-year-old boy.

21   It doesn't account for that, does it?

22   A.   That's correct.  It does not -- the type of sexual abuse

23   has not been identified as a risk factor.

24             *MR. BERRY:*  Objection.  Nonresponsive to the question.

25   BY MR. BERRY:

Cross/Berry - Dr. Krueger

1    Q.  Does it consider that fact, yes or no?

2    A.  Well, I would say that one would have to look at the use of

3    violent implementation in the index crime and to that -- and

4    decide whether that was sexual or nonsexual.

5    Q.  Right.  But it doesn't talk about the type of violence

6    other than that binary question of sexual versus nonsexual.  Do

7    you agree with that?

8    A.  Yes.

9    Q.  It doesn't refer to slapping, punching, and hitting the boy

10   specifically.  Correct?

11   A.  Well, it would in the sense that if there are separate

12   charges for violence, such as a threat or use of a gun or

13   injury and so on, it would take that into account.  Otherwise,

14   it --

15   Q.  Actually, it wouldn't, because you'd only get a one point

16   regardless.  Correct?

17   A.  Yes.  But it -- if there's -- well, it would have to be

18   charged.  I mean, if it's violence occurring as part of sexual

19   sadism, it would not count.  If there's -- however the violence

20   occurs, if it results in a separate nonsexual charge, separate

21   nonsexual charge of violence, then it would be -- then it would

22   count.

23   Q.  But just once?

24   A.  You would just get a point on that, yes.

25   Q.  You'd get a point for slapping, and you don't get an extra

Cross/Berry - Dr. Krueger

1  point for using a handle of a hammer to sodomize him.  Correct?

2  A.  Correct.

3  Q.  And you don't get an extra point for using a knife against

4  the throat of this boy, do you?

5  A.  Correct, no.

6  Q.  And you didn't make any note in your report about how the

7  Static-99 does not take into account the severity of the crime,

8  did you?  Yes or no.

9  A.  I did not.  It's not part of the instrument.

10 Q.  You also failed to follow proper protocol by including a

11 statement as to whether you considered the score an accurate

12 representation of the offender's risk given the characteristics

13 that were excluded from the 99.  Isn't that correct?

14 A.  I did not make such a statement.

15 Q.  In fact, there's a new tally sheet that you didn't use.

16 Correct?

17 A.  That's correct, although I did regrade -- I used the new

18 tally sheet subsequently as I reviewed for this.  I don't have

19 it before me, but I looked at the new tally sheet.

20 Q.  But you didn't provide it to us, did you?

21 A.  That's correct.

22 Q.  And in it, instead of calling it moderate or whatever you

23 called it, it actually calls him above average risk.  Correct?

24 A.  Yes, probably, yes.

25 Q.  Now, with regards to Number 8 on the Static-99, do you see

Cross/Berry - Dr. Krueger

1    where it says, Any unrelated victims?

2    A.  Correct.

3    Q.  Why did you mark that as a no?

4    A.  Because at the time I understood that a victim had to be --

5    I understood that the victimization was of a picture of an

6    unrelated victim, and you're not allowed to count pictures.  It

7    has to be an actual hands-on victim.

8            I subsequently have learned that apparently there is

9    an image of him touching the 16-year-old -- 16-month-old

10   individual, which would make it a hands-on crime, and thus I

11   would add one point to the score.

12   Q.  In fact, you asked that very question of the defense --

13   because you knew it could influence the Static-99, you asked

14   that back in July after you had interviewed him.  Correct?

15   A.  Asked -- well, I'm not sure who I -- I may have -- I'm not

16   sure who I asked.  It could have been, it could have been a

17   question to the attorneys.  I'm not sure.

18   Q.  Your question on July 12th, 2017, to the defense team was,

19   First, was -- you say "where," I think you mean "there" -- was

20   there in the discovery or where in the discovery there is

21   reference to Mr. Augusta's sexual abuse of an infant and was

22   this ever charged separately?  And if there was this additional

23   child, was this child a relative?  And then you say, The reason

24   the first of the question above is important is that this

25   information could influence his score on the Static-99.

Cross/Berry - Dr. Krueger

1   Correct?

2   A.   Sure.

3   Q.   When did you finally learn this?

4   A.   When I obtained the presentence investigation, presentence

5   evaluation report from the -- it was just provided to me in the

6   past day or so, couple days.

7   Q.   But you didn't proffer an addendum to your report saying,

8   whoops, I got that one wrong?

9   A.   I have not, no.

10  Q.   I'd like to turn to the Hare psychopathy, the PCL-R for a

11  moment.  It's already in evidence, so if we could go back to

12  it.  It's Exhibit Number 1.  You agree that the greater the

13  psychopathy rating, the higher the risk of being convicted of a

14  new sex crime.  Correct?

15  A.   Yes.

16  Q.   You scored him at a 15 and said in your report that the

17  cutoff for psychopathy is 30.  Correct?

18  A.   Yes.

19  Q.   Yes?

20  A.   Yes.

21  Q.   In the report, you said, quote, This is an elevated score.

22  But you never said in your report that regardless of the

23  cutoff, the higher, the greater the risk.  Correct?

24  A.   I did not.

25  Q.   In fact, you have said in the Cartegena case, in the

Cross/Berry - Dr. Krueger

1    transcript at Page 73, Lines 3 to 5, that, quote, There must be

2    a thousand peer-reviewed articles on it which shows the higher

3    the Hare score, the greater the risk of recidivism, end quote.

4    Correct?

5    A.   Yes.

6    Q.   Now, you didn't put that in your report, did you?

7    A.   Correct.

8    Q.   By the way, what is the cutoff for psychopathy?

9    A.   It's 30.

10   Q.   In the Punn transcript, on Page 47, at Lines 15 to 17, you

11   testified that this particular defendant had a score of nine,

12   and that was well below the threshold of 25 or 30.

13   A.   Well, I think, depending upon different articles, there's a

14   threshold of 25 or 30 for psychopathy.

15   Q.   Did you say 25 or 30 in Punn because that guy had nine, so

16   he was way off of it, but in this one, with 15, maybe we should

17   push it up to 30, make him look further away?  Is that why you

18   did that?

19   A.   That was not my intention, no.

20   Q.   Now, on the checklist, you mark it as -- we talked about

21   this previously -- yes, no, or maybe.  Correct?

22   A.   Yes.

23   Q.   And you never said in your report that you marked this guy

24   a maybe nine times.  Nine times you put him on the bubble.

25   Right?

Cross/Berry - Dr. Krueger

1    A.  Okay, sure.

2    Q.  Now, you agree that, as we talked about earlier, another

3    rater could look at this, and your maybe could be a yes or a no

4    for that rater.  Do you agree with that?

5    A.  Yes.

6    Q.  It would not be unreasonable for another rater to look at

7    this and mark him, let's say, one off of you.  Correct?

8    A.  Yes.  Again, it would depend upon the qualifications and

9    training of the rater.

10   Q.  Of course.  So on each of these maybes, another rater could

11   call them a yes.  Right?  That would raise him from a 15 to a

12   24.  Do you agree with that math?

13   A.  Yes.  I mean, any of these another rater could disagree.

14   Q.  In fact, you didn't have a second person rate this guy, did

15   you?

16   A.  I did not.

17   Q.  And, in fact, the Hare organization, the website itself

18   talks about how, quote, We further recommend that wherever

19   possible, the PCL-R scores of two independent raters should be

20   averaged.  But you didn't do that, did you?

21   A.  I did not.

22   Q.  So another one could have rated him a 24 or maybe even a

23   29, and we'd have to average those two scores.  Do you agree

24   with that?

25   A.  Well, I think that one could have -- you could have another

Cross/Berry - Dr. Krueger

1    individual rate.  I think that there have been studies that

2    show that on average, there's a five- or six-point discrepancy

3    between defense experts who rate the Hare and prosecution

4    experts.  And this is --

5    Q.  What we call the partisan allegiance effect.  Correct?

6    A.  I'm not sure what it's called.  That nomenclature makes

7    sense.  But this is well described.

8    Q.  How would you rate yourself in terms of compassion and

9    empathy, so to speak?

10   A.  I think I'm compassionate.  I think I'm empathic.

11   Q.  Are you familiar with the study that says that if the

12   rater, in this case you, scores high on a couple of factors,

13   compassion and empathy being one of them, that they are less

14   likely to score an individual closer to the psychopathy,

15   psychopathic threshold?  Are you familiar with that study?

16   A.  I'm not aware of that particular study.

17   Q.  Does it surprise you?

18   A.  No.

19   Q.  If you would, please, look at Government's Exhibit 3

20   already in evidence.  It's the SONAR, Dr. Krueger.

21   A.  Okay.

22   Q.  On your screen, I've highlighted a portion.  Do you see

23   that there?  It says, It is possible.

24   A.  Sure.

25   Q.  And it says, It is possible that the dynamic factors

Cross/Berry - Dr. Krueger

1    identified in the current study may be more important for

2    determining the timing of reoffending than for determining

3    which offenders will eventually recidivate given long followup

4    periods.  Do you agree with that, that it says that?

5    A.  Yes.

6    Q.  Sorry, I didn't mean to take that off the screen.  You

7    didn't put that in your report about the predictive accuracy or

8    the utility of the SONAR, did you?

9    A.  I did not.

10   Q.  You also talk a lot about Mr. Augusta being a victim

11   himself.  Correct?

12   A.  I don't know a lot about it, but I mention it.

13   Q.  Fair enough.  I gave a subjective term there.  I appreciate

14   you biting into it.  You agree, though, don't you, that a

15   history of being a victim actually increases a person's risk of

16   recidivism?  Correct?

17   A.  Yes.

18   Q.  You've testified to that fact before.  Isn't that right?

19   A.  I may have.  I'm not quite -- I don't recall exactly when,

20   but --

21   Q.  Do you know what the MacDonald Triad is?

22   A.  I do not.

23   Q.  The set of three factors that when two are present, they

24   tend to predict later violent tendencies, like, for example,

25   homicidal -- serial killers, things like that.  You're not

Cross/Berry - Dr. Krueger

1    familiar with that?

2    A.   No.

3    Q.   Did you read the Foley report on Page 3 where it documents

4    two of those factors?  What is enuresis?  What does that mean?

5    A.   That means urinating at night, basically.

6    Q.   And it says that he wet the bed until the age of 12 or 13,

7    and it also says he was engaged in fire-starting from the age

8    of nine to early adolescence.  You didn't mention any of that

9    in your report, did you?

10   A.   Correct.

11   Q.   And are you not familiar with the fact that those factors

12   are considered important when people assess the dangerousness

13   of an individual?

14   A.   Well, I think -- now that I -- that particular term doesn't

15   ring a bell, but I would say these three factors do, when

16   there's been substantial literature, I think earlier literature

17   supporting this and subsequent literature saying that this is

18   not so important or predictive.  That's my general

19   recollection.

20   Q.   But you didn't mention any of it in your report.  Right?

21   A.   I did not, I did not.

22   Q.   You also did not mention in your report that in one of his

23   psych evals when he was 12, that he got so enraged at a

24   12-year-old girl at a YMCA pool that he pulled her under and

25   nearly drowned her.  You didn't note that, did you?

Cross/Berry - Dr. Krueger

1    A.  I did not.

2    Q.  Now, you talk about treatment in this case and say he has a

3    good prognosis.  But you agree that it's very difficult to

4    treat someone with a fixated pattern of deviant behavior.

5    Correct?

6    A.  I'm not sure I would characterize the -- I would use

7    "very."  I think that it's -- it's challenging to treat

8    somebody with a pattern of deviant behavior.

9    Q.  In the Cartegena transcript, on Page 101 at Lines 18 to 22,

10   you said, quote, The research does not well distinguish between

11   treating pedophilia and treating other sexual deviant behavior.

12   I think available research would suggest that if somebody has a

13   fixated pattern of sexual deviance, it's hard to treat, much,

14   much harder to treat.

15   A.  Yeah, I would agree.

16   Q.  You never stated in your report that someone like Augusta

17   is the kind of person that is much, much harder to treat, you

18   just said, good prognosis for treatment.  Correct?

19   A.  I'm not sure I would -- that's a simple -- that's a

20   conclusory remark.  I think I said that he had a good

21   prognosis, and I would say, perhaps, he's bright, motivated, an

22   excellent candidate for therapy.

23   Q.  You say, quote, He's an excellent candidate for therapy and

24   sex offender-specific therapy and, in my judgment, has a good

25   prognosis for treatment.  Correct?

Cross/Berry - Dr. Krueger

1    A.   Yes.

2    Q.   But nowhere in the report did you talk about the studies

3    that show that treatment is largely ineffective for these

4    people, did you?

5    A.   Well, I did not.  I would say that there's some controversy

6    regarding that assertion that treatment is largely ineffective.

7    I mean, there have been some large studies which have been

8    disappointing, but there are also some other studies of an

9    analytic nature that show that treatment is effective.

10        And there are certainly many, a variety of other

11   studies, one of which I provided in terms of this New England

12   Journal of Medicine article, which show that an open design is

13   very effective, it's just a matter that there's not funding or

14   a history that has allowed for large-scale, scientifically

15   valid studies.

16   Q.   In the Cognitive-Behavioral Treatment of Paraphilias, an

17   article you wrote in the Israel Journal of Psychiatry and

18   Related Science in 2012, you said -- you summarized some

19   studies and said, Although recidivism was low initially,

20   relapse rates continue to rise even ten years after treatment.

21   Do you remember writing that?

22   A.   I wrote that article.  I don't know exactly what I was

23   referring to, but I do not dispute that I wrote that.

24   Q.   In another -- in the same article later on you're

25   summarizing another series of empirical studies, meta-analysis,

Cross/Berry - Dr. Krueger

1   and you summarize and you say, They concluded that, quote,

2   there is, as yet, no evidence that clinical treatment reduces

3   rates of sex offense in general and no appropriate data for

4   assessing whether it may be differentially effective for

5   different types of offenders.  You wrote that, too, didn't you?

6   A.  Yes, I would stick by that basically.

7   Q.  In the same article you also said, quote, Evaluation of

8   recidivism has proven extremely difficult, in part due to

9   underreporting of sexual crimes.  Does that sound about right?

10  A.  Sure.

11  Q.  And that goes back to our issue about what does recidivism

12  mean.  Right?

13  A.  Yes.

14  Q.  Reoffense versus reconviction.  Correct?

15  A.  Yes.

16  Q.  You also don't mention in your report that in Dr. Foley's

17  report, he documented that Augusta told him that when he was in

18  a psychiatric hospital in 2007, that he, quote, conformed to

19  hospital expectations, quote, to get out of the facility, end

20  quote.  You didn't include that in your report either, did you?

21  A.  Correct.

22  Q.  And you agree that having been abused himself does not mean

23  that was the cause of Mr. Augusta abusing Victim 1 or any of

24  the other victims.  You agree with that.  Right?

25  A.  Of course, yes.

Cross/Berry - Dr. Krueger

1   Q.   Causation is not -- correlation is not causation.  Correct?

2   A.   Correct.

3   Q.   In fact, you wrote in a letter in 2011 to the Archives of

4   Sexual Behavior that, quote, The psychiatric -- or, excuse me,

5   The psychiatric community, quote, currently lacks sufficient

6   science to establish the etiology for many psychiatric

7   disorders, end quote.  What does "etiology" mean?

8   A.   Etiology.

9   Q.   Thank you.

10  A.   The origin, the etiology, the cause, the sort of origins of

11  psychiatric disturbance.

12  Q.   In all of the things that you listed in your report that

13  you reviewed, the 20-odd things, none of them were the

14  contraband in this case.  Right?  You did not review the

15  contraband.  Isn't that correct?

16  A.   By "contraband," you mean video images or pornography?  I

17  did not, no.

18  Q.   You've done that in other cases, though, haven't you?

19  A.   Sure.

20  Q.   In fact, you have testified before, specifically in the

21  Cartegena case again, at Page 7, Lines 20 to 25, you said,

22  Certainly self-report is one element of evidence.  There are

23  other elements which we would rely upon, including the

24  evidentiary record of discovery, which we talked about, and

25  particularly useful is what a hard-drive analysis might

Cross/Berry - Dr. Krueger

1    contain.  But yet you didn't look at anything from the hard

2    drive in this case.  Correct?

3    A.  Correct.

4    Q.  You didn't look at the images from March 10th, 2013, to

5    March 31st, 2013, that were still images of the defendant

6    engaging in sexual behavior with Victim 1, his mother, the

7    adolescent sister, and the adolescent brother, who were not

8    charged in this case?  You didn't look at those.  Right?

9    A.  I did not.  I would say that in the past, you know, before

10   10 or 15 years ago, it was the case that such images were

11   allowed to be distributed by defense attorneys.

12         Subsequently, there were various rulings that made

13   these images basically contraband, so that in order to review

14   them, one had to actually go into the vaults of the FBI or

15   wherever and view these, and I did not do that in this

16   circumstance.

17         I certainly will if it's sort of feasible.  I think

18   that the available resources did not allow this, and I'm able

19   to, on the basis of what was described, make an opinion.  I

20   don't have to see -- I mean, I will always want and solicit as

21   much information as I can, but I don't always have to see

22   images to make an opinion.

23   Q.  And you talk about how the law has changed over time, but

24   it's been the same since 2011 when you were in the Cartegena

25   case in the Eastern District of New York and 2015 in the Punn

Cross/Berry - Dr. Krueger

1  case, and both of those you reviewed the images.  Correct?

2  A.  Yes.

3      *MR. BERRY:*  At this time, Your Honor, the United

4  States would like to play for Dr. Krueger a compilation of the

5  contraband in this case and ask him some followup questions

6  regarding his opinion and whether it's affected.

7          It's about 12 minutes long.  It is culled from 49

8  minutes of video and audio.  For example, the nine-minute audio

9  we played in the Stamm case, Your Honor, pulled out a section

10  of that.  I've tried to truncate it as much as possible.  It is

11  just under 12 minutes.  I plan to just play it and then end

12  with a couple of followup questions, and then I'll be done.

13      *THE COURT:*  All right.  I'm going to ask that you not

14  play the videos or audio segments on the screen that is in the

15  gallery or on any other screen in the courtroom, save the

16  witness's and the defense attorneys.

17      *MR. BERRY:*  That's fine with me.  If the court can

18  help me with that, I'm fine with that, as well.

19          So what I'm going to do, Your Honor, because I'm

20  looking at my laptop, I'm going to start it playing and then I

21  will try to tilt the screen down so that the audience doesn't

22  see that, as well.  Maybe a juror's monitor would be a good

23  idea for the defense attorney.

24      *THE COURT:*  That would be fine.

25  BY MR. BERRY:

Cross/Berry - Dr. Krueger

1   Q.  Dr. Krueger, do you have it on your monitor right now?

2   A.  No, the monitor is blank.

3   Q.  Okay.

4   A.  Okay, now, sure.

5   Q.  Do you see it?  It says, U.S. v. Augusta, Compilation of

6   Photos and Videos from March 10, 2013, to July 22nd, 2015?

7   A.  Yes.

8   Q.  Thank you.

9       MR. BERRY:  And most of this doesn't have sound.

10  Occasionally something has sound.  So if it had sound, I left

11  it in, Your Honor.  If it didn't, it's not there.  I'm not

12  redacting one way or another.  So there's some silence for a

13  couple of minutes, and then sound will jump in.  I don't mean

14  that to alarm anyone.  It's just the way it's cut together.

15  I'll start now.

16      (Video/audio recording played.)

17  BY MR. BERRY:

18  Q.  I'm going to pause it for just a second.  Can you hear that

19  okay?

20  A.  Sure, I can hear it.  I just wondered if there were images

21  associated with it, which I didn't see.

22  Q.  It's just the audio.  That's why the sign is in the

23  middle --

24  A.  Sure.

25  Q.  -- to signify that.

1          *MR. BERRY:*  Continue.

2          *(Video/audio recording played.)*

3     BY MR. BERRY:

4     Q.  That's it, Dr. Krueger.  Now, having seen that, does it

5     change your opinion at all about whether this man can be

6     managed safely in the community today?

7     A.  It does not.

8          *MR. BERRY:*  No further questions.

9          *THE COURT:*  Any questions, Ms. Freese?

10         *MS. FREESE:*  Your Honor, just briefly in a couple of

11    areas.  Nothing at length.

                        REDIRECT EXAMINATION

12

13    BY MS. FREESE:

14    Q.  Dr. Krueger, how long have you been a doctor?

15    A.  Since 1977, 40 years.

16    Q.  Okay.  So the government just asked you a number of

17    questions about bias, and because we didn't go through all of

18    your qualifications based upon their agreement to them,

19    throughout your career, have you had periods where you've

20    testified on behalf of the state or the government?

21    A.  Yes, sure.

22    Q.  And just briefly, when were some of those times?

23    A.  When I was in Massachusetts before I moved to New York, I

24    did evaluations in their sort of civil commitment program.  I

25    must have done a hundred evaluations and was called to testify,

Redirect/Freese - Dr. Krueger

1    depending upon the result of the evaluation, by defense or --

2    by the defense or the prosecution.  It was roughly 50/50 at

3    that time.

4            Subsequently, I actually did a number of cases for the

5    Office of Professional and Medical Conduct that I testified for

6    the prosecution.  And also I guess more recently there was a --

7    this year there was a case in which I testified for the

8    Attorney General in terms of the admissibility of a

9    psychiatric -- of a pedophilia diagnosis.

10   Q.  And are your professional opinions driven by who hires you?

11   Do you shape them depending upon who is hiring you?

12   A.  No.

13   Q.  And all of the opinions that you've offered throughout the

14   course of your testimony, you offer them to a reasonable degree

15   of psychiatric certainty?

16   A.  Yes.

17   Q.  Now, currently your employment, you work in the treatment

18   of sex offenders.  Correct?

19   A.  The assessment and treatment of sex offenders, yes.

20   Q.  And that is at least on a part-time basis for the State of

21   New York?

22   A.  It's on a full-time, it's a four-day-a-week, it's

23   80 percent of my time.  So this is what I've done 15, 20 years

24   full time, 80 percent of my time.

25   Q.  And I really just want to talk to you about three of the

Redirect/Freese - Dr. Krueger

1   tests.  Based upon -- are any of your opinions, and I'm not

2   talking about factual discrepancies, but are any of your

3   opinions that you rendered in your report changed at all?

4   A.  No.

5   Q.  With respect to the Static-99, you and I had a number of

6   discussions about the other victims.  Some were charged, some

7   were uncharged.  Is that correct?

8   A.  Yes.

9   Q.  And specifically, Government's Exhibit Number -- my

10  apologies.  Well, your scoring sheet of the Static-99, which is

11  Government's Exhibit Number 6, specifically talks about other

12  victims.  Right?

13  A.  Yes.

14  Q.  And if you change that score to reflect what you now know,

15  explain how that impacts your opinion, if at all, with respect

16  to his moderate to high risk conclusion.

17  A.  So according to this, let's say there's an unrelated

18  victim, you would increase the score of three -- to three or to

19  five.  Three would put it still at a low moderate category.

20  Five would be in the moderate high category.  It would not

21  alter the location of this according to this older scoring

22  sheet.

23        According to the new one, I think it would place you

24  in an average -- it would be an above average risk.  And if one

25  looks at a contemporary application, if one waits 30 years, it

Redirect/Freese - Dr. Krueger

1    would put him in a, I think, below average risk.

2           I don't have the page before me, but the scores would

3    not change, just the sort of interpretation would.  And I think

4    that he would be -- the older he is, the more he would fall

5    into an average category.

6    Q.  And with respect to the ACE test, you were actually asked

7    about another case in this district and some of your other

8    conclusions you've reached.  How many times have you

9    administered the ACE test, if you can ballpark?

10   A.  I would say, over the past four, five years, maybe a

11   hundred times.

12   Q.  Okay.  And in your report, you indicated that it was, I

13   think you did specifically say the worst that you've

14   encountered --

15   A.  Yes.

16   Q.  -- in your experience.

17   A.  Yes.

18   Q.  But we know that in another case there was a higher score,

19   and that was before you rendered that opinion.  Correct?

20   A.  That's correct.

21   Q.  Okay.  So given that fact and we know that it's now not the

22   worst, how would you categorize it in terms of the over one

23   hundred evaluations that you have done?

24   A.  It's among the worst.

25   Q.  Among the worst?

Redirect/Freese - Dr. Krueger

1   A.   Among the worst.

2   Q.   And just so that we're clear, that score of a seven which

3   you testified to on direct examination was done after you

4   rendered your opinion in this matter?

5   A.   Yes.

6   Q.   Okay.  And is the six out of ten, if it's among the worst,

7   still significantly elevated?

8   A.   Yeah, sure.

9   Q.   And sort of my final subset of questions are just about the

10  Hare report.  You were asked a number of questions about that,

11  particularly the cutoff.  And explain the cutoff between -- the

12  difference between 25 and 30 and the difference in the

13  literature, and then my second followup question would be, is

14  that significant here?

15  A.   Okay.  I mean, I think that -- again, I -- there were

16  different sources for the two numbers.  I can't cite them

17  exactly.  The manual may state 30.  But if somebody is on the

18  margin -- I mean, the issue is whether somebody makes a

19  threshold criteria for psychopathy.

20        That diagnosis or that entity is used, let's say, in

21  the SVR-20, and I think otherwise it has a certain

22  significance.  The fact that Mr. Augusta had a score of, I

23  think, 15 places him well below the psychopathic threshold, so

24  to speak, for these purposes.  I mean, even if you concede I'm

25  four or five points off or six or seven, he still doesn't make

1    that threshold.

2    Q.  And I think you indicated on cross-examination that some of

3    the literature would indicate the difference between a

4    prosecution and defense evaluation could be as much as five or

5    six points.  Is that right?

6    A.  Yes, that's my recollection.

7    Q.  Okay.  So if we would add -- let's add six.  If we would

8    add six points to your score of 15, he'd still be under the 25.

9    Correct?

10   A.  Yes.

11        *MS. FREESE:*  One moment, Your Honor.  Your Honor, I

12   have no additional questions for Dr. Krueger.

13        *THE COURT:*  Thank you.  Anything else?

14        *MR. BERRY:*  No, Your Honor.

15        *THE COURT:*  Dr. Krueger, I meant to ask you earlier,

16   have you ever testified before Congress or the Sentencing

17   Commission about these matters?

18        *THE WITNESS:*  I haven't.  It sort of came to me -- I

19   became aware of this sort of after an initial request.  I have

20   testified before the New York -- committees in New York State.

21        *THE COURT:*  Okay.  Thank you.

22        *THE WITNESS:*  Sure.

23        *THE COURT:*  You may step down.  Counsel, I have a

24   telephone call regarding a trial matter that's scheduled for

25   Monday.  It should just take a few minutes.  So I'm going to

```
 1    give you a ten-minute recess here so that we can take up that
 2    matter.  It should be very brief.  It's really just a
 3    scheduling call.  Okay?
 4             MS. FREESE:  Thank you, Your Honor.
 5             THE COURT:  We'll be in recess.
 6             COURTROOM DEPUTY:  Court is in recess.
 7         (Recess taken.)
 8             THE COURT:  Ms. Freese.
 9             MS. FREESE:  Yes, thank you, Your Honor.  That
10    concludes our testimony for the day.  At this point we have
11    three witnesses in the courtroom who would like to offer
12    remarks as opposed to testimony on behalf of my client.
13             THE COURT:  All right.
14             MS. FREESE:  First would be Cheryl Parsons.  And, Your
15    Honor, where would you like Ms. Parsons to stand?  At the
16    podium?
17             THE COURT:  I would ask counsel for the government
18    whether they wish to have them sworn as witnesses, or are they
19    character witnesses?  I'm not sure what you've worked out.
20             MR. BERRY:  Your Honor, if the court is inclined to
21    ask questions, I'd like them to be sworn.  To the extent that
22    they're just offering a statement, a character statement on his
23    behalf, I'm happy to expedite this along.
24             THE COURT:  All right.  So the podium is fine.
25             MS. FREESE:  Okay.  Thank you, Your Honor.
```

1        *THE WITNESS:*  My name is Cheryl Parsons.  It's spelled

2   C-h-e-r-y-l, Parsons with an "s" on the end.

3        I am a retired teacher from Carlisle High School where

4   I taught from 1977 until 2012.  I directed three choirs at the

5   high school, taught music theory and theater experiences,

6   initiated and was the faculty adviser for the extracurricular

7   show choir, and I codirected the high school musical.

8        I first met William, who I knew as Will Hunter, when

9   he was in ninth grade in the fall of 2010.  His middle school

10  music teacher, Mrs. Fry, who served as our rehearsal

11  accompanist for the high school musical, had encouraged him to

12  audition for our 2011 production of Titanic.

13       As I recall, Will waited until near the end of the

14  auditions to sing and read for the audition.  He came across as

15  very self-conscious, and his body language clearly registered

16  with me as someone who was more than ordinarily fearful.  His

17  posture was drawn in, he didn't make eye contact easily, and

18  maintained an unusually wide spatial distance between himself

19  and anyone else, including Mrs. Fry, who he knew well.

20       Although the audition procedure included a group dance

21  audition in which most students signed up for a time slot that

22  enabled them to learn and perform the dance combination with

23  friends, it was evident that Will was there without the benefit

24  of support from peers.  Will had to be coaxed to sing, and we

25  discovered, to our surprise, that he has a solo quality voice,

1   albeit an untrained one at that time.

2          His reading of text, although not that of an

3   experienced actor, was fluent with accurate pronunciation, a

4   varied inflection, and word emphasis that indicated he had good

5   comprehension of the text.

6          Because Titanic had 24 male roles of various sizes, we

7   cast him in a minor role that had a few brief lines of solo

8   singing.  This was a bit out of the ordinary since we had no

9   previous history with Will or could not know how dependable he

10  might be.

11         Once we got into rehearsal, we learned that Will was

12  reliable and consistently present on days that he was needed

13  and clearly aimed to please, although he was rarely satisfied

14  with his own performance.

15         During rehearsal, he gradually lost most of his

16  distrust of others, although I can't recall whether he made any

17  close friends during his first musical of his high school

18  career.

19         I do recall that during demanding dance rehearsals,

20  some of the students distanced themselves from Will because of

21  a perceived unpleasant body odor.  If I recall accurately, the

22  codirector of the musical, who was a male teacher, spoke with

23  Will about personal hygiene, and I believe he was gradually

24  more accepted into the musical family afterward.

25         Close to performance time it became clear that another

1  young man with a slightly larger role became academically

2  ineligible to perform.  By this time, we thought highly enough

3  of Will to ask him to assume the larger role, which required

4  more line memorization and more solo singing to be learned

5  pretty much in the eleventh hour.

6          Will rose to the challenge and performed with

7  confidence and complete accuracy.  I distinctly remember a

8  conversation I had with the high school principal on the day

9  after he had attended one of the performances.  This was the

10  principal's first year at the high school.  Having been the

11  middle school principal at the school Will had attended the

12  previous year, the principal exclaimed in utter surprise, what

13  have you done with Will Hunter?  He is such a different person

14  than he was in middle school.

15          I had not been aware of any back history with regard

16  to Will, so I was taken aback by his remark.  I attributed the

17  change to the power of music and theater to bring out the best

18  in people and to bond performers together and never did find

19  out any particulars at that time about Will's middle school

20  experiences.

21          Because Will was making such great strides and because

22  high school boys with talent who will prioritize choral singing

23  are in short supply, I asked Will to audition for the high

24  school's most select choral ensemble which met five days a week

25  for 50 minutes a day, the Carlisle High School Chamber Singers.

1   It was a graded class with full academic weight.

2         He did audition, and he was a very strong tenor during

3   my final year of teaching before retirement, which was his

4   sophomore year.  Because he went right into Chamber Singers,

5   Will had missed the beginning level choir's strong emphasis on

6   learning how to read music and sight-sing.

7         Regardless of that, I encouraged him to participate in

8   an extracurricular activity that was open mostly just to the

9   Chamber Singers, the Cumberland County Choral Festival, which

10  was an extracurricular commitment to learning 12 additional

11  pieces of music and attending several countywide rehearsals at

12  other schools.

13        Most of the students who had participated in the

14  county festival, including Will, also auditioned for district

15  chorus, which is a two-day festival that is very competitive.

16  Generally about 800 students audition to be in that chorus,

17  which is 200 students.  Students from seven counties are judged

18  in rather rigorous two rounds of auditions to select the top 25

19  singers in each voice part.

20        I held rehearsals over the summer preceding these

21  auditions and after school to prepare the students for these

22  festivals.  Will was very reliable in attending rehearsals, and

23  because his music reading skills were not as advanced as the

24  others, he often asked for extra help, staying for an extra 30

25  to 40 minutes for some individual instruction.  Again, he

tended to be very self-critical, never quite satisfied with his

progress, even though it was significant.

Once accepted, the district singers needed to learn an

additional seven selections in order to audition for the

prestigious regional chorus.  Ultimately Will represented

Carlisle High School quite well both at the county and the

district level.

And my memory is a bit hazy as to whether he actually

succeeded in going on to regional chorus or not, although I

remember expecting him to achieve regional chorus the following

year and was disappointed that he did not.

During his sophomore year, Will was much more accepted

into the family circle atmosphere of choir students that I

strove to make accessible to everyone.  I do recall some

occasions when he was very quiet and withdrawn causing a couple

students to suggest that he didn't care about the success of

the Chamber Singers.  In retrospect, it's easy for me to

understand that he was probably going through some tough times

at home.

Because the choir took a multiple-day field trip to

New York City each spring involving quite a few fundraising

projects in which parents participated, I usually became

acquainted with parents and siblings of most of my students.  I

never remember meeting Will's family at meetings or following

concerts when we sometimes have receptions for the singers and

1   their families.

2          Will participated in the musical again during his

3   tenth-grade year, this time singing in a barber shop quartet

4   and having a speaking part in Bye-Bye Birdie.  During the last

5   week of rehearsal and following performances, rehearsals went

6   quite late into the evening.  Will didn't drive at the time and

7   never had a parent come to pick him up.  Sometimes late was

8   after 11 o'clock at night.

9          On a number of occasions, when the weather was bad, I

10  drove him home.  Again, I never met family after the

11  productions, even though Will did talk about needing to be

12  responsible for his brother and sisters from -- or brothers and

13  sister from time to time.  He often voluntarily stayed late to

14  assist with cleaning up the guy's dressing room, which was even

15  messier than anyone can imagine.  In retrospect, it now seems

16  clear to me that Will was not eager to go back home.

17         The year after I retired, Will contacted me several

18  times to assist him with learning his district chorus tryout

19  selections, as the new choral teacher did not schedule very

20  much rehearsal time believing that students needed to be strong

21  enough music readers to learn the music on their own.

22         During this time and again during his senior year when

23  Will was auditioning for a music education major at Mansfield

24  University, he came to my home to get assistance.  At no time

25  when I was alone with Will late at night at school cleaning up

1   or taking him home in my car or when he came to my home music

2   studio did I ever feel afraid of him or sense that he was

3   anything other than a young man wanting to make the most of his

4   potential.

5         Although I was aware that he lived with his mother,

6   grandmother, and siblings, it seemed like the family was

7   stretched for money.  I knew that his mother had respectable

8   jobs.  I was not aware that she had graduated from college.  I

9   never heard mention of Will's father.

10        I direct a community choir in Carlisle that gives four

11  concert performances each year, and it was my practice to offer

12  Carlisle High School choir students free admission to the

13  concert in return for their help in handing out programs.

14        Over the course of his sophomore, junior, and senior

15  years, Will almost always volunteered and always showed up when

16  he said he would, unlike some of the other students who were

17  less reliable.  He always dressed appropriately and interacted

18  with the public in a pleasant and welcoming manner.  He clearly

19  enjoyed staying for the concerts to hear the advanced

20  repertoire that the choir performs.

21        Sometimes when the concerts were held at venues far

22  from his home, Will would walk quite a long distance in order

23  to volunteer.  He would often share his reactions to the

24  concert repertoire with me afterwards and made very astute

25  observations about the variety of musical styles represented.

1           When I learned of Will's arrest and alleged crimes, I

2     was completely stunned, and based on their comments on

3     FaceBook, his friends from the school choral program were

4     equally surprised.  I know from talking with several of them

5     that the teachers at the high school were in total disbelief,

6     as well.

7           I had always experienced him as a gentle soul and had

8     never witnessed any action or gesture that was in any way

9     threatening or violent.  The only anger I had ever seen was

10    frustration with himself.  Compared to most other students, his

11    level of gratitude and manner of expressing it was very sincere

12    and mature.

13          I have been corresponding several times a month with

14    Will for nearly two years, and I believe that he has been

15    increasingly open with me.  I have no reason to believe that he

16    has been dishonest.  I visited him several times at the

17    Cumberland County Prison and once when he was at Camp Hill.

18          I have also spoken with his grandmother on the phone

19    probably at least four times.  And I think it's important to

20    note that she allowed me to come to her home twice, once last

21    winter and once slightly less than two weeks ago when I was

22    preparing these remarks and I wanted to corroborate the things

23    that I was saying that Will had told me.

24          She has validated many of the incidents in Will's

25    family history that he wrote or spoke about to me.  His

1   grandmother is 90 years old.  She lives in her own home on

2   Regal View in North Middleton Township.  Her niece now lives

3   with her.  I found her to be coherent.  She walks with a cane.

4   She maintains her personal hygiene well and looks remarkably

5   young for somebody who is 90 years old.

6          She would answer lots of my questions and tell me some

7   personal stories.  She was not willing to offer a lot of her

8   own personal experience.  But here are some things that I

9   learned that lead me to feel that Will is truly a good person

10  at heart, one that was a victim of abuse himself, someone who

11  made some bad decisions when under tremendous stress, and

12  someone who, in my opinion, is not ultimately a danger to

13  society.

14         Will has told me and his grandmother has confirmed to

15  me that his father violently beat him and his mother.  He felt

16  that he was lucky to have survived some of the abuse.  It

17  wasn't until today that I learned that his mother also was

18  violent with him.

19         Will's grandmother indicated to me on two different

20  occasions that at birth Will had problems that necessitated

21  multiple tubes in his head and kept him at the hospital for two

22  weeks, even though Will was not a premature baby.

23         Will's father seldom, if ever, lived with the family,

24  failed to provide for the family, in his grandmother's words,

25  never put a roof over their head, and was imprisoned more than

1  once, possibly, although I can't confirm this, this is what the

2  grandmother thought, for drug possession or dealing.

3       The seven-year age difference between Will and his

4  next youngest sibling provided enough time for Will to view

5  himself as his mother's protector, and his grandmother

6  corroborated that.

7       Will's father treated him dramatically different than

8  his brothers and sister.  On one occasion at a family reunion,

9  his grandmother remembers Will's father making Will change his

10  seat to sit alone at a distance from the rest of the family

11  during the meal.  Will's grandmother had nothing good to say

12  about Will's father and at one point had been threatened by him

13  herself.

14       Will's most trusted relationship was with his

15  grandfather, whose death in 2001 had a significant negative

16  effect on Will.  Will's grandmother told me that she believes

17  strongly that had his grandfather lived as long as she has,

18  Will would not be in trouble today.

19       Will was expected to keep quiet about the abuse that

20  was occurring, to cover up his own bruises and scars, and

21  according to him, he was sometimes blamed for things he didn't

22  do, but he didn't speak up in order to preserve the family's

23  reputation.

24       He wrote me that he kept quiet out of fear, and these

25  are his direct words, "fear of getting beat, fear of getting my

mom beat up, fear of getting my grandmother in trouble or hurt,
fear of getting taken out of the home or having my siblings
removed from the home, fear of being hospitalized, fear that no
one would believe me, fear of making something out of nothing,
so many things that simply boil down to the fact that I was
young and scared."

Will lived in Carlisle, Harrisburg, and York and then
back to Carlisle.  He attended many different schools.  His
grandmother and I were trying to tally them up, and I think
there were at least seven.  And he did not develop many
friendships.  He was sometimes bullied and picked on and was
sometimes scapegoated for standing up for himself.

I only was aware of one instance of bullying in my
class at the high school when one of the young men in choir hid
Will's jacket.  It was on a day when Will was staying at school
throughout the day into an evening rehearsal and needed to walk
home when the weather was cold and wet after dark.

I didn't discover the prank until the evening of
rehearsal was over and didn't learn what had happened to the
jacket until much later.  We were lucky that there was a hooded
sweatshirt in the lost and found in my room that fit Will so
that he didn't need to face the weather without a jacket, and I
think I may ultimately have taken him home that night.

Will says he learned early on in life to detach
himself from the family drama as a defense mechanism.  He has

1   also told me that he entertained himself at various times in

2   middle school and sometimes in high school by exploring chat

3   rooms on the Internet.  He said that he was curious about what

4   made these people tick.

5          Will's Internet activity was not monitored at home.

6   His grandmother was retired when Will was in high school so was

7   at home most of the time.  She only remembers two or three

8   times when he had any friends come over to the house.  These

9   friends were, in all cases, girls and on a couple of the

10  occasions were on prom night.

11         Will attended the prom at Carlisle High School as a

12  sophomore, a junior, and as a senior.  As a sophomore, he was

13  not really eligible to attend unless he had been asked by an

14  upperclassman, and that was what happened the first time, a

15  girl in the class ahead of him asked him to go to the prom.

16  Two of his prom dates I know were girls from the choir at high

17  school.

18         According to his grandmother, Will frequently cooked

19  dinner for the family, and they sat down together to eat it

20  most nights.  Will volunteered at Victory Circle and at Project

21  SHARE in Carlisle.  These are nonprofit organizations to help

22  the underserved.  He was active in the Educational Theater of

23  Carlisle, in addition to his many musical activities.

24         Will had high hopes of graduating from college and

25  attended Mansfield University for a probationary summer term

1  that immediately followed his high school graduation.  He had a

2  grade point average of 3.767 that term.

3  When his mother suffered severe health problems as a

4  result of seizures in November of Will's freshman year in

5  college, he took a break from college to take charge of her

6  medical decisions and care and ultimately to find two jobs that

7  enabled him to support the family when she had a second round

8  of seizures that have left her brain damaged and permanently in

9  a rehab hospital.

10  Her grandmother -- or his grandmother has visited his

11  mother at the rehab facility in Mechanicsburg and corroborates

12  that she cannot speak, that they actually can get her dressed

13  and sit her up in her chair, and she's not sure whether her

14  daughter recognizes her or not.

15  At age 19, he was responsible for making decisions

16  that would save his mother's life and for supporting a family

17  of five.  He was working 60-plus hours a week seven days a

18  week, working two jobs, one at Amazon and one in the evenings

19  and weekends at the Motel 6.  And he still was trying to handle

20  some coursework from school at home, which ultimately had to be

21  abandoned.

22  Will had assumed more responsibility than most young

23  people from a very young age.  He was accustomed to working

24  hard to make his family situation as good as possible.  He

25  didn't have much practice in asking for help.  He told me that

his father encouraged him to take advantage of public

assistance, but that he had seen his father irresponsibly use

the system and he didn't want to be like that.

It was during this time that Will couldn't handle

stress well, and I'm not sure how much it coincides with the

videos that we have seen or were shown today, but I know that

it led to a chain of bad decisions.  He seemed, when writing to

me about it, confused about how it really did actually all

happen, and he was either not able or possibly too embarrassed

to explain it clearly to me.

From the things he wrote me, it seemed obvious that he

was trying to please the older men with whom he communicated on

the Internet and was not particularly interested in child

pornography for its own sake.

When I started writing to Will, he hadn't heard from

anyone in his family since his arrest.  It was obvious to me

that what mattered to him more than anything else was to get

news of his mother's condition and to know whether his

grandmother and siblings were all right.

I know Will as a caring young man.  I now understand

that he endured many hardships and, as a result, had developed

coping mechanisms that are hard to understand through the

average person's eyes.

But through it all, he kept trying to bounce back.  He

liked to be active, and he liked to help others.  He was

1  polite, kind, and considerate when he wasn't dealing with

2  depression or having a hard time living up to his own

3  expectations.  He is resilient and much of the time is hopeful

4  of making a better life for himself.

5       During the 20 months that we have been corresponding,

6  he has sent me letters of gratitude and well wishes on Mother's

7  Day and on my birthday, a day that usually fell right after the

8  choir's spring concerts, something the choir students had a

9  long tradition of singing to me and giving me cards.

10      I have also received letters from him that reflect

11 hopelessness and depression when he has felt abandoned by the

12 many people he tried to help over the years or when his public

13 defenders were so overloaded that he couldn't communicate with

14 them regularly and wasn't sure he would be adequately

15 represented.

16      Will has always been an achiever.  Even in prison,

17 Will has sought to improve himself.  He reads frequently and

18 writes daily.  He started writing a novel for an inmate writing

19 contest.  He has been very pleased when he has been approved to

20 hold a job, and he says that he tries to exercise whenever his

21 job permits.

22      I send him music theory exercises when I write to him,

23 which he looks forward to receiving.  He doesn't tolerate

24 sitting around and doing nothing very well.  He is a creative

25 person and unfortunately found about the worst possible vehicle

1    for demonstrating his creativity.

2         Will recently wrote me that he had summoned up the
3    courage to request a test for HIV.  He said that he had not
4    known that Ira Task was HIV-positive until after he was
5    arrested.  He was very relieved to discover that his test came
6    out negative.

7         I do not believe that Will is a danger to society.  I
8    am deeply saddened that he hid his history of being abused so
9    well.  Because his father was so seldom mentioned and because
10   Will is such a big guy, it never occurred to those of us in a
11   position to report abuse that he was a victim.  Had his history
12   been known, he could have received the help that he needed that
13   would have prevented this horrible situation.

14        I hope that justice and mercy can combine in
15   determining this young man's future and that Will can receive
16   help and support.  He has so much potential for good.  I know
17   that he is not blameless, but I also know that he was
18   influenced by older adults who were manipulating a curious and
19   susceptible young person who had few adults that showed an
20   interest in him and whom he could trust.

21        I'll end with two quotes from one of his letters in
22   which he was ruminating on all the factors in his life that led
23   him to this point.

24        First, "It's all too much pressure, and with all the
25   secrets in my house, no one can help me put together the

pieces."  And from the same letter, "I'm going to be fine,

that's what I want everyone to know, whether they helped me or

not, talked to me or not, like me or not, I'm going to be all

right, so don't you worry about that.  Things will work out one

way or another."

        Thank you for the opportunity to speak on Will's

behalf.  I know that there are others who could affirm some of

the things that I have mentioned but are fearful of the

repercussions of being involved with a case of this nature.

Thank you.

        THE COURT:  Thank you.

        MS. FREESE:  Next, Your Honor, is Robin Bell.

        MS. BELL:  I'm Robin Bell, R-o-b-i-n B-e-l-l.  I have

known William Chandler Byers Augusta since his birth.  I refer

to him as Chandler.  His mother Kendra and I were best friends

growing up.  We were in the same Girl Scout troop, and we

remained friends all throughout school and college.  She is the

godmother to my daughter.

        I also met Kenny Hunter when I was home from college

on a winter break and briefly had a relationship with him, but

he proved to be unstable, so it was short-lived.

        At an early age, I could tell Chandler was gifted.  I

recall a Christmas when he was about three or four, he received

some type of interactive map, and days later he was able to

name all of the states and their capitals.  He was a quick

1    learner as a toddler, and all throughout his school career he

2    excelled.  He is also a very talented actor and vocalist.

3         It is my belief that things were not always as they

4    appeared in the household.  It always appeared that things were

5    fine, but that was not always the case.  For appearance sake,

6    Chandler was always well dressed.  He had the best of

7    everything, clothes, shoes, toys, and electronics.  He probably

8    had every material thing that any child could ever want or

9    need.

10        I do believe that the family was what would probably

11   be called dysfunctional.  I am aware of mental and physical

12   abuse that went on in the household.  Kendra did not freely

13   admit to some of the abuse, but I was aware of it.  Kendra was

14   always yelling, whether it be at the kids or her parents.  I

15   don't want to paint a bad picture of her since she is unable to

16   defend herself.

17        I do know that her yelling was most likely a learned

18   behavior.  Growing up, her father did a great deal of yelling

19   at her and her mother for no apparent reason or not one that I

20   could see.  My experience as a parent, I find myself mirroring

21   my mother.

22        I also remember on occasions I would talk to Kenny

23   Hunter on the phone during college, and his mother also was

24   yelling in the background expletives and calling them names and

25   the like.  So neither one of them -- you know, this was learned

1    behavior from both of them.

2           I also do know that Kendra did not have the

3    picture-perfect marriage.  I often worried about her safety and

4    advised her to leave on numerous occasions.  I had known of

5    abuse before they were married.  On a trip on New Year's Eve, I

6    had a glimpse of what it was as we were traveling down I-495 to

7    D.C.

8           Kenny kept hitting on Kendra from the backseat and at

9    some point had snapped off one or more of her false

10   fingernails.  I then told her to pull over and for him to get

11   out.  I explained that I was not going to put up with this and

12   that we could easily be killed in an accident on this busy

13   highway.

14          The abuse continued after they were married.  There

15   were several times when she would have me come to the house

16   after an incident, but she really never talked about what had

17   actually happened.  Several times Kenny would take her vehicle

18   and claim that he was never bringing it back.

19          At one point Kenny had won a great deal of money in a

20   lottery, but instead of taking care of his family, he went and

21   bought a Maserati.  I recall on two occasions when I witnessed

22   Kendra beating Chandler.  On both of these occasions, I had to

23   tell her to stop.  This was not what I would describe as

24   discipline.

25          The first was in the living room, and she had him

1    pinned on the floor, and she was beating him, and I had yelled

2    for her to stop.  The second, she had chased him up a hill and

3    was beating him, and I could hear Chandler yelling and

4    screaming and crying, and I had to yell for her to stop at that

5    time.

6           I refused to let my daughter go anywhere with Kendra

7    after a specific incident that happened at a local park when

8    she was about three years old.  When Kendra brought my daughter

9    back home, I noticed that she was acting a little differently,

10   and I asked what was wrong with her.  She seemed to get very

11   upset and proceeded to tell me that Uncle Kenny came to the

12   park and was yelling and grabbing and pushing Aunt Kendra.

13          I immediately called Kendra on the phone and asked her

14   about what went on, and she confirmed what my daughter said was

15   true.  I was very upset that my daughter had to witness

16   something of this nature, but also it further angered me that

17   Kendra did not bring it to my attention, she let my daughter

18   come tell me.  She just dropped my daughter off like nothing

19   had happened.  She had a way of acting like nothing happened or

20   nothing was ever wrong.

21          I would say that when her family started to grow, that

22   we hung out less and less.  I don't ever recall going on any

23   trips with her and all three children.  I believe after her

24   daughter was born, we were together less and less.  We still

25   talked on the phone, but we did not see each other as often.

1        I can honestly say by the time that XXXXX was born, we

2    were only interacting through phone conversations.  I never was

3    around the youngest two as infants, and I was not -- even not

4    aware that she was pregnant until she had the baby.

5        I do know that Chandler always appeared to be

6    withdrawn and quiet, never made much eye contact.  After he

7    grew in size, it always appeared through his mannerisms that he

8    made himself seem small as if he wanted to be unseen.

9        I can't remember any loving family moments as a

10   family, no hugs, kisses, or such.  His father Kenny never

11   seemed to treat him in a loving manner.  He treated him very

12   differently than the other children.

13       Around 2007, Kendra and I had a falling out and we

14   were no longer associated with each other.  I only saw Kendra

15   once in 2008, and that was while I was hospitalized after

16   suffering an aneurysm.  After that, we had little to no

17   contact.

18       I had visited her when she fell ill and was in a coma.

19   She then got better and came home, and we FaceBook messaged a

20   few times regarding my daughter, and after she fell ill again.

21   Thank you.

22           *THE COURT:*  Thank you.

23           *MS. FREESE:*  And lastly, and I'll try and pronounce

24   her name correctly, lastly, Your Honor, is Nichelle Chivis.

25           *MS. CHIVIS:*  Good evening.  My name is Nichelle N,

1    like Nancy, i-c-h-e-l-l-e, Chivis, C-h-i-v, as in victory, i-s.

2            Before I begin my remarks, I want to say and put on

3    the record that Mrs. Parsons, Ms. Bell and I, we did not

4    corroborate our statements in any way, shape, or form.  And I'm

5    saying that because I'm going last, and you're going to hear

6    some -- you're going to see some similarities.  And I just met

7    Mrs. Parsons today.  And I know Ms. Bell, but we don't see each

8    other often at all.

9            I'm the godmother of Mr. Byers Augusta Hunter.  I was

10   there when he was born.  In fact, I saw him before his mother

11   did.  Mr. Byers Augusta Hunter has been forced to endure

12   endless stressful circumstances since his conception.  I'm a

13   firm believer that if a pregnant woman is under tremendous

14   stress, that stress is transferred and felt by the unborn baby.

15           When Mr. Byers Augusta Hunter was born, he did not

16   cry.  His muscles were so tight that there was some speculation

17   that he may have some dystrophy.  As it turned out, he was

18   fine.  He did not cry a lot as a baby, and as he got older,

19   when he would cry, he would often scream with his mouth shut.

20   I always thought that this was odd and attributed it again to

21   the stress his mother was under while she was pregnant and as a

22   new mother.

23           Mr. Byers Augusta Hunter was loved very much by his

24   mother, grandparents, myself, and the extended family.  There

25   was some disagreement about his paternity, hence the hyphenated

1    names, but ultimately it was determined that Kenneth Hunter,

2    Senior, not Ruben Augusta, is his father.

3         Determining paternity was a long and stressful

4    process.  Mr. Byers Augusta Hunter was an unfortunate victim

5    and witness to some of the situations that the adults in his

6    life created.  I never witnessed his father being affectionate

7    with him.  At best, he tolerated him.

8         In my statement, I didn't know if it was going to be

9    submitted or read, but I do have a picture, a family picture

10   attached to it.  And in this picture, you can see that

11   Mr. Byers Augusta Hunter was set apart from his parents and

12   siblings.  His parents are each touching a child, but neither

13   of them is touching him.  This is indicative of how I perceived

14   his family there, present in the home but not engaged.  It is

15   just heartbreaking.

16        Mr. Byers Augusta Hunter has always learned things

17   quickly.  When he applied himself, he was a top-notch student.

18   He was somewhat reticent, but I thought that was just because

19   of some of the instability he experienced at home.  His mother

20   was a very ambitious woman before her health failed.  She was

21   always trying to advance herself professionally and provide for

22   her family.  Changing jobs every few years and changing the

23   schools that Mr. Byers Augusta Hunter attended may have added

24   to the stress at the time.

25        To my knowledge, Mr. Byers Augusta had a stint in a

mental hospital when he was in elementary school.  He may have had another inpatient stay the following year.  Although children do not come into this world with an instruction manual and parents make mistakes, his circumstances, in my opinion, were extremely unusual.

There was domestic violence in the home.  He may have seen and definitely heard his mother's cries.  His mother told me of one occasion his father punched him in the chest to wake him up.  There may have been other occasions where Mr. Byers Augusta was abused, but I did not witness them, nor was I made aware of them.

Mr. Byers Augusta Hunter's status changed from being an only child to gaining a brother and a sister ten months apart in the same calendar year.  A few years later he gained another brother.  A lot of responsibility was placed on Mr. Byers Augusta Hunter as he got older and his mother's health began to deteriorate.

He did not have a stable and consistent male role model in his life after his grandfather passed away.  His mother employed the flight response when faced with the fight or flight paradigm.

She would call the Carlisle Police Department to come calm Mr. Byers Augusta or talk to him after he and his mother would argue about something during his teen years.  He was on juvenile probation and had to attend some sort of court-ordered

1    camp on weekends for a while.  He was medicated unnecessarily.

2            I remember his mother telling me that the doctors were

3    evaluating him for Asperger syndrome.  I do not know what, if

4    anything, ever came from that.  Had a different parenting style

5    been employed, I wholly believe that Mr. Byers Augusta Hunter

6    would not be in this predicament today.

7            I noticed a lot of anger in Mr. Byers Augusta at a

8    young age.  It was very hard to get information out of him.  He

9    witnessed the differences that were made between him and his

10   siblings.  His father showed affection to his siblings but not

11   him.

12           His mother did not have him circumcised, but his

13   younger brothers were.  That may seem like an insignificant

14   difference, but it is a difference that was known, seen, and

15   felt by him for a very long time.  Kids do not like to be

16   different, and he was made to look and feel different.

17           His mother did the very best that she could in most

18   cases but failed as a parent in other cases.  For example, she

19   told me for years that she had Mr. Byers Augusta's name legally

20   corrected.  He has gone by the surname of Hunter for many

21   years.  His high school diploma, admission to college, et

22   cetera, are all under the name of William Chandler Hunter.

23   Apparently she was not truthful with me, because Mr. Byers

24   Augusta, not Mr. Hunter, is incarcerated.

25           Any investigation of Mr. Byers Hunter is incomplete

184

1   unless all known aliases are considered:  William Byers;

2   William Byers, hyphen, Augusta; William Byers Augusta; William

3   Hunter; Chandler Byers; Chandler Byers, hyphen, Augusta;

4   Chandler Byers Augusta; Chandler Hunter; W.C. Byers, hyphen,

5   Augusta.  You see where I'm going with this.  Please don't

6   leave any stone unturned.  There is something in his past that

7   has significantly contributed to him being incarcerated today.

8         Mr. Byers Augusta tends to withdraw and withhold

9   information.  Sometimes he makes very serious statements in a

10  matter-of-fact manner.  When prodded, he will share the

11  information that you need.  I have never known him to tell

12  falsehoods.  He is not being disrespectful or arrogant, it is

13  just how he's accustomed to speaking.

14        It may appear that he has a lack of remorse, but that

15  is not true, either.  He has been downtrodden for so long that

16  he does not possess the ability to share his true feelings

17  about situations immediately.  All of these factors, including

18  his background, lead me to believe that he is not a bad young

19  man, but a very sick and confused young man.

20        I do not believe that he belongs in jail or prison.  I

21  know that he needs help and may only receive that help in the

22  forensic unit of a psychiatric hospital.  As much as I would

23  like to believe that correctional institutions are designed to

24  help inmates become productive members of society upon their

25  release, I understand that reduced staffing and day-to-day

1   costs don't support that ideology.  It is far more economical

2   to simply lock up our young men and throw away the key.

3          Please do not do that to Mr. Byers Augusta Hunter.  He

4   needs help.  He needs help to find that little boy inside of

5   him that had his childhood abruptly canceled through no fault

6   of his own.  He needs to be taught to comprehend exactly what

7   has transpired.

8          Don't be fooled by the man you see here.  He is very

9   much a man-child.  There was obviously a disconnection

10   somewhere in his past that led to the behavior and actions that

11   he is alleged to have committed.  Please invest your resources

12   into uncovering, identifying, and correcting whatever it is

13   that led to the alternative reality that engulfs him like a

14   poisonous bubble.

15          I am afraid that he will be killed in prison, quite

16   honestly.  Please do whatever you can to get him placed in the

17   forensic unit of a mental hospital.

18          I love Mr. William Chandler Byers Augusta Hunter very

19   much.  I do not agree with the crimes he has committed at all,

20   but love you don't just turn off and on because someone does

21   something that you disagree with.  I love him.

22          He has pled guilty to a horrific crime, and he must

23   pay his debt to society.  I am pleading for leniency and

24   redemption for him.  Please do not let his journey end in

25   prison.  He is a talented young man that could offer a lot to

society.  He is academically gifted and possesses a beautiful
singing voice.

He's also a sick young man that needs help.  His
parents failed him in many ways, and that is a big part of why
we are here today.  Please do not compound this devastating
tragedy by failing to get Mr. Byers Augusta Hunter the help
that he needs.  And I thank you for your time.

*THE COURT:*  Thank you.

*MS. FREESE:*  Your Honor, that concludes all of the
individuals who wished to speak on my client's behalf.  I do
have some conclusory remarks.

*THE COURT:*  All right.  We did not make part of the
record the calculations of the probation office.  We should do
that now.  Everyone understands we begin with an offense level
43, criminal history category one, making for a guideline range
of life.

I've received the sentencing memos of both counsel,
and I know that there was one objection that counsel had made
part of the record that we should address at this point.

*MS. FREESE:*  And, Your Honor, you're, I believe,
referencing my request to have a certain portion of the
presentence report removed.

*THE COURT:*  Yes.

*MS. FREESE:*  That is correct, Your Honor, as I
indicated in my objections, and I rest mostly on that.

1    Although we know that BOP policy requires that the presentence

2    investigation report not be disclosed, we also know the

3    reality.  I certainly firsthand know the reality that these

4    documents circulate throughout the prison.

5          I have grave concerns, which actually have been

6    somewhat validated already by a couple of things that have

7    transpired over the last 48 hours at SCI Camp Hill.  My concern

8    is that he is already vulnerable in prison, and I am afraid

9    that he could be killed and that some of the information places

10   him in grave danger.

11         We understand that the court must consider it as part

12   of its 3553(a) analysis, but what I've specifically requested

13   be removed was the detailed chat logs that were recited in the

14   presentence report, on Pages 10 through 14 of the presentence.

15         So based upon that, I ask that it be redacted or

16   removed from the report, fully recognizing that Your Honor, it

17   is appropriate for consideration.

18         *THE COURT:*  All right.  Mr. Berry, do you have a

19   position on this?

20         *MR. BERRY:*  Your Honor, our position is that it is

21   part of the offense conduct.  It is the nature and

22   circumstances.  It was appropriately included in the PSR, and

23   the concerns about his danger can be addressed.  The marshals

24   have the ability to address that, BOP has the ability to

25   address that.

1        And excising portions of the PSR that, you know, will

2   come back many years later to assess what was his original

3   offense, sometimes that's all we have to look at.  And I don't

4   think it's appropriate to be pulling those sorts of things out

5   just because they're particularly heinous and disturbing, so we

6   would ask that it remain in the PSR.

7        *THE COURT:*  Is there any reason why the probation

8   office could not include the chat logs as an addendum to the

9   presentence report, in other words, an attachment?

10       *MR. BERRY:*  I don't have any problem with that.  I

11  just don't like the idea of picking and choosing our facts.

12       *THE COURT:*  Okay.  I'm going to ask that it be

13  rewritten to be made an attachment to the presentence report.

14  And obviously I, unfortunately, have had the opportunity to

15  read the chat logs many times over, so I certainly will

16  consider them and they can be made part of the assignment.

17  Okay?

18       *MS. FREESE:*  Thank you, Your Honor.  Thank you.

19       *THE COURT:*  All right.  Anything else you want to

20  offer on your client's behalf?

21       *MS. FREESE:*  Yes, Your Honor, I do have some

22  conclusory remarks.

23       Well, it's been a long and very difficult day, and,

24  unfortunately, the court has the most difficult task of

25  sentencing Mr. Augusta for horrendous crimes.  I've reviewed

the government's sentencing memorandum many times, and to the extent that they summarize that these crimes would shock the conscience and that it may be the most difficult and worst case that the district has ever seen, I would agree.

The government clearly, in its 41 pages, Your Honor, wants you to see a monster, someone who is not a human being, and for that reason, they seek a life sentence for crimes that my client committed, by their own admission within the sentencing memo, when he himself was a child.

It's undisputed that this conduct occurred, as is cited in the government's own memo, between 2013 and 2015.  It is no coincidence that the indictment in this case cuts off at my client's 18th birthday.  It is the relevant conduct that is cited throughout the government's memo that the court has heard so much about that actually occurred when my client was 15, 16, 17, and 18.

And I'm not asking you, Your Honor, to jump to this conclusion that he was a kid or a juvenile.  The Supreme Court has specifically spoken on how juvenile offenders are to be viewed differently.

Now, the government, of course, and understandably in its interests to advocate, maybe not explicitly but wants the court to basically ignore my client's age as a factor.  In the 41 pages, while there's one reference to another case where a client was -- or where, excuse me, the defendant was 21 years

1    of age, there's really very little reference or focus and

2    there's no response to the defense arguments as to our Supreme

3    Court's rulings in the juvenile life without parole cases.

4           But, Your Honor, this case is different.  My client is

5    a human being.  And the 3553(a) analysis requires the court not

6    just to look at the nature and circumstances of the offense.

7    And, yes, they are appalling.  My client, by his own admission,

8    fully admits to what he's done.  He did so by signing a 25-page

9    admission, something that I, as counsel, have never

10   experienced, signed a 25-page admission that was filed with

11   this court.

12          Other than his initial request for counsel at the time

13   that he was arrested, he's always admitted fully and completely

14   what he's done and the horrific acts that he's committed.  But

15   that's one factor.  That's not the totality of this court's

16   consideration, because the court must also consider the

17   additional history and characteristics of the defendant, which

18   were really, in large part, unaddressed by the government.

19          His youth at the commission of this crime truly sets

20   him apart, not just from his co-defendants, but from the vast

21   majority of sex offenders in this country.  And from the cases

22   I could go through in the government's 41-page memorandum, I

23   pulled out their ages.  These other offenders, they're in their

24   40s, their late 30s, their 50s, their 60s.  They're not 18, 17,

25   16.

1          My client might be 21 today, but this conduct occurred

2     many years ago, several years ago.  As he reports in several --

3     to several places and which I would argue to the court has been

4     substantiated, he became involved in sexualized chat rooms at

5     or about the age of 12 or 13.  The conduct or the subject of

6     this offense occurred just a few years later.

7          Juveniles, Your Honor, are different.  They're

8     different because of status of their brain development and the

9     ability for rehabilitation.  And, again, I don't ask you to

10    assume that fact.  The United States Supreme Court tells you

11    that.  Juvenile lifers cannot -- this is a direct quote from

12    Graham v. Florida -- cannot, with reliability, be classified

13    among the worst offenders.

14         So while the government calls Mr. Augusta the worst of

15    the worst and while the conduct is unbelievable and shocking,

16    the Supreme Court tells us something different.  Juveniles are

17    not mature.  They have an underdeveloped sense of

18    responsibility, and they're more vulnerable and susceptible to

19    negative influences than adults.

20         I'd ask you to go back further.  What type of life did

21    Chandler, William, whatever he was known to certain people,

22    have?  He had a life of chaos and tumult going back to his

23    mother's conception.  His home was a house of horrors.

24         There was a question of paternity.  His mom was a

25    liar, a secretive woman.  His father beat his mother.  His

1    mother and father beat him.  He was punched like a man.  He was

2    deprived at times of food, and at other times he was forced to

3    eat food and then his own vomit.

4         It wasn't just physical abuse.  It was unthinkable

5    emotional abuse.  He was mocked.  When Will was trying to

6    figure out his sexuality, homosexuality, he was ridiculed.  His

7    dad called him a faggot and a shithead and told him to go put

8    his mom's dress on.  He was degraded, he was demeaned, he was

9    isolated.

10        He tried to find friends, as his teacher and as some

11   other people in his life told you, but frankly, he had

12   virtually none.  He sought acceptance, and he sought it in all

13   of the wrong places, in unthinkable ways, and certainly with

14   all of the wrong people.  Your Honor, he tried to hang himself

15   when he was eight years of age and was committed to a

16   psychiatric institute less than two years later.

17        The government somehow questions this abuse, these

18   horrors, and spends much of its time today and in its

19   sentencing memorandum indicating that perhaps my client

20   fabricated this for mitigation purposes.

21        There's argument that Dr. Krueger's conclusions are

22   based exclusively on self-reports of Mr. Augusta that he was

23   sexually abused, and yet Dr. Krueger told us that he denied

24   being sexually abused.  He acknowledged the behavior,

25   acknowledged what he had done and his conversations, what he

1    had done with older men, men that were decades older, but he

2    didn't characterize this as abuse.

3            It is simply untrue that many of these claims and

4    these personal characteristics are not corroborated.  You've

5    heard from a number of sources and we know through school

6    reports, psychiatric and psychological reports, of past suicide

7    attempts and friends and family that these things happened.

8    They're documented throughout his life.  They're not convenient

9    or motivated by an energetic defense attorney.

10           In his teen years, he sought acceptance in sexualized

11   chat rooms, starting out at about age 12.  He was groomed by

12   pedophiles.  He was cyber-sexually abused.  Grown men egged him

13   on, groomed him when he was a child himself.  There's a

14   significant point here, and it's a delicate one, but it's a

15   significant point.

16           The investigation, the forensic evidence recovered by

17   the government in this case, the indictment, never captures the

18   fact that my client was a juvenile that was preyed upon and

19   abused by other older men.  Why do I say that?  Because, of

20   course, it's the government's discretion who they prosecute and

21   who they don't, but no one has really talked about that fact.

22           When my client -- and this is undisputed because the

23   forensic evidence bears it out.  We see cases in this district

24   all the time where the government says the victim is 15, 16,

25   this is a child.  Well, we know from the forensic evidence that

1  my client was also that same child, and he was having sex,

2  talking with, whether it was cyber or live, with 40-, 50-,

3  60-year-old men.  That conduct goes unmentioned.  And it is, I

4  would argue, significant.

5       There is a need here to promote just punishment,

6  afford adequate deterrence, and promote respect for the law.  I

7  couldn't agree more with the government that the punishment

8  should fit the crime, but less than a life sentence for what

9  I'm going to characterize as a juvenile, meaning an individual

10 under 25 years old, with a still-developing brain, can

11 accomplish that.

12      For someone who commits even the most heinous crime,

13 in this case, Mr. Augusta, a sentence of less than life is

14 sufficient but not greater than necessary, and the court must

15 consider the need here for total punishment.

16      Now, the government cites in its memorandum the case

17 of United States v. Goff and urges this court not to impose a

18 sentence, quote, too lenient.  Well, in Goff, Your Honor, the

19 court imposed a four-month sentence for possession of child

20 pornography.  And I would submit that that is entirely

21 unhelpful to the court and not remotely similar to the nature

22 of the crime here.

23      Not once in this memorandum -- and it is a 3553(a)

24 factor that this court consider total punishment.  Mr. Augusta

25 is serving the equivalent of a life sentence that was imposed

by a separate sovereign.  He is serving, in state prison, a
sentence of 45 to 90 years.  If he is paroled at his minimum,
which is the greatest of greatest leaps in this case, he would
be roughly 65 years of age.

If Pennsylvania at the time, depending upon the
politics, the governor, actually would follow the Truth In
Sentencing Act policy and provisions, well, then Mr. Augusta
would be roughly 96 years of age when he's released from
custody on his state sentence.  Mr. Augusta will surely serve
past his minimum for these violent sex crimes.  And this is a
factor, Your Honor, that the court should, and I would argue
must, consider.

With respect to the unwarranted sentencing
disparities, if there's one thing that frankly I've always
thought, but when I look through all of the cases cited by the
government and all of the cases that our office has certainly
experienced, what we know is this:

Each case requires an individualized analysis of the
person who committed the crimes, of the 3553(a) factors.  Like
Mr. Berry and Ms. Taylor could go through and cite ten cases or
maybe even a hundred where a life sentence was imposed for a
heinous crime, I could come up with a hundred more where there
was a significant variance because of an individualized factor.
That is the challenge, frankly, with these types of cases.

In the cases, however -- and I did make every effort

1    to look up many of them.  I pulled dockets and spent hours on

2    PACER pulling up documents from all over the country because I

3    was interested in one thing:  When the court conducted the

4    individualized assessment in any of these cases, were the

5    individuals 16, 17, 18, when they committed the crimes, were

6    they 20, 21, 22.  And the overwhelming majority of the cases I

7    was actually able to pull within 24 hours tell me that, no, the

8    individualized assessment, one of the characteristics there,

9    these defendants were 40, 45, 50.  They were two to three times

10   my client's age at the time that they committed the offenses,

11   and that, Your Honor, is extremely relevant.

12           Even the co-defendants in this case, there is one

13   co-defendant who is very close in age, and that's Matthew

14   Fensler.  And he was -- I believe my spreadsheet reveals he's

15   25 years of age based on his date of birth.  He is the only

16   defendant, even though there's still an age gap, that is

17   similarly situated age-wise.

18           You heard from Dr. Krueger.  And obviously, as to be

19   expected, he's been rigorously cross-examined.  I would argue

20   to Your Honor, though, that he is credible.  He's Harvard

21   educated.  He's the medical director of the Sexual Behavior

22   Clinic, works for the New York Psychiatric Institute, travels

23   the world, educates, and he's been conducting, over the course

24   of his career, really thousands of assessments.

25           And his professional opinion is that my client's

1    attitude towards treatment is positive, that he's bright -- and

2    that's been corroborated through a number of different

3    sources -- he's cooperated, he's motivated, and that he's an

4    excellent candidate for therapy.

5          We recognize, and I think this needs to be mentioned,

6    Your Honor, that there's an emphasis and I would expect an

7    argument to be made that Dr. Krueger is completely incredible

8    based upon his opinion, which frankly I give him credit for,

9    that William could be treated in society.  He wasn't asked to

10   provide any opinion with respect to society's interest on

11   punishment.  Obviously there's a separate interest there.  He's

12   a sex offender counselor, and that was the nature of his

13   evaluation.  He was looking at him for purposes of treatment.

14         He is vulnerable in prison, and it's worth mentioning

15   to the court that his trip to SCI Camp Hill has been absolute

16   hell.  He is in the special housing unit now after being

17   harassed over loudspeakers, not just by correctional officers

18   but by other inmates.  His cellmate was afraid that he was

19   going to be murdered because Will was absolutely viral during

20   this transport for the sentencing proceeding.

21         So this fear that my client has or this concern or

22   opinion that Dr. Krueger has appears to already be manifesting

23   itself.  He didn't particularly have problems at Cumberland

24   County Prison, but as we've discussed, a state prison is a

25   whole different can of worms.

1          He will be -- his home jail, so to speak, is SCI

2     Forest, but the transport that he's experienced here and the

3     circumstances when I saw him in the special housing unit have

4     truly been frightening.  He checked himself into the special

5     housing unit when another inmate came up to him and said, you

6     could be killed tonight or you check yourself in.  And Will

7     wasn't sure what he wanted to do but ultimately decided to

8     check himself in.

9          He's troubled, Your Honor.  He's sick, and he needs

10    treatment.  He has multiple mental health diagnoses, multiple

11    sexual disorders, and, as we know, a still-developing brain.

12    For all of these reasons, Your Honor, we ask you to impose a

13    sentence of a term of years, not to impose a life sentence on

14    Mr. Augusta.

15         I do believe, Your Honor, that this case is remarkable

16    in several ways, and I can't, as his counsel, really honestly

17    agree more with the government in its characterization of the

18    conduct here.  It is absolutely shocking.  But we are asking

19    Your Honor to consider that term of years because we believe

20    that it is sufficient but not greater than necessary.

21         As the presentence report sets forth, such a sentence

22    under Chapter 5 of the guideline range shall run concurrently

23    because he is incarcerated for wholly related conduct.  We ask

24    for that concurrent sentence, to the extent that it doesn't

25    exceed the state sentence, to -- that the court order that it

1    be served in a state correctional institution, as the state

2    does have primary custody.

3            Finally, Your Honor, really, and in summary to what

4    these other witnesses, the few people that my client does have,

5    whom I commend for coming today, I would say this:  He's still

6    a human being.  He's a young man who committed heinous, heinous

7    acts, but he's a person.

8            And the Third Circuit, in a case that was published in

9    2009, which I cited in my memo, Olhovsky, indicated that the

10   court cannot be so appalled by the offense that it loses sight

11   of the offender.  And we're asking Your Honor to do just that,

12   to not be so appalled by this heinous crime and the offense

13   that it loses sight of the human being, William Augusta.  Thank

14   you.

15           THE COURT:  Thank you.  Ms. Freese, is Marienville the

16   proper correctional facility?  Is that where it is?

17           MS. FREESE:  It is in Marienville.

18           THE COURT:  In Marienville.

19           MS. FREESE:  So it's actually the State Correctional

20   Institution at Forest, is the name of the --

21           THE COURT:  At Forest?

22           MS. FREESE:  Yes.  And that's where he's currently

23   designated.

24           THE COURT:  All right.  And you mentioned Mr. Fensler.

25   Do you recall what his sentence was?

1          MS. FREESE:  Your Honor, I do have it right here.  I

2    believe that it was either 35 or 40 years, but I do have that

3    information.

4          THE COURT:  Four twenty I am told.  I had a chart of

5    every single defendant in this case, and I knew what counts

6    they pled to and were charged with.  Some were charged with 10

7    and 13, and I don't remember where --

8          MS. FREESE:  I do have, and this, of course,

9    prepared by our report -- excuse me, by our office, that he

10   received a sentence of 420 months.

11         THE COURT:  And do you have which counts he pled to?

12         MS. FREESE:  I do.  It may be easier if I hand it up

13   to the court.

14         THE COURT:  Okay.  Ten and thirteen was my

15   recollection, but if I could just double-check that.  All

16   right.  This confirms my recollection that the highest sentence

17   was 480 months to date, and that was Casey O'Dell.

18         MS. TAYLOR:  That's correct, Your Honor.

19         THE COURT:  Okay.  Does your client wish to speak?

20         MS. FREESE:  Yes, Your Honor.

21         THE COURT:  All right.

22         THE DEFENDANT:  Never in a billion years did I think

23   I'd be standing in front of a judge for crimes I committed,

24   especially not when they involved hurting my family and the

25   people that I love most.

1        I know that those people aren't here today.  I'm not

2   sure if they'll be able to read any transcripts for this or

3   ever get this message, but I would still like to speak to them,

4   if I may.

5        To XXXXX, I want him to know that none of this was

6   ever his fault.  He didn't deserve any of this.  I am so sorry.

7   There's no excuse for anything that happened.  I was wrong, and

8   there isn't a day that goes by that I don't wish that I could

9   take back the hurt and the pain and the damage that I caused

10  him.  And I just hope that he'll be able to grow up and still

11  have hope for his future.

12       To my goddaughter, I know you're too young to

13  understand what happened.  I just, I hope that you can still

14  grow into being a strong, independent young woman who will make

15  your mother proud, and I know that you will.

16       To her mother, I betrayed a friendship and a level of

17  trust that I know is going to be hard to forgive, but I hope

18  that one day she'll be able to forgive me at some point.

19       To my other brother and sister, XXXXX and XXXXX, I'm

20  sorry.  I know I didn't treat them the way that they deserved

21  to be treated all the time, and they didn't deserve any of

22  this.  I dragged them into my own stupidity, and I hope that

23  one day they'll be able to forgive me.

24       And I also wanted to apologize to my parents.  I mean,

25  I'm sorry for the hurt and the pain and damage that I've caused

1     them throughout not just with this, but everything before this.

2            I know the things that I did have to be punished and

3     should be.  I'm just asking that you don't make me spend the

4     rest of my life in jail, that you give me a chance, a second

5     chance to prove that I'm not the monster and the animal who has

6     done all these things and who all this evidence has brought

7     before you.

8            I just -- I'm asking that you consider giving me a

9     chance to make things right.  That's all I have to say.  Thank

10    you.

11            THE COURT:  Thank you.  For the government.

12            MR. BERRY:  Your Honor, we've heard an awful lot about

13    the defendant, and I just want the court -- I think the court

14    has everything it needs before it.  I'm not going to belabor

15    this point, but the one person that has not really been talked

16    about that much is Victim 1.  And I just want the court to keep

17    that in mind as you think about this sentence.

18            And then I have one housekeeping request that maybe is

19    more appropriate at the end of the sentencing hearing, and that

20    is that the transcript be redacted as to the names of the

21    siblings that Mr. Augusta just referenced on the record.  I

22    think the rest of us did as diligent a job as we could about

23    not saying their names, and I don't fault him at all for

24    bringing their names up.  That's perfectly appropriate.  I just

25    ask that the court reporter redact those names.

1          *MS. FREESE:*  Certainly no objection.

2          *THE COURT:*  Okay.  Counsel, I have considered the

3     3553(a) factors, everything that I have heard from the

4     witnesses, what counsel have said and written.

5          The balancing is, as counsel has noted, a careful one

6     that in a case like this causes the court to have to separate

7     from the serious and horrific offenses that bring this young

8     man before the court and look at the person who stands before

9     the court.

10          He's 21 years old, a high school graduate, a very

11     smart young man who is creative and musically talented.  Like a

12     lot of people who come before the court, he comes from an

13     absolutely chaotic home environment.  He's the product of a

14     stormy, abusive relationship.

15          He's had a little bit more guidance because he's had a

16     grandmother, which we don't see in some of the people who come

17     before the court.  But he does have an abusive mother and a

18     convicted felon for a father, so he didn't start from a good

19     place.

20          He has no criminal history points in spite of that.

21     The trouble that he managed to get himself into in his youth,

22     unlike most of the people who come before the court, was not

23     drug dealing or running the streets, but rather he found a

24     place in chat rooms and quickly went to a very dark place.

25          I don't think we need to go over the events that bring

1    him before the court.  He has a background of violent,

2    assaultive behavior from a young age and a history of acting

3    out on his pedophilic impulses and, unfortunately, victimized

4    his own family member.

5         He's before the court for the production of

6    pornography based on repeated violent sexual assaults against a

7    small child, and as counsel has noted in the writings, the

8    assault was unusually depraved, dehumanizing, heinous, and

9    cruel.

10        I have considered the testimony of his witnesses very

11   carefully.  I note that the government has properly pointed out

12   that a number of the factors that Dr. Krueger used in making

13   the assessments that he did were based on the defendant's own

14   incomplete history, and many of these assessments are quite

15   subjective.

16        I take to heart what counsel has said and written

17   about the youth of this offender.  Much has been written and

18   said about the developing brain and the lack of judgment that

19   we see in people below age 18 that causes them to act in ways

20   that sometimes we do not understand.

21        No matter what age this defendant is, I just find the

22   conduct in this case incomprehensible, as I know everyone here

23   does.  It's particularly aggravated by the fact that adult men

24   were made a party to this conduct.  Strangers assisted in the

25   abuse of this little boy.  Mr. Stamm, who was sentenced only a

1   couple of weeks ago and whose voice we heard on the tapes

2   today, literally terrorizing this little boy in order to get

3   him to submit.

4          I honestly don't know how this young man got to that

5   place, and I don't think anybody here, including Dr. Krueger,

6   could ever explain it to my satisfaction.  It is very

7   difficult, looking at a guideline range sentence of life, to

8   make the determination that no sentence other than a life

9   sentence would meet sentencing objectives.  I'm not prepared to

10  do that here today.

11         I've carefully considered the other defendants in this

12  case, their age, their own culpability, and obviously I must

13  look at sentencing disparity.  As I have pointed out to other

14  counsel, Mr. Augusta is at the very top of the indictment for a

15  reason.  It is his conduct that is the most serious and

16  reprehensible in the case.

17         I note that the other defendants are older and maybe

18  could be arguably a factor in the conduct of Mr. Augusta, but I

19  don't believe that's been borne out by the evidence.  I do not

20  believe that Mr. Augusta was lured into this conduct by adult

21  defendants who egged him on and that but for their

22  encouragement, this offense would not have occurred.

23         I've read the transcripts, and I think that he acted

24  on his own accord.  I think he is wholly culpable for the harm

25  that he's caused here.  I do believe that a sentence below life

1  does satisfy sentencing objectives.

2          Pursuant to the Sentencing Reform Act of 1984, it's

3  the judgment of the court that the defendant, William Chandler

4  Augusta, is hereby committed to the custody of the Bureau of

5  Prisons to be imprisoned for a term of 720 months.

6          This sentence consists of a sentence of 720 months on

7  Count 4; 360 months on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and

8  13; and 240 months on Counts 11 and 12.  All sentences are to

9  run concurrently with each other.

10          The court recommends to the Bureau of Prisons that the

11  State Correctional Institution at Forest or any other facility

12  to which the defendant may be transferred be the place of

13  confinement, thereby making this sentence concurrent with the

14  sentences in Cumberland County Court under Dockets Number 2014,

15  2015, 2934-2015 and 68-2016.

16          It's ordered that the defendant pay to the Clerk, U.S.

17  District Court, a special assessment of $100 on each count for

18  a total of $1300 due immediately.

19          I find that the defendant does not have the ability to

20  pay a fine or additional assessment but order that he make

21  restitution in the amount of $81,891.95 payable to the Clerk,

22  U.S. District Court.

23          Restitution is to be disbursed as follows:  $58,415 to

24  Andy; $5,000 to Pia; $5,000 to Mya; $5,000 to Ava; and $8,000

25  to Cindy.  The payment of interest is waived.

1            Restitution in the amount of $476.95 is owed to the

2    Pennsylvania Victims Compensation Assistance Program, and it's

3    to be paid jointly and severally with restitution imposed or

4    that will be imposed in the cases of Casey O'Dell, Scott Lane,

5    David Sewell, Bruce Edgecombe, Moises Marquez, William Staples,

6    Paul Stamm, Dylan Heatherly, James Reese, Jason Bolden.

7            No further payment is required after the sum of the

8    amounts actually paid by all defendants has fully covered the

9    compensable losses.

10           The defendant shall forfeit to the United States his

11   interest in certain properties described in the charging

12   document.

13           During the term of imprisonment, the restitution is

14   payable every three months in an amount after a telephone

15   allowance equal to 50 percent of the funds deposited into the

16   defendant's inmate trust fund account.

17           When the defendant is released from imprisonment, he

18   shall be placed on supervised release for a term of life on

19   each count to be served concurrently.

20           If he is released, the defendant shall report in

21   person to the probation office in the district to which he is

22   released within 72 hours of his release from the custody of the

23   Bureau of Prisons.

24           While on supervised release, the defendant must not

25   commit any federal, state, or local crime, possess a dangerous

1    weapon, or unlawfully possess a controlled substance.

2         The defendant shall comply with the standard

3    conditions that have been adopted by the court and with the

4    following additional conditions:

5         The defendant shall cooperate in the collection of

6    DNA as directed by the probation officer.

7         The defendant must not have direct contact with any

8    child that he knows or reasonably should know to be under the

9    age of 18 without the permission of the probation officer.

10        If the defendant has direct contact with any child

11   that he knows or reasonably should know to be under the age of

12   18 without the permission of the probation officer, he must

13   report this contact to the probation officer within 24 hours.

14        Direct contact includes written communication,

15   in-person communication, or physical contact.  Direct contact

16   does not include incidental contact during ordinary daily

17   activities in public places.

18        A defendant must not go to or remain at any place

19   where he knows children under the age of 18 are likely to be,

20   including parks, schools, playgrounds, and child care

21   facilities.

22        The defendant must participate in a sex

23   offender-specific assessment.  The defendant must participate

24   in an offense-specific treatment program and follow the rules

25   and regulations of the program.  The probation officer will

1    supervise participation in the program that could include an

2    evaluation and completion of any recommended treatment.

3         The defendant must submit to periodic polygraph

4    testing at the discretion of the probation office as a means to

5    ensure that he is in compliance with the requirements of the

6    supervision and treatment program.

7         The defendant must submit computers or other

8    electronic communications or data storage devices or media to a

9    search.  He must warn any other people who use these computers

10   or devices capable of accessing the Internet that the devices

11   may be subject to searches pursuant to this condition.

12        The defendant must allow the probation officer to

13   install computer monitoring software on any computer he uses.

14   To ensure compliance with computer monitoring, the defendant

15   must allow the probation officer to conduct initial and

16   periodic unannounced searches of any computers subject to

17   computer monitoring.

18        These searches shall be conducted for the purposes of

19   determining whether the computer contains any prohibited data

20   prior to the installation of the monitoring software, to

21   determine whether the monitoring software is functioning

22   effectively after its installation, and to determine whether

23   there have been attempts to circumvent the monitoring software

24   after its installation.  The defendant must warn any other

25   people who use these computers that the computers may be

1   subject to searches pursuant to this condition.

2          The defendant must not communicate or otherwise

3   contact the victim either directly or through anyone else.

4          The defendant must submit his person, property, house,

5   residence, vehicle, papers, computers, other electronic

6   communications or data storage devices or media or office to a

7   search conducted by the U.S. probation officer.

8          Failure to submit to a search may be grounds for

9   revocation of release.  The defendant shall warn any other

10  occupants that the premises may be subject to searches pursuant

11  to this condition.

12         The defendant shall apply all monies received from

13  income tax refunds, lottery winnings, judgments, and/or other

14  anticipated or unexpected financial gains to the outstanding

15  court-ordered financial obligation.

16         The defendant must provide the probation officer with

17  access to any requested financial information and authorize the

18  release of any financial information.  The probation office may

19  share financial information with the United States Attorney's

20  Office.

21         The defendant must not incur new credit charges or

22  open additional lines of credit without the approval of the

23  probation office.

24         In the event that restitution is not paid in full

25  prior to the commencement of supervised release, the defendant

1   shall, as a condition of supervised release, satisfy the amount

2   due in monthly installments of no less than $50 to commence 30

3   days after release from confinement.

4          The court finds the defendant poses a low risk of

5   future substance abuse and therefore suspends the mandatory

6   drug testing requirement.  It's my determination that this

7   sentence is sufficient but not greater than necessary to comply

8   with the provisions set forth in 18, United States Code,

9   Section 3553(a)(2).

10         I have considered all seven factors set forth in the

11  statute.  I recognize that the guidelines, policy statements,

12  and amendments are advisory only.  I find their application

13  reasonable and appropriate.

14         Counsel, there was not a waiver of appellate rights,

15  was there?

16         Mr. Augusta, you do have a right to appeal your

17  conviction if you believe that your guilty plea was somehow

18  unlawful or involuntary or if you think there was some other

19  fundamental defect in the proceedings that you didn't waive by

20  entering a guilty plea.

21         You also have a statutory right to appeal your

22  sentence under certain circumstances, particularly if you think

23  the sentence I impose on you is contrary to law.  With few

24  exceptions, any Notice of Appeal must be filed within 14 days

25  after sentence is imposed on you.

1          If you're not able to pay the costs of an appeal, you

2     can ask the court for leave to appeal in forma pauperis, and if

3     you so request, the Clerk of Court will prepare and file a

4     Notice of Appeal on your behalf.

5          Counsel, there was something else for the record?

6     Mr. Berry?

7          *MR. BERRY:*  Yes, Your Honor.  I've made a terrible,

8     terrible oversight.  In all the other defendants' cases, they

9     all have plea agreements.  We all have agreements about

10    restitution.

11         *THE COURT:*  Okay.

12         *MR. BERRY:*  Particularly for Victim 1.  So my

13    oversight is not noticing in the PSR that there was no

14    restitution for Victim 1 in this case.

15         What I would ask the court to do is give me 90 days,

16    which the guidelines permit, for restitution to -- from

17    sentencing we can do an additional 90 days to deal with the

18    restitution issue.  And Ms. Freese and the government can

19    hopefully work out an agreement on what that issue is, and, if

20    not, we will litigate what the appropriate restitution amount

21    would be for Victim 1.

22         But I would be completely derelict in my duty if I

23    didn't try to get restitution for Victim 1 from this defendant

24    in particular.

25         *THE COURT:*  Okay.  Ms. Freese.

1          MS. FREESE:  Yes, Your Honor, under all of the

2    circumstances, we understand.  We don't have an objection to

3    the request.

4          THE COURT:  All right.  Is there anything else for the

5    record?

6          MS. FREESE:  I don't believe so, Your Honor.  I

7    believe that concludes it.  Thank you very much.

8          THE COURT:  Thank you, counsel.

9          COURTROOM DEPUTY:  Court is adjourned.

10       (Whereupon, the proceedings were adjourned at 5:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4        I, Lori A. Shuey, Federal Certified Realtime Reporter, in

5   and for the United States District Court for the Middle

6   District of Pennsylvania, do hereby certify that pursuant to

7   Section 753, Title 28, United States Code, that the foregoing

8   is a true and correct transcript of the stenographically

9   reported proceedings held in the above-captioned matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12       Dated in Harrisburg, Pennsylvania, this 31st day of

13  December, 2017.

14

15                         **/s/ Lori A. Shuey**
                           Lori A. Shuey
16                         Federal Certified Realtime Reporter

17

18

19

20

21

22

23

24

25